## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **APPROACH RESOURCES INC.,** *et al.*, | § | **Case No. 19-36444 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

## DISCLOSURE STATEMENT IN SUPPORT OF AMENDED JOINT PLAN OF LIQUIDATION OF APPROACH RESOURCES INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

### DATED: NOVEMBER 12, 2020[2]

**THOMPSON & KNIGHT LLP**
David M. Bennett
State Bar No. 02139600
Email: david.bennett@tklaw.com
1722 Routh St., Suite 1500
Dallas, TX 75201
Telephone:  (214) 969-1700
Facsimile:  (214) 969-1751

**THOMPSON & KNIGHT LLP**
Demetra Liggins
State Bar No. 24026844
Email: demetra.liggins@tklaw.com
Anthony F. Pirraglia
State Bar No. 24103017
Email: anthony.pirraglia@tklaw.com
811 Main Street, Suite 2500
Houston, TX 77002
Telephone:  (713) 654-8111
Facsimile:  (713) 654-1871

**COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Approach Resources Inc. (4817); Approach Midstream Holdings LLC (4122); Approach Oil & Gas Inc. (7957); Approach Operating, LLC (1981); Approach Delaware, LLC (7483); Approach Services, LLC (3806); and Approach Resources I, LP (5316).  The Debtors' mailing address is One Ridgmar Centre, 6500 West Freeway, Suite 900, Fort Worth, Texas 76116.

[2] All capitalized terms not defined herein shall have their meanings as set forth in the Plan (defined below).  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

**THE DEADLINE TO VOTE ON THE PLAN IS <u>DECEMBER 11, 2020 at 4:00 PM</u> <u>(PREVAILING CENTRAL TIME)</u>.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY EPIQ CORPORATE RESTRUCTURING, LLC, ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

The Debtors are providing the information in this Disclosure Statement to Holders of Claims and Interests entitled to vote for purposes of soliciting votes to accept or reject the *Amended Joint Plan of Liquidation of Approach Resources Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, which is attached as **Exhibit A**.  Nothing in this Disclosure Statement may be relied upon or used by any Person for any other purpose.  Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement, including the risk factors described in Article VIII herein.

The Plan is supported by the Debtors and certain parties-in-interest, including the Debtors' pre-petition secured lenders.  The Debtors urge Holders of Claims or Interests whose votes are being solicited to vote to accept the Plan.

The Debtors urge each Holder of a Claim or Interest entitled to vote on the Plan to consult with their own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement and the Plan and the transactions contemplated therein.  Furthermore, the Bankruptcy Court's approval of the adequacy of the information contained in this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein, an endorsement by the Bankruptcy Court of the merits of the Plan, or the Bankruptcy Court's approval of the Plan.

This Disclosure Statement contains, among other things, a summary of the Plan, financial information, and other documents annexed to this Disclosure Statement, certain statutory provisions, and certain anticipated events that may come about as a result of, or in connection with, the Cases.  Summaries of some or all of the annexed documents and statutory provisions are provided to assist you in your understanding of the Debtors.  Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents or statutory provisions or every detail of such anticipated events.  In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes.  Factual information contained in this Disclosure Statement has been provided by the Debtors' management or financial advisors, except where otherwise specifically noted.  The Debtors do not make any representation or warranty regarding the accuracy or completeness of the information contained herein or attached hereto.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records, some of the Debtors' public filings made with the Securities and

Exchange Commission (the "SEC") (all of which such filings can be found on https://www.sec.gov/) and on various assumptions regarding the Debtors' businesses and the larger current economic climate to the extent that it affects the Debtors' businesses. Although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, the Debtors make no representations or warranties as to the accuracy of the financial information contained herein or the assumptions regarding the Debtors' businesses and the businesses' future results and operations. The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein, which statements speak only as of the date hereof. This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver.

The Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events, or otherwise. Holders of Claims or Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was filed. Information contained herein is subject to completion, modification, or amendment. The Debtors reserve the right to file an amended or modified plan and related disclosure statement from time to time.

The Debtors have not authorized any entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims or Interests (including those Holders of Claims or Interests who do not submit ballots to accept or reject the Plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the provisions therein.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article XII of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions that are required for the Effective Date to occur, pursuant to the Plan, will be satisfied (or waived).

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws. This Disclosure Statement has not been approved or disapproved by the SEC or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure

Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors, unless explicitly provided otherwise.

[*remainder of page intentionally left blank*]

# TABLE OF CONTENTS

ARTICLE I INTRODUCTION .................................................................................................. 1

ARTICLE II SUMMARY OF PROPOSED DISTRIBUTIONS.................................................. 1

    **A.**    Plan Overview.......................................................................................................1

    **B.**    Classification of Claims and Interests..................................................................1

    **C.**    Treatment of Claims and Interests .......................................................................2

            **(i)**    Priority Non-Tax Claims.......................................................... 4

            **(ii)**    Prepetition Secured Claims....................................................... 5

            **(iii)**    Miscellaneous Secured Claims ................................................ 6

            **(iv)**    Class 4 GUC Claims ................................................................ 6

            **(v)**    Intercompany Claims ............................................................... 7

            **(vi)**    Interests ................................................................................... 7

ARTICLE III SUMMARY OF KEY PLAN PROVISIONS....................................................... 7

    **A.**    Sources of Cash for Distributions........................................................................7

    **B.**    Plan Funding ........................................................................................................7

    **C.**    Application of Available Cash...............................................................................7

            **(i)**    Payment of DIP Facility Claims and Prepetition Secured Claims/Funding of Post-Effective Date Agent Professional Retainers ................................. 7

            **(ii)**    Professional Fee Claims Reserve and Budgeted Claims Reserve Funding 8

            **(iii)**    Gift Reserve Funding .............................................................. 8

    **D.**    Retained Causes of Action....................................................................................8

    **E.**    Vesting of Assets in the Post-Effective Date Debtors ..........................................8

    **F.**    Corporate Form ....................................................................................................9

    **G.**    Officers and Directors..........................................................................................9

    **H.**    Corporate Existence .............................................................................................9

    **I.**    Cancellation of Notes, Instruments, Certificates, and Other Documents .............9

    **J.**    Authorization for Transactions...........................................................................11

    **K.**    Preservation of Rights of Action; Settlement .....................................................11

    **L.**    Employee Benefit Plans......................................................................................12

    **M.**    Effectuating Documents......................................................................................12

    **N.**    Exemption from Certain Transfer Taxes.............................................................12

    **O.**    Plan Administrator Closing of the Chapter 11 Cases .........................................13

    **P.**    The Plan Administrator Agreement ....................................................................13

    **Q.**    The Plan Administrator.......................................................................................13

    **R.**    Retention of Professionals ..................................................................................13

    **S.**    Compensation of the Plan Administrator............................................................14

    **T.**    Liability; Indemnification...................................................................................14

    **U.**    Powers and Duties of the Plan Administrator.....................................................14

    **V.**    Distribution Procedures......................................................................................16

    **W.**    Termination.........................................................................................................17

    **X.**    Timing and Delivery of Distributions.................................................................17

    **Y.**    Method of Cash Distributions.............................................................................17

    **Z.**    Compliance with Tax Requirements...................................................................17

| | | |
|---|---|---|
| **AA.** | Distribution Record Date | 18 |
| **BB.** | Date of Distributions on Account of Allowed Claims | 18 |
| **CC.** | No Distributions Pending Allowance | 18 |
| **DD.** | Undeliverable Distribution Reserve | 18 |
| **EE.** | Budgeted Claims Reserve Distribution | 19 |
| **FF.** | Gift Reserve Distribution | 19 |
| **GG.** | Post-Effective Date Agent Professional Retainers | 19 |
| **HH.** | Professional Fee Claims Reserve Distribution | 20 |
| **II.** | Assumption/Rejection | 20 |

| | | | |
|---|---|---|---|
| | **(i)** | Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases | 20 |
| | **(ii)** | Cure Amounts | 21 |
| | **(iii)** | Insurance Policies | 22 |
| | **(iv)** | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 22 |
| | **(v)** | Reservation of Rights | 22 |
| | **(vi)** | Nonoccurrence of Effective Date | 22 |

| | | |
|---|---|---|
| **JJ.** | Expunging of Certain Claims | 23 |
| **KK.** | Objections to Claims | 23 |

| | | | |
|---|---|---|---|
| | **(i)** | Authority | 23 |
| | **(ii)** | Claim Objection Deadline | 23 |

| | | |
|---|---|---|
| **LL.** | Estimation of Claims | 23 |
| **MM.** | Reduction of Claims | 24 |

**ARTICLE IV QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN** .................................................................. 24

| | | |
|---|---|---|
| **A.** | What is chapter 11? | 24 |
| **B.** | Why are the Debtors sending me this Disclosure Statement? | 24 |
| **C.** | Am I entitled to vote on the Plan? | 25 |
| **D.** | What will I receive from the Debtors if the Plan is consummated? | 25 |
| **E.** | What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, or Professional Fee Claim? | 25 |

| | | | |
|---|---|---|---|
| | **(i)** | Administrative Claims | 25 |
| | **(ii)** | Priority Tax Claims | 26 |
| | **(iii)** | Professional Fee Claims | 26 |
| | **(iv)** | Statutory Fees | 27 |

| | | |
|---|---|---|
| **F.** | When will I receive a distribution on account of my Allowed Claim or Interest? | 27 |
| **G.** | How will I receive a distribution on account of my Allowed Claim or Interest? | 27 |
| **H.** | What impact does the Bar Date have on my Claim? | 27 |
| **I.** | Are any regulatory approvals required to consummate the Plan? | 28 |
| **J.** | What happens to my recovery if the Plan is not confirmed or does not go effective? | 28 |

**K.**    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" ............................................................29

**L.**    Is there potential litigation related to the Plan? ..........................................30

**M.**    Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed Unsecured Claims Entitled to Vote under the Plan? .............................................................................................................30

**N.**    How will the preservation of certain Causes of Action affect my recovery under the Plan? ...........................................................................................30

**O.**    What is the deadline to vote on the Plan? ....................................................31

**P.**    How do I vote for or against the Plan? .........................................................31

**Q.**    Why is the Bankruptcy Court holding a Confirmation Hearing? ..................31

**R.**    When is the Confirmation Hearing set to occur? .........................................31

**S.**    What is the purpose of the Confirmation Order? ..........................................31

**T.**    What is the effect of the Plan on the Debtors' ongoing businesses? .............32

**U.**    Can the Debtors amend or modify the Plan? ...............................................32

**V.**    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ...............................................................32

**W.**    Do the Debtors recommend voting in favor of the Plan? ..............................33

**X.**    Who Does Not Support the Plan? .................................................................33

ARTICLE V THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ......................................................................................................33

**A.**    Overview of the Debtors' Business .............................................................33

**B.**    Corporate History ........................................................................................34

**C.**    The Debtors' Assets and Operations ............................................................35

**D.**    The Debtors' Prepetition Capital Structure ..................................................35

    **(i)**    Senior Secured Credit Facility .........................................................36

    **(ii)**    7.00% Senior Notes ..........................................................................36

    **(iii)**    Common Stock ..................................................................................37

**E.**    Events Leading to Chapter 11 .....................................................................37

    **(i)**    Market Decline and Challenges Faced by the Debtors .......................37

    **(ii)**    Operational Initiatives ......................................................................38

    **(iii)**    Cost Management Initiatives .............................................................39

    **(iv)**    Financial Management ......................................................................40

    **(v)**    Engagement of Restructuring Advisors to Assist the Debtors .............40

    **(vi)**    Appointment of Special Committee ...................................................41

    **(vii)**    Discussions with Stakeholders ..........................................................41

ARTICLE VI KEY EVENTS IN THESE CASES ..............................................................42

**A.**    First Day Relief ...........................................................................................42

**B.**    Other Procedural and Administrative Motions .............................................44

**C.**    DIP Financing and Use of Cash Collateral ..................................................44

**D.**    Retention of Professionals by the Debtors ...................................................46

**E.**    Employee Compensation Plans ....................................................................47

**F.**    Monthly Operating Reports ................................................49

    As required by Bankruptcy Rule 2015 and in accordance with the guidelines set
forth by the Office of the U.S. Trustee, the Debtors have filed monthly
operating reports at Dkt. Nos. 240, 280, 350, 436, 474, 495, and 573
(collectively, the "Monthly Operating Reports"), which Monthly
Operating Reports are incorporated fully herein by reference................49

**G.**    Schedules and Statements ...............................................49

**H.**    Denial of Request for Appointment of Equity Committee ....................49

**I.**    Sublease Motion.........................................................50

**J.**    Pfluger Lease Amendment................................................50

**K.**    Alpine Transaction......................................................50

    **(i)**    Bid Procedures ..............................................50

    **(ii)**    Stalking Horse ..............................................50

    **(iii)**    The Alpine Sale Hearing......................................51

    **(iv)**    Alpine's Termination Notice ..................................51

    **(v)**    Motions to Compel and Related Settlement .......................52

**L.**    Zarvona Transaction ...................................................52

    **(i)**    Renewed Marketing Process....................................52

    **(ii)**    Zarvona Sale Hearing ........................................53

**M.**    Adequate Protection Motions.............................................53

**N.**    Exclusive Period for Filing a Plan and Soliciting Votes.....................54

**O.**    Litigation Matters......................................................54

    **(i)**    Prepetition Litigation ......................................54

    **(ii)**    Postpetition Litigation .....................................55

    **(iii)**    Litigation Not Yet Commenced .................................55

ARTICLE VII EFFECT OF THE PLAN ON CLAIMS AND INTERESTS...........................55

**A.**    Compromise and Settlements .............................................55

**B.**    Satisfaction of Claims .................................................56

**C.**    Releases...............................................................56

    **(i)**    Releases by Debtors and Estates...............................56

    **(ii)**    Releases by Lender Parties. ..................................57

    **(iii)**    Releases by Releasing Parties.................................58

    **(iv)**    Injunction Related to Releases................................59

    **(v)**    Deemed Consent. .............................................60

    **(vi)**    Plan Obligations. ...........................................60

**D.**    Exculpation ...........................................................60

**E.**    Permanent Injunction ..................................................60

**F.**    No Waiver..............................................................62

**G.**    Bankruptcy Rule 3016 Compliance. ......................................62

**H.**    Integral to Plan.......................................................62

**I.**    Setoffs ...............................................................62

**J.**    Recoupment ............................................................63

**K.**    Release of Liens ......................................................63

**L.**　　Good Faith ........................................................................................................63

ARTICLE VIII RISK FACTORS ............................................................................. 63

**A.**　　Bankruptcy Law Considerations.......................................................................64

　　**(i)**　　Parties in Interest May Object to the Plan's Classification of Claims and Interests.................................................................................... 64

　　**(ii)**　　The Conditions Precedent to the Effective Date of the Plan May Not Occur.......................................................................................... 64

　　**(iii)**　　The Debtors May Fail to Satisfy Voting Requirements........................... 64

　　**(iv)**　　The Debtors May Not Be Able to Secure Confirmation of the Plan. ....... 64

　　**(v)**　　Nonconsensual Confirmation................................................................. 65

　　**(vi)**　　These Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code. .................................................................... 65

　　**(vii)**　　The Debtors May Object to the Amount or Classification of a Claim. .... 66

　　**(viii)**　　Risk of Non-Occurrence of the Effective Date........................................ 66

　　**(ix)**　　Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan................................................................................. 66

　　**(x)**　　Releases, Injunctions, and Exculpations Provisions May Not Be Approved ...................................................................................... 66

**B.**　　Risks Associated with Forward-Looking Statements ...........................................67

　　**(i)**　　The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.................................................................................... 67

　　**(ii)**　　Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary. ................................................................ 67

ARTICLE IX SOLICITATION AND VOTING PROCEDURES ............................................ 67

**A.**　　Holders of Claims or Interests Entitled to Vote on the Plan..................................68

**B.**　　Voting Record Date .........................................................................................68

**C.**　　Voting on the Plan ...........................................................................................68

**D.**　　Ballots Not Counted.........................................................................................69

**E.**　　Votes Solicited in Good Faith ...........................................................................70

ARTICLE X CONFIRMATION OF THE PLAN ........................................................... 70

**A.**　　Joint Plan.......................................................................................................70

**B.**　　Requirements for Confirmation of the Plan........................................................70

**C.**　　Best Interests of Creditors/Liquidation Analysis ................................................71

**D.**　　Feasibility.......................................................................................................71

**E.**　　Acceptance by Impaired Classes .......................................................................71

**F.**　　Confirmation Without Acceptance by All Impaired Classes..................................72

　　**(i)**　　No Unfair Discrimination ...................................................................... 72

　　**(ii)**　　Fair and Equitable Test .......................................................................... 72

ARTICLE XI CERTAIN UNITED STATES FEDERAL INCOME TAX  CONSEQUENCES

OF THE PLAN ........................................................................................................ 73

    **A.**    Introduction ..............................................................................................73
    **B.**    Certain U.S. Federal Income Tax Consequences to the Debtor ...........................74
    **C.**    Certain U.S. Federal Income Tax Consequences to the U.S. Holders ..................75

ARTICLE XII RECOMMENDATION ......................................................................... 78

## EXHIBITS

Exhibit A: The Plan

Exhibit B: Liquidation Analysis

Exhibit C: Disclosure Statement Order

Exhibit D: Wind-Down Budget

Exhibit E: List of Retained Causes of Action

## ARTICLE I
## INTRODUCTION

Approach Resources Inc. and its debtor affiliates, as debtors and debtors in possession in these jointly-administered Cases (collectively, the "Debtors" or the "Company"), submit this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against, and Interests in, the Debtors in connection with the solicitation of votes for acceptance of the *Joint Plan of Liquidation of Approach Resources Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 643], as amended by the *Amended Joint Plan of Liquidation of Approach Resources Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 661] (as amended, supplemented, and modified from time to time, the "Plan").  A copy of the Plan is attached as **Exhibit A** and incorporated herein by reference.

Contemporaneously with the filing of the Plan and this Disclosure Statement, the Debtors filed their *Motion of Debtors for Entry of an Order (i) Approving Proposed Disclosure Statement on a Conditional Basis; (ii) Establishing Solicitation and Voting Procedures; (iii) Scheduling a Combined Hearing to Approve the Disclosure Statement on a Final Basis and Confirm the Plan; (iv) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; and (v) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases* [Dkt. No. 645] (the "Disclosure Statement Motion").

During the course of these Cases, the Debtors have engaged in extensive negotiations with the Lender Parties.  In particular, the Debtors consulted with the Agent regarding the terms and provisions of the Plan.  The Agent has indicated that the Lender Parties support confirmation of the Plan.

## ARTICLE II
## SUMMARY OF PROPOSED DISTRIBUTIONS

### A.     Plan Overview

As described in more detail below, on September 30, 2020, the Debtors closed the sale of substantially all of their assets to the Purchaser pursuant to the Sale Order.  The Plan, among other things, appoints a Plan Administrator to, among other things, wind down the Debtors' limited remaining operations and distribute the remaining proceeds of the Debtors' assets in the manner specified in the Plan.  Under the Plan, a Plan Administrator will be appointed to oversee the Wind Down and to resolve and compromise Claims.  The Plan provides that the Plan Administrator shall, subject to the Agent's consent, complete the winding up of the Debtors as expeditiously as practicable under applicable law, and empowers and directs the Plan Administrator to take such actions as may be necessary to effect the dissolution of the Debtors.

### B.     Classification of Claims and Interests

The following table designates the Classes of Claims against, and Interests in, the Debtors and specifies which of those Classes and Interest are (i) Impaired or Unimpaired by the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) deemed to accept or reject the Plan.

| Class | Impairment | Entitled to Vote |
|---|---|---|
| Class 1 – Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 – Prepetition Secured Claims | Impaired | Yes (Entitled to vote to accept or reject) |
| Class 3 – Miscellaneous Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 4 – Class 4 GUC Claims | Impaired | Yes (Entitled to vote to accept or reject) |
| Class 5 – Intercompany Claims | Impaired | No (Deemed to reject) |
| Class 6 – Interests | Impaired | No (Deemed to reject) |

**C.    Treatment of Claims and Interests**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and satisfy the conditions necessary to obtain Consummation of the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN AND THE RISK FACTORS DESCRIBED BELOW.  THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR A REVIEW OF THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY.  FOR CERTAIN CLASSES OF CLAIMS, THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT THAN THE ESTIMATED AMOUNTS SHOWN IN THE TABLE BELOW.**

| Class | Summary of Treatment | Estimated Allowed Amount of Claims | Approximate Recovery |
|---|---|---|---|
| Class 1 – Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Class 1 Claim has agreed to a different treatment, each such Holder shall receive at the election of the Plan Administrator (subject to the Agent's consent), (a) Cash equal to the amount of such Allowed Claim, in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter); and (ii) 30 days after the date such Claim becomes an Allowed Claim in Class 1 (or as soon as reasonably | $0.00 | 100% |

| Class | Summary of Treatment | Estimated Allowed Amount of Claims | Approximate Recovery |
|---|---|---|---|
| | practicable thereafter); and (b) such other treatment agreed to by the Plan Administrator (subject to the Agent's consent) required to render such Allowed Claims Unimpaired pursuant to section 1124 of the Bankruptcy Code. | | |
| Class 2 – Prepetition Secured Claims | The Prepetition Agent shall receive, on behalf of the Holders of the Prepetition Secured Claims: (a) on the Effective Date, from the Debtors, following payment of the DIP Facility Claims in full, all Available Cash, up to an amount necessary to satisfy the Prepetition Secured Claims in full, except for any portion of such Available Cash transferred by the Debtors to fund the Post-Effective Date Agent Professional Retainers and the Wind-Down Budget to fund (i) the Budgeted Claims Reserve, (ii) the Professional Fee Claims Reserve, and (iii) the Gift Reserve; and (b) beginning on the first calendar quarter following the Effective Date, and continuing on at least a quarterly basis thereafter, the Plan Administrator shall pay all Available Cash in excess of the amounts in the Distribution Reserve Accounts then remaining to be paid in accordance with the Wind-Down Budget, up to an amount necessary to satisfy the Prepetition Secured Claims in full. All Assets vesting in the Post-Effective Date Debtors, other than Available Cash transferred to the Gift Reserve and the Professional Fee Claims Reserve, shall be subject to the Liens of the Prepetition Agent; _provided, however_, that such Liens shall be retained for defensive purposes only to entitle the Prepetition Agent to enforce the Distribution and other terms of the Plan; _provided, further, however_, that the Prepetition Agent shall not foreclose upon such retained Liens unless a Final Order is entered finding that (i) a Plan Default occurred (including if any collateral is sought to be used in a manner inconsistent with the Plan) and (ii) such default was not cured in accordance with the Plan. | $307,418,000[3] | 27.5%[4] |
| Class 3 – Miscellaneous | On or as soon as reasonably practicable after the latest to occur of (a) the Effective Date; and (b) the date on which each such Miscellaneous Secured Claim | $0.00 | 100% |

[3] As described further below, the Holders of the Prepetition Secured Claims received an adequate protection payment upon the closing of the sale of substantially all of the Debtors' assets to Zarvona. Accordingly, a portion of the Prepetition Secured Claims have already been paid. For the purpose of showing the total amount of the Prepetition Secured Claims in this chart, however, such payment has not been subtracted from the total amount of the Prepetition Secured Claims listed in the chart above.

[4] As described further below, the Holders of the Prepetition Secured Claims received an adequate protection payment upon the closing of the sale of substantially all of the Debtors' assets to Zarvona. For the purpose of showing such Holders' approximate aggregate recovery in these Cases, the Debtors have included such payment when calculating the projected recovery above.

| Class | Summary of Treatment | Estimated Allowed Amount of Claims | Approximate Recovery |
|---|---|---|---|
| Secured Claims | becomes an Allowed Claim, each Holder of such an Allowed Miscellaneous Secured Claim, if any, shall receive, in satisfaction, settlement, and release of such Claim, at the election of the Plan Administrator with the Agent's consent, (i) such treatment in accordance with section 1124 of the Bankruptcy Code as may be determined by the Bankruptcy Court; (ii) payment in full, in Cash, of such Claim; (iii) satisfaction of any such Claim by delivering the collateral securing any such Claims and paying any interest fees, costs and/or expense required to be paid under section 506(b) of the Bankruptcy Code; or (iv) providing such Holder with such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court. | | |
| Class 4 – Class 4 GUC Claims | Each Holder of an Allowed Class 4 GUC Claim shall receive, as soon as reasonably practicable after the Effective Date, in full and final satisfaction, settlement and release of and in exchange for such Claim, its Pro Rata share of (i) the Gift Reserve,[5] following payment of all other Claims and other amounts entitled to receive payment from the Gift Reserve under the Plan, and (ii) following the indefeasible payment in full of all Prepetition Secured Claims, all remaining Available Cash. | $92,471,000 | 1.84-1.95% |
| Class 5 – Intercompany Claims | On the Effective Date, each Intercompany Claim shall be, cancelled, released, and extinguished, and will be of no further force or effect, nor entitled to receive any Distribution on account of such Intercompany Claims | - | 0% |
| Class 6 – Interests | All of the Class 6 Interests outstanding as of the Effective Date shall be eliminated, extinguished, and cancelled.  Holders of Interests shall not be entitled to, nor shall they receive, any Distribution or retain any property or interest in property on account of such Interests. | - | 0% |

**(i)     Priority Non-Tax Claims**

Classification:  Class 1 consists of the Allowed Priority Non-Tax Claims.

Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 1 has agreed in writing with the Debtors or Plan Administrator (subject to the Agent's consent) to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 1 shall receive, on account of, and in full, final, and complete satisfaction, settlement, release, and discharge of and in exchange for, such Claim, at the election of the Plan Administrator (subject to the Agent's consent), (a) Cash equal to the amount of such Allowed Claims in Class 1, in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (i) the Effective Date

---

[5] The Gift Reserve is the Distribution Reserve Account established to hold the $1.8 million Gifted Amount.

(or as soon as reasonably practicable thereafter); and (ii) 30 days after the date such Claim in Class 1 becomes an Allowed Claim in Class 1 (or as soon as reasonably practicable thereafter); and (b) such other treatment agreed to by the Plan Administrator, subject to the consent of the Agent, required to render such Allowed Claims in Class 1 Unimpaired pursuant to section 1124 of the Bankruptcy Code.  Cash payments of Allowed Claims in Class 1 shall be paid from the Budgeted Claims Reserve; *provided, however*, that all Allowed Claims in Class 1 that are not Budgeted Expenses shall instead be paid from the Gift Reserve.

<u>Voting</u>: Claims in Class 1 are Unimpaired.  The Holders of Claims in Class 1 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, shall not be entitled to vote to accept or reject the Plan.

**(ii)      Prepetition Secured Claims**

<u>Classification</u>:  Class 2 consists of the Allowed Prepetition Secured Claims.

<u>Allowance</u>:  The Prepetition Secured Claims shall be (a) deemed Allowed in the amount of (i) $297,026,070.00 of unpaid principal, plus all interest, fees, costs, charges, and expenses due and owing pursuant to the terms of the Prepetition Secured Financing Documents and the DIP Orders *less* (ii) any amounts paid pursuant to the Sale Order, and (b) secured by a valid, binding, and perfected security interest in and to the properties and Assets of the Debtors pledged under the Prepetition Secured Financing Documents and as set forth in the DIP Orders.

<u>Treatment</u>:  The Prepetition Agent shall receive, on behalf of the Holders of the Prepetition Secured Claims:

(1)      on the Effective Date, from the Debtors, following payment of the DIP Facility Claims in full, all Available Cash, up to an amount necessary to satisfy the Prepetition Secured Claims in full, except for any portion of such Available Cash transferred by the Debtors to fund the Post-Effective Date Agent Professional Retainers and such Available Cash transferred by the Debtors or the Plan Administrator pursuant to the Wind-Down Budget to fund (i) the Budgeted Claims Reserve, (ii) the Professional Fee Claims Reserve, and (iii) the Gift Reserve; and

(2)      beginning on the first calendar quarter following the Effective Date, and continuing on at least a quarterly basis thereafter, the Plan Administrator shall pay all Available Cash in excess of the amounts in the Distribution Reserve Accounts then remaining to be paid in accordance with the Wind-Down Budget, up to an amount necessary to satisfy the Prepetition Secured Claims in full.

For the avoidance of doubt, unless and until the Allowed Prepetition Secured Claims are satisfied in full, except with respect to (i) amounts payable under the Wind-Down Budget and (ii) Available Cash transferred to the Gift Reserve, all Available Cash resulting from the liquidation of Assets shall be distributed to the Holders of Allowed Prepetition Secured Claims. All Assets vesting in the Post-Effective Date Debtors, other than Available Cash transferred to the Gift Reserve and the Professional Fee Claims Reserve, shall be subject to the Liens of the Prepetition Agent; *provided, however*, that such Liens shall be retained for defensive purposes only to entitle the Prepetition Agent to enforce the Distribution and other terms of the Plan; *provided, further, however*, that the Prepetition Agent shall not foreclose upon such retained Liens

unless a Final Order is entered finding that (i) a Plan Default occurred (including if any collateral is sought to be used in a manner inconsistent with the Plan) and (ii) such default was not cured in accordance with the Plan.

Voting: Claims in Class 2 are Impaired.  The Holders of Claims in Class 2 shall be entitled to vote to accept or reject the Plan.

**(iii)    Miscellaneous Secured Claims**

Classification:  Class 3 consists of Miscellaneous Secured Claims.

Treatment:   On or as soon as reasonably practicable after the latest to occur of (a) the Effective Date; and (b) the date on which each such Miscellaneous Secured Claim becomes an Allowed Claim, each Holder of such an Allowed Miscellaneous Secured Claim, if any, shall receive, on account of, and in full, final and complete satisfaction, settlement, and release of, and in exchange for such Allowed Miscellaneous Secured Claim, at the election of the Plan Administrator with the Agent's consent, (i) such treatment in accordance with section 1124 of the Bankruptcy Code as may be determined by the Bankruptcy Court; (ii) payment in full, in Cash, of such Allowed Miscellaneous Secured Claim; (iii) satisfaction of any such Allowed Miscellaneous Secured Claim by delivering the collateral securing any such Claims and paying any interest fees, costs and/or expense required to be paid under section 506(b) of the Bankruptcy Code; or (iv) providing such Holder with such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  Cash payments of Allowed Miscellaneous Secured Claims that are Budget Expenses shall be paid from the Budgeted Claims Reserve; *provided, however*, that all Allowed Claims in Class 3 not constituting a Budgeted Expense shall instead be paid from the Gift Reserve.

Voting:  Claims in Class 3 are Unimpaired.  Each Holder of an Allowed Miscellaneous Secured Claim in Class 3 shall be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject the Plan.

**(iv)    Class 4 GUC Claims**

Classification:  Class 4 consists of all Class 4 GUC Claims.

Allowance: The Senior Notes Claim is Allowed in the amount of Eighty Seven Million Seven Hundred Seventy-Five Thousand Eight Hundred Ninety dollars ($87,775,890.00).

Treatment:  Each Holder of an Allowed Class 4 GUC Claim shall receive, as soon as reasonably practicable after the Effective Date, in full and final satisfaction, settlement and release of and in exchange for such Allowed Class 4 GUC Claim, its Pro Rata share of (a) the Gift Reserve, following payment of all other Claims and other amounts entitled to receive payment from the Gift Reserve under the Plan, and (b) following the indefeasible payment in full of all Prepetition Secured Claims, all remaining Available Cash.

Voting: Claims in Class 4 are Impaired.  The Holders of Class 4 GUC Claims shall be entitled to vote to accept or reject the Plan.

**(v)     Intercompany Claims**

<u>Classification</u>:  Class 5 consists of all Intercompany Claims.

<u>Treatment</u>:  On the Effective Date, each Intercompany Claim shall be canceled, released, and extinguished, and will be of no further force or effect nor entitled to receive any Distribution on account of such Intercompany Claims.

<u>Voting</u>:  Claims in Class 5 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, accordingly are not entitled to vote to accept or reject the Plan.

**(vi)    Interests**

<u>Classification</u>:  Class 6 consists of all Interests in the Debtors.

<u>Treatment</u>:   All of the Class 6 Interests outstanding as of the Effective Date shall be eliminated, extinguished, and cancelled.  Pursuant to section 1129(b)(2)(C) of the Bankruptcy Code, Holders of Interests shall not be entitled to, nor shall they receive, any Distribution or retain any property or interest in property on account of such Interests.

<u>Voting</u>:  Interests in Class 6 are Impaired.  The Holders of Allowed Interests in Class 6 are deemed to have rejected the Plan and, accordingly, are not entitled to vote to accept or reject the Plan.

### ARTICLE III
### SUMMARY OF KEY PLAN PROVISIONS

**A.     Sources of Cash for Distributions**

Except as otherwise specifically provided in the Plan or in the Confirmation Order, all Cash required for the payments to be made pursuant to the Plan shall be obtained from the Available Cash.

**B.     Plan Funding**

The Plan will be funded by the Available Cash.

**C.     Application of Available Cash**

**(i)     Payment of DIP Facility Claims and Prepetition Secured Claims/Funding of Post-Effective Date Agent Professional Retainers**

On the Effective Date, (a) the Debtors shall fund the Post-Effective Date Agent Professional Retainers by (i) transferring to the Agent's counsel an amount of Available Cash equal to $100,000, and (ii) transferring to the Agent's financial advisor an amount of Available Cash equal to $50,000; and (b) the Debtors or the Plan Administrator, as applicable, shall (i) pay to the Agent an amount of Available Cash necessary to pay any remaining DIP Facility Claims in full (to the extent that such claims have not already been indefeasibly paid in full), and (ii) pay to

the Agent for application to the Prepetition Secured Claim all remaining Available Cash, less the amount required to fund the Distribution Reserve Accounts pursuant to the Wind-Down Budget and the Plan.

### (ii) Professional Fee Claims Reserve and Budgeted Claims Reserve Funding

On the Effective Date, following the funding of the Post-Effective Date Agent Professional Retainers, payment of the DIP Facility Claims in full, and the transfer of Available Cash to the Agent as set forth above and in the Plan, the Debtors or the Plan Administrator, as applicable, shall, pursuant to the Wind-Down Budget, establish Distribution Reserve Accounts funded by an amount of Available Cash sufficient to fund (a) the Budgeted Claims Reserve and (b) the Professional Fee Claims Reserve.

### (iii) Gift Reserve Funding

On the Effective Date, following the payment of the DIP Facility Claims in full, the transfer of Available Cash to the Agent as set forth above and in the Plan, and the funding of the Budgeted Claims Reserve and the Professional Fee Claims Reserve, the Debtors or the Plan Administrator, as applicable, shall establish a Distribution Reserve Account funded by an amount of Available Cash equal to the Gifted Amount to fund the Gift Reserve. The Plan Administrator Expenses[6] and the Indenture Trustee Distribution[7] shall be payable only from the Gift Reserve and shall be subject to the Wind-Down Budge.

### D. Retained Causes of Action

All Retained Causes of Action shall vest in the Post-Effective Date Debtors for the benefit of the Holders of Prepetition Secured Claims until the Prepetition Secured Claims are paid in full, and then for the benefit of Holders of Allowed Class 4 GUC Claims.

### E. Vesting of Assets in the Post-Effective Date Debtors

On the Effective Date, and except as otherwise set forth in the Plan, the Assets, including, without limitation: (i) Available Cash; (ii) the Distribution Reserve Accounts; and (iii) all Retained Causes of Action, including the attorney-client privilege related to all Retained Causes of Action, shall vest in each respective Post-Effective Date Debtor pursuant to section 1141(b) of the Bankruptcy Code Free and Clear except for the Liens of the Prepetition Agent as provided in Section 4.02(b) of the Plan.

---

[6] "Plan Administrator Expenses" means any amounts owed under the Plan Administrator Agreement and any reasonable fees (including professional fees), costs, and expenses of the Plan Administrator, which, pursuant to the Wind-Down Budget, shall be capped at $100,000 and paid from the Gift Reserve.

[7] "Indenture Trustee Distribution" means an amount equal to the Indenture Trustee Fees not to exceed One Hundred Twenty Thousand dollars ($120,000.00), which shall be payable from the Gift Reserve as a settlement pursuant to the terms of the Plan.

### F.      Corporate Form

On the Effective Date, each of the Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Plan Administrator with the Agent's consent in accordance with the terms of the Plan and applicable law.

### G.      Officers and Directors

On the Effective Date, (i) the positions of the current directors, officers, and managers, or in the case of a governing body created by a partnership agreement, limited liability company agreement or similar agreement, the members of such governing body (such persons and the corporate directors collectively, the "Governors") of each Debtor shall be eliminated, and each Governor shall be terminated (without the necessity of further action); and (ii) to the fullest extent permitted by applicable law, the rights, powers, and duties of the Governors of each Debtor that has a Governor shall vest in the Plan Administrator, who shall serve as the sole officer and director of each Post-Effective Date Debtor after the Effective Date.  The Plan Administrator, subject to the consent of the Agent, may also elect such additional director(s) and officer(s) of each Post-Effective Date Debtor as the Plan Administrator deems necessary to implement the Plan and the actions contemplated in the Plan.  The Plan Administrator, subject to the consent of the Agent, shall also have the power to act by written consent to remove any officer or director of any Post-Effective Date Debtor at any time with or without cause.

### H.      Corporate Existence

After the Effective Date, the Plan Administrator shall, subject to the Agent's consent and consistent with applicable non-bankruptcy law and consistent with the implementation of the Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Post-Effective Date Debtor (including the cancellation of all Interests in a Post-Effective Date Debtor) and complete the winding up of such Post-Effective Date Debtor as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Post-Effective Date Debtor or its directors or officers or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit.  The Plan Administrator may, subject to the Agent's consent and to the extent required by applicable non-bankruptcy law, maintain a Post-Effective Date Debtor as a corporate entity in good standing until such time as such Post-Effective Date Debtor is dissolved or merged out of existence.

### I.      Cancellation of Notes, Instruments, Certificates, and Other Documents

On the later of the Effective Date and the date on which Distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan, (a) the Indenture and Senior Notes shall be deemed cancelled, without any need for further action by any Person, Holder, or the Bankruptcy Court, and the Indenture Trustee shall not have any continuing duties or obligations thereunder and shall be discharged; and (b) the obligations of the Debtors

pursuant, relating, or pertaining to the Indenture and the Senior Notes shall be released and discharged; except that the Indenture shall continue in effect solely for the purpose of: (i) allowing the Indenture Trustee to receive distributions from the Debtors and to make further distributions to the Holders of Senior Notes Claims (subject to the Indenture Trustee's Charging Lien and allowing such Holders to accept distributions, on account of such Claims; (ii) preserving the Indenture Trustee's rights to payment of fees and expenses, and allowing the maintenance, exercise, and enforcement of the Indenture Trustee's Charging Lien under the Indenture or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (iii) seeking compensation and reimbursement for any reasonable and documented fees and expenses incurred by or on behalf of the Indenture Trustee in connection with the implementation of the Plan; (iv) preserving the right of the Indenture Trustee to exculpation and indemnification from the Debtors pursuant and subject to the terms of the Indenture; (v) maintaining, enforcing, and exercising any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other Claim or entitlement that the Indenture Trustee may have under the Indenture; and (vi) preserving the Indenture Trustee's right to appear and be heard in the Cases or in any other proceeding in the Bankruptcy Court, including but not limited to enforcing any obligations owed to it under the Plan or Confirmation Order; *provided that* nothing in the Plan shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan. On the Effective Date, each Holder of a certificate or instrument evidencing a Claim that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument (including the Senior Notes) in accordance with the Indenture or agreement that governs the rights of such Holder of such Claim. Such surrendered certificate or instrument shall be deemed cancelled as set forth in, and subject to the exceptions set forth in, Section 6.08 of the Plan.

On and after the Effective Date, the duties and responsibilities of the Indenture Trustee under the Indenture shall be discharged and released, except (i) to the extent required to effectuate the Plan including, but not limited to, making distributions under the Plan to the Holders of Senior Notes Claims under the Indenture and (ii) with respect to any rights of the Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims or Interests under the Indenture, including any rights to the Indenture Trustee's Charging  Lien. After the performance by the Indenture Trustee and the Indenture Trustee's respective representatives and professionals of any obligations and duties required under or related to the Plan or the Confirmation Order, the Indenture Trustee shall be deemed to be relieved of and released from any obligations and duties arising thereunder.

On and after the final distribution on account of the Allowed Senior Notes Claims, the Senior Notes shall be deemed to be worthless, and Depository Trust Company shall take down the relevant positions at the request of the Indenture Trustee without any requirement of indemnification or security on the part of the Debtors or the Indenture Trustee.

On the Effective Date, all Interests in the Debtors shall be terminated and extinguished and any certificates or other documents that previously evidenced ownership of those Interests shall be deemed cancelled (all without further action by any Person or the Bankruptcy Court) and shall be null and void and such certificates and documents shall evidence no rights or interests in any of the Debtors.  Upon cancellation of the Interests in Approach Resources Inc., neither Approach Resources Inc. nor the Plan Administrator shall file periodic or other reports with the Securities

and Exchange Commission; *provided, however*, that Approach Resources Inc. shall continue to be subject to the requirements of the Securities Act until such time as the Plan Administrator terminates the registration of its common stock under the Securities Act and the rules and regulations promulgated thereunder.

### J.      Authorization for Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Plan Administrator may, subject to the consent of the Agent, take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (iii) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (iv) all other actions that the Plan Administrator determines are necessary or appropriate, including the making of filings or recordings in connection with the Plan, which actions may be set forth in a Plan Supplement Exhibit.

### K.      Preservation of Rights of Action; Settlement

Except to the extent such rights, Claims, Causes of Action, defenses, and counterclaims are otherwise disposed of in the Plan, the Asset Purchase Agreement, or are expressly and specifically released in connection with the Plan and/or Confirmation Order, or in any settlement agreement approved by the Bankruptcy Court during the Cases, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code: (i) any and all rights, Claims, Retained Causes of Action (including Retained Avoidance Actions), defenses, and counterclaims of or accruing to the Debtors or their Estates shall vest in the Post-Effective Date Debtors, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, Claims, Causes of Action, defenses, and counterclaims have been Scheduled, listed or referred to in the Plan, the Bankruptcy Schedules, or any other document Filed with the Bankruptcy Court; and (ii) the Post-Effective Date Debtors do not waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, Claim, Cause of Action, defense, or counterclaim that constitutes property of the Estates: (a) whether or not such right, Claim, Cause of Action, defense, or counterclaim has been listed or referred to in the Plan, the Bankruptcy Schedules, the Bankruptcy SOFAs, or any other document Filed with the Bankruptcy Court; (b) whether or not such right, Claim, Cause of Action, defense, or counterclaim is currently known to any of the Debtors; and (c) whether or not a defendant in any litigation relating to such right, Claim, Cause of Action, defense, or counterclaim Filed a Proof of Claim in the Cases, Filed a notice of appearance or any other pleading or notice in the Cases, voted for or against the Plan, or received or retained any consideration under the Plan.  Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, Cause

of Action, defense, or counterclaim, or potential right, Claim, Cause of Action, defense, or counterclaim, in the Plan, the Bankruptcy Schedules, or any other document Filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Plan Administrator's right (subject to the consent of the Agent) to commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, or counterclaims that any of the Debtors have, or may have, as of the Effective Date.  Subject to the limitations in section 11.02 of the Plan and the Plan Administrator Agreement, and subject to the consent of the Agent, the Plan Administrator may, on behalf of the Post-Effective Date Debtors, commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, and counterclaims that vest in the Post-Effective Date Debtors in its sole discretion, in accordance with what is in the best interests, and for the benefit, of the Creditors.

### L.      Employee Benefit Plans

Before the Effective Date, all Employee Benefit Plans other than the KEIP and Severance Plan shall be terminated in accordance with the applicable provisions of state and federal law. Subject to the Wind-Down Budget, to the extent that any KEIP or Severance Plan obligations constituting Budgeted Expenses remain outstanding as of the Effective Date, the KEIP and Severance Plan shall vest in the Post-Effective Date Debtors in accordance with the terms of such plans such that any KEIP or Severance Plan obligations constituting Budgeted Expenses shall be enforceable by and against the Post-Effective Date Debtors and payable from the Budgeted Claims Reserve.[8]

### M.      Effectuating Documents

The Plan Administrator shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Plan Administrator shall be authorized to certify or attest to any of the foregoing actions.  The Debtors are authorized to perform their obligations under the Plan.

### N.      Exemption from Certain Transfer Taxes

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of an Interest or transfer of property, in each case, pursuant to, in contemplation of, or in connection with the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate or personal property transfer tax, sale or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, fee or charge, and upon entry of the Confirmation Order, the appropriate taxing authority, governmental officials or agents shall forgo the collection of any such tax or governmental assessment, fee or charge and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, or governmental assessment, fee or charge.

---

[8] For the avoidance of doubt, the KEIP payments were made upon the closing of the sale of substantially all of the Debtors' assets to the Purchaser in accordance with the orders approving the KEIP.

### O.     Plan Administrator Closing of the Chapter 11 Cases

When (i) the Bankruptcy Court has adjudicated all applications by Professionals for final allowances of compensation for services and reimbursement of expenses and the issuance of a Final Order for each application and the payment of all amounts payable thereunder; (ii) all Disputed Claims filed against the Debtors have become Allowed Claims or have been Disallowed by Final Order or otherwise pursuant to the Plan, and (iii) all appropriate Distributions have been made pursuant to the Plan, the Plan Administrator shall, subject to the consent of the Agent, seek authority from the Bankruptcy Court to close the Debtors' Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.   Notwithstanding the foregoing, the Plan Administrator may seek authority from the Bankruptcy Court to close all of the Cases other than the Case of Approach Resources, Inc. at any time after the Effective Date.

### P.     The Plan Administrator Agreement

The Plan Administrator Agreement shall be included in the Plan Supplement, and must be acceptable to the Agent in form and in substance.  To the extent the Plan is inconsistent with the Plan Administrator Agreement, the Plan Administrator Agreement shall control for all purposes.

### Q.     The Plan Administrator

Subject to the Bankruptcy Court's approval and appointment of the selection of the Plan Administrator at the Confirmation Hearing, a Person to be designated by the Agent and disclosed in the Plan Supplement shall initially serve as the Plan Administrator, and such initial Plan Administrator shall only be removable for cause.  Such initial Plan Administrator's appointment, as well as a copy of the proposed initial Plan Administrator's resume, will be disclosed in the Plan Supplement.   Any subsequent Plan Administrator shall be appointed by the Agent.   Matters relating to the appointment, removal, and resignation of the Plan Administrator and the appointment of any successor Plan Administrator shall be set forth in the Plan Administrator Agreement.   The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under the Plan and Plan Administrator Agreement, and as otherwise provided in the Confirmation Order.  The Plan Administrator shall be required to perform his or her duties as set forth in the Plan and the Plan Administrator Agreement.

### R.     Retention of Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the reasonable discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The payment of reasonable Plan Administrator Expenses shall be subject to and paid in accordance with the Wind-Down Budget from the Gift Reserve.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court except as otherwise provided in the Plan. Professionals of, among others, the Debtors, shall be eligible for retention by the Plan Administrator on a special counsel basis, and former employees of the Debtors shall, in the discretion of the Plan Administrator, be eligible for retention by the Plan Administrator.

The reasonable fees and expenses incurred in connection with services performed by the Plan Administrator and his or her professionals relating to the administration, liquidation, and/or distribution of Assets shall be subject to the Wind-Down Budget and paid from the Gift Reserve. Before each payment of any Plan Administrator Expenses, including the reasonable fees and expenses of the Plan Administrator's retained professionals, and other reasonable costs, expenses, and liabilities of the Plan Administrator, the Plan Administrator and the Plan Administrator's retained professionals shall provide written notice thereof to the Agent in such detail and with such support as the Agent may reasonably request. If the Agent does not object to the payment of such amounts within fifteen (15) Business Days after receipt of such notice, the Plan Administrator may make such payments provided that such payments are within the Wind-Down Budget. If the Agent objects and such objecting party and the Plan Administrator cannot agree on the appropriate amount of such payment, then the Plan Administrator may not make such payment unless he or she obtains an order from the Bankruptcy Court approving such payment.

### S.      Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be disclosed in the Plan Supplement. The payment of the reasonable fees of the Plan Administrator and any professionals retained by the Plan Administrator shall be subject to, and paid in accordance with, the Wind-Down Budget from the Gift Reserve and made in accordance with the provisions of the Plan and the Plan Administrator Agreement.

### T.      Liability; Indemnification

The Plan Administrator shall not be liable for any act or omission taken or omitted to be taken in his or her capacity as the Plan Administrator, other than acts or omissions resulting from such Person's willful misconduct, gross negligence, or fraud. The Plan Administrator may, in connection with the performance of his or her functions, and in his or her sole absolute discretion, consult with attorneys, accountants, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Professionals. Notwithstanding such authority, the Plan Administrator shall be under no obligation to consult with attorneys, accountants, or his or her agents, and his or her determination to not do so should not result in imposition of liability on the Plan Administrator unless such determination is based on willful misconduct, gross negligence, or fraud. The Post-Effective Date Debtors shall indemnify and hold harmless the Plan Administrator and his or her agents, representatives, Professionals, and employees from and against and in respect to any and all liabilities, losses, damages, Claims, costs, and expenses, including, but not limited to reasonable attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the implementation or administration of the Plan; *provided, however*, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence, or fraud.

### U.      Powers and Duties of the Plan Administrator

Upon the Effective Date, the Plan Administrator shall have the authority and right on behalf of each Post-Effective Date Debtor, without the need for Bankruptcy Court approval (unless otherwise set forth in the Plan), to carry out and implement all provisions of the Plan, including

to:

(1)    subject to Article 11, effectuate the Claims reconciliation process in accordance with and subject to the terms of the Plan, including to object to, seek to subordinate, compromise, or settle any and all Claims against or Interests in the Debtors (other than the Prepetition Secured Claims); *provided, however*, that, for the avoidance of doubt, nothing in this subsection (1) shall modify any rights of the Agent to object to any Claims on its own behalf in accordance with the Bankruptcy Code and Bankruptcy Rules;

(2)    make Distributions to holders of Allowed Claims in accordance with the Plan; *provided, however*, that all Distributions on account of the Senior Notes Claims shall be made to the Indenture Trustee (and be subject to the Charging Lien);

(3)    subject to the Wind-Down Budget, exercise its reasonable business judgment to direct and control the Wind Down under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(4)    prepare, File, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described in the Plan;

(5)    in each case with the written consent of the Agent and, when necessary, subject to Bankruptcy Court approval, prosecute all Causes of Action on behalf of the Post-Effective Date Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Post-Effective Date Debtors and Creditors;

(6)    subject to the Wind-Down Budget, retain and compensate professionals to assist in performing its duties under the Plan;

(7)    subject to the Wind-Down Budget, make payments on account of Professional Fee Claims and any other payments to Professionals (consistent with the terms of any Bankruptcy Court order approving such retention and subject to any applicable Bankruptcy Court approval requirements), as well as the reasonable fees and expenses of other professionals who may be engaged after the Effective Date;

(8)    maintain the books and records and accounts of the Post-Effective Date Debtors (in good faith consultation with the Agent);

(9)    subject to the consent of the Agent, invest Available Cash, including any Cash proceeds realized from the liquidation of any Assets, including any Causes of Action, and any income earned thereon;

(10)    subject to the Wind-Down Budget, incur and pay reasonable and necessary expenses in connection with the performance of his or her duties under the Plan;

(11)    administer each Debtor's and Post-Effective Date Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited

determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including any action, suit, proceeding, or audit;

(12)    prepare and file any and all informational returns, reports, statements, returns, or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit, or by applicable law;

(13)    consult with and update the Agent when reasonably requested, including with respect to Claims and the Claims-reconciliation process, Causes of Action, the Wind-Down, and other actions relating to implementation of the Plan and provide an accounting to the Agent of all post-Effective Date receipts and disbursements on a monthly basis or such other frequency as agreed to between the Plan Administrator and Administrative Agent;

(14)    pay statutory fees in accordance with the Plan;

(15)    close the Chapter 11 Cases in accordance with the Plan; and

(16)    perform any other duties and functions that are consistent with the implementation of the Plan.

## V.    Distribution Procedures

Any payments or distributions to be made by the Plan Administrator to Holders of Claims as required by the Plan shall be made only to the Holders of Allowed Claims.  No payments or other distributions of property shall be made on account of any Claim or portion thereof unless and until such Claim or portion thereof is Allowed.  No Distribution will be made on account of a Claim or Interest to the extent that such Claim or Interest has been Disallowed, released, withdrawn, waived, settled, or otherwise satisfied or paid, including, without limitation, payments by third-party guarantors, sureties, or insurers, whether governmental or nongovernmental. Subject to approval of the Agent, the Plan Administrator may establish reserves for Disputed Claims, and (except with respect to the payment of Claims in Class 2) defer or delay distributions to ensure an equitable and ratable distribution to Holders of Allowed Claims, in accordance with the terms of the Plan; _provided that_ the Plan Administrator will make Distributions of net income plus all net proceeds from any sale of the Assets to Holders of Allowed Claims in accordance with the Plan at least annually, except that the Plan Administrator may retain an amount of net income or net proceeds as is reasonably necessary to maintain the value of the Assets or to meet Claims and contingent liabilities (including Disputed Claims).  The Plan Administrator will make no Distributions upon a Claim held by a party against whom the Plan Administrator asserts any Avoidance Action until resolution of the Avoidance Action by settlement or judgment or as otherwise provided by Final Order.  Notwithstanding anything to the contrary in the Plan, all Distributions on account of Senior Notes Claims shall be delivered to the Indenture Trustee in a form that is eligible to be distributed through the facilities of the Depository Trust Company.

Except as otherwise provided herein, the Distributions on account of Allowed Senior Notes Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such

Allowed Senior Notes Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Senior Notes Claims, to any portion of such Allowed Senior Notes Claims for accrued but unpaid interest, if any.

### W.     Termination

The duties, responsibilities, and powers of the Plan Administrator shall terminate after all Assets have been fully resolved, abandoned, or liquidated, the Assets have been distributed in accordance with the Plan and the Plan Administrator Agreement, and the Cases have been closed.

### X.     Timing and Delivery of Distributions

The terms of the Plan shall govern Distributions from the Post-Effective Date Debtors.

### Y.     Method of Cash Distributions

Any Cash payment to be made pursuant to the Plan may be made by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of the Plan Administrator; *provided, however,* that all Distributions on account of Allowed Senior Notes Claims shall be made by wire transfer to the Indenture Trustee (and shall be subject to the Charging Lien).

### Z.     Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanism they believe is reasonable and appropriate.  The Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, reserve the right to allocate all Distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.  Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  The Plan Administrator may require a Holder of an Allowed Claim to complete and return an Internal Revenue Service Form W-8 or W-9, as applicable to each such Holder, and any other applicable tax forms.

With respect to any Person from whom a tax identification number, certified tax identification number, or other tax information required by law has not been received by the Plan Administrator within thirty (30) days from the date of such request (the "Initial Request"), the Plan Administrator may, at its option, withhold the amount reasonably determined by the Plan

Administrator to be withheld from a distribution to such Person and decline to make such distribution until the information is received. Failure of any Person to provide the information requested within six (6) months of the Initial Request shall result in the forfeiture of the affected distribution and the treatment of said distribution as Unclaimed Property.

### AA.   Distribution Record Date

As of the Distribution Record Date, other than with respect to any publicly held securities (including the Senior Notes), all transfer ledgers, transfer books, registers and any other records maintained by the designated transfer agents with respect to ownership of any Claims will be closed and, for purposes of the Plan, there shall be no further changes in the record holders of such Claims. The Plan Administrator shall have no obligation to recognize the transfer of any Claims occurring after the Distribution Record Date, and will be entitled for all purposes to recognize and deal only with the Holder of any Claim as of the close of business on the Distribution Record Date, as reflected on such ledgers, books, registers or records.

### BB.   Date of Distributions on Account of Allowed Claims

Except as otherwise specifically provided herein, any Distributions and delivery to be made under the Plan shall be made on the Effective Date or as soon as practicable thereafter. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Any payment, delivery or Distribution by the Plan Administrator pursuant to the Plan, to the extent delivered by the United States mail, shall be deemed made when deposited by the Plan Administrator (or his or her agent or designee) (i) with the Indenture Trustee, with respect to the Allowed Senior Notes Claims or (ii) into the United States mail with respect to other Allowed Claims. Distributions or deliveries required to be made by the Plan on a particular date shall be deemed to have been made on such date if actually made on such date or as soon thereafter as practicable taking into account the need to establish the Distribution Reserve Accounts and account for Disputed Claims. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim (plus any interest—and, in the case of Senior Notes Claims, fees—accruing on such Claim that is payable in accordance with the Plan and the Bankruptcy Code).

### CC.   No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been resolved, settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

### DD.   Undeliverable Distribution Reserve

(1)      **Deposits**. If a Distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such Distribution becomes deliverable, is claimed

or is deemed to have been forfeited in accordance with Section 8.03, Section 8.05 or Article IIIDD(2) of the Plan.

(2)     **Forfeiture**.  Any Holder of an Allowed Claim (other than the Indenture Trustee) that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within six (6) months after the first distribution is made to such Holder shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim for the undeliverable or unclaimed distribution against the Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, or their respective properties or assets.  In such cases, any Cash or other property held by the Post-Effective Date Debtors in the Undeliverable Distribution Reserve for distribution on account of such Claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become Unclaimed Property, notwithstanding any federal or state escheat laws to the contrary, and shall be available for immediate distribution by the Plan Administrator to the Holders of the Prepetition Secured Claims in accordance with Section 4.02 of the Plan.  Such Holder shall be forever barred and enjoined from asserting any such Claim for the undeliverable or unclaimed distribution against the Agent and the Holders of the Prepetition Secured Claims.

(3)     **Disclaimer**.  The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Claim Holder (other than the Indenture Trustee), or (ii) obtain an executed Internal Revenue Service Form W-9 or other form required by law from any Claim Holder.

(4)     **Beneficiaries**.  The Unclaimed Property shall be held or deposited in the Undeliverable Distribution Reserve for the benefit of Holders of Prepetition Secured Claims.

### EE.     Budgeted Claims Reserve Distribution

On or as soon as reasonably practicable after the Effective Date, the Debtors or the Plan Administrator, as applicable, shall transfer the amount set forth in the Wind-Down Budget to fund the Budgeted Claims Reserve as described in **Error! Reference source not found.** of the Plan for the benefit of the Holders of Claims entitled to receive payment from the Budgeted Claims Reserve under the Plan.  After the payment of all such Claims, any remaining funds in the Budgeted Claims Reserve shall be paid to the Agent for the benefit of Holders of Allowed Prepetition Secured Claims.

### FF.     Gift Reserve Distribution

On or as soon as reasonably practicable after the Effective Date, the Debtors or the Plan Administrator, as applicable, shall fund the Gift Reserve using an amount of Available Cash equal to the Gifted Amount to be used for the purposes set forth under the Plan.

### GG.     Post-Effective Date Agent Professional Retainers

The Debtors or the Plan Administrator, as applicable, shall fund the Post-Effective Date Agent Professional Retainers on the Effective Date using Available Cash.  The Post-Effective Date Agent Professional Retainers may be used to pay the fees and expenses incurred by the Agent's

professionals from and after the Effective Date in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court. Any remaining funds in the Post-Effective Date Agent Professional Retainers shall be paid to the Agent for the benefit of Holders of Allowed Prepetition Secured Claims upon the completion of the Wind-Down. On the Effective Date, the Debtors shall pay in full all accrued and unpaid fees and expenses of the Agent's professionals as of the Effective Date and such fees and expenses shall not be subject to the approval of the Bankruptcy Court.

### HH.    Professional Fee Claims Reserve Distribution

On or as soon as reasonably practicable after the Effective Date, the Debtors or the Plan Administrator, as applicable, shall transfer the amount set forth in the Wind-Down Budget to fund the Professional Fee Claims Reserve for the benefit of the Holders of Professional Fee Claims entitled to receive payment from the Professional Fee Claims Reserve under the Plan. After the payment of all such Claims, any remaining funds in the Professional Fee Claims Reserve shall be paid to the Agent for the benefit of Holders of Allowed Prepetition Secured Claims.

### II.    Assumption/Rejection

### (i)    Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases.

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for any Executory Contract or Unexpired Lease (a) identified by the Debtors with the consent of the Agent or by announcement on the record at the Confirmation Hearing in any Plan Supplement as an Executory Contract or Unexpired Lease designated for assumption by the Debtors, (b) that is the subject of a separate motion or notice to assume or reject Filed by the Debtors with the consent of the Agent or by announcement on the record at the Confirmation Hearing and pending as of the Confirmation Hearing, or (c) that previously expired or terminated pursuant to its own terms. Except as otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, unless otherwise assumed by the Debtors, any Executory Contract or Unexpired Lease that remains, as of the Effective Date, the subject of a pending notice of proposed or potential assumption and assignment issued in connection with the Sale shall be deemed rejected as of such date to the extent not assumed and assigned to the applicable Purchaser in connection with the Sale.

Except as otherwise previously approved by an Order of the Bankruptcy Court, entry of the Confirmation Order by the Bankruptcy Court shall constitute an order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, approving the assumptions, assumptions and assignments, and rejections of such Executory Contracts and Unexpired Leases as set forth in the preceding paragraph. Unless otherwise indicated in the Plan, assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases pursuant to the Plan shall be effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order and not assigned to a third party on or before the Effective Date shall vest in and be fully enforceable by the Post-Effective Date Debtors in accordance with its terms, except as such terms may have been modified by the provisions of the

Plan or any order of the Bankruptcy Court authorizing its assumption pursuant to section 365 of the Bankruptcy Code; provided that if an assignment is pending as of the Effective Date, the Plan Administrator shall be authorized to take any and all actions necessary to implement such assignment.

To the maximum extent permitted by law, to the extent any provision (including, without limitation, any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the assumption and assignment contemplated by the Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto, except for asserting and pursuing a Claim for a Cure Amount. Notwithstanding anything to the contrary in the Plan, the Debtors, subject to the consent of the Agent or by announcement on the record at the Confirmation Hearing, reserve the right to alter, amend, modify, or supplement the Plan Supplement in their discretion prior to the Effective Date on no less than seven (7) days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

(ii)    **Cure Amounts**

With respect to any Executory Contract or Unexpired Lease assumed by the Debtors, any Claim for a Cure Cost shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Allowed amount of such Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to any particular Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (a) the Allowed amount of any Claim for Cure Costs; (b) the ability of the Post-Effective Date Debtors or another assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, no payments on account of the Claim for Cure Costs shall be made until such dispute is resolved by a Final Order. At least seven (7) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Costs to the applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or the related amount of any Claim for Cure Costs must be Filed, served and actually received by the Debtors on the later of (a) two days before the date of the Confirmation Hearing; and (b) five days after receiving notice of any amendment, modification or supplement to the Plan Supplement or notices of assumption and assignment. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption and assignment or the Cure Costs related thereto will be deemed to have assented to such assumption and assignment and/or Cure Cost. Payment of the Cure Costs associated with any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under such Executory Contract or Unexpired Lease occurring at any time prior to the effective date of the assumption and assignment. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned and with respect

to which the Allowed Cure Cost has been paid shall be deemed disallowed and expunged without further notice, action, Order, or approval of the Bankruptcy Court.

### (iii)    Insurance Policies

All insurance policies to which the Debtors have any rights as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts and assumed by the Debtors unless other treatment of such policies is proposed in the Plan Supplement.

### (iv)    Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court Order, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be Filed no later than thirty (30) days after the later of the Effective Date or the date a Final Order is entered granting the rejection.  Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, or the Post-Effective Date Debtors without the need for any objection by any Person or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Bankruptcy Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as Class 4 GUC Claims and shall be treated in accordance with the particular provisions of the Plan applicable to such Claims; *provided however*, if the Holder of an Allowed Claim for rejection damages has an unavoidable security interest in any collateral to secure obligations under such rejected Executory Contract or Unexpired Lease, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim to the extent of the value of such Holder's interest in the collateral, with the deficiency, if any, treated as a Class 4 GUC Claim.

### (v)    Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtors that any contract, joint operating agreement, oil and gas lease, or other contractual obligation or arrangements is in fact an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter and to provide appropriate treatment of such contract or lease.

### (vi)    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request by the Debtors to extend the deadline for assuming or rejecting executory contracts and unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**JJ.      Expunging of Certain Claims**

Except as otherwise provided by a Bankruptcy Court order, all Claims marked or otherwise Scheduled as contingent, unliquidated, or disputed on the Bankruptcy Schedules and for which no Proof of Claim has been timely filed, shall be deemed Disallowed Claims and such Claims shall be expunged as of the applicable Bar Date without the necessity of filing a Claim objection and without further notice to, or action, order or approval of the Bankruptcy Court.  Neither the Agent nor any of the Prepetition Lenders shall be required to file Proofs of Claim in any of the Cases in order for the Prepetition Secured Claim to be Allowed.  Any Order entered by the Bankruptcy Court in relation to the establishment of a Bar Date for any claim in any of the Cases, including the Confirmation Order, shall not apply to the Agent or the Prepetition Lenders with respect to the allowance of the Prepetition Secured Claims.

**KK.     Objections to Claims**

**(i)      Authority**

Subject to the consent of the Agent, the Plan Administrator shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims. Except as set forth in the Plan, from and after the Effective Date, the Plan Administrator may, subject to the consent of the Agent, settle or compromise any Disputed Claim without approval of the Bankruptcy Court and shall have the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law; *provided, however*, that (a) if the Plan Administrator and the Holder of a Disputed Claim agree to compromise, settle, and/or resolve a Disputed Claim by granting such Holder an Allowed Claim in the amount of $25,000 or less, the Plan Administrator may compromise, settle, and/or resolve such Disputed Claim in his or her sole discretion; and (b) if the Plan Administrator and the Holder of a Disputed Claim agree to compromise, settle, and/or resolve a Disputed Claim by granting such Holder an Allowed Claim in an amount greater than $25,000, the Plan Administrator may do so only with the consent of the Agent.

**(ii)     Claim Objection Deadline**

As soon as practicable, but no later than the Claim Objection Deadline, the Plan Administrator may, subject to the consent of the Agent, File with the Bankruptcy Court objections to Claims and serve such objections on the Creditors holding the Claims to which such objections are made.  Nothing contained in the Plan, however, shall limit the right of the Plan Administrator to object to Claims, if any, Filed or amended after the Claim Objection Deadline.  The Claim Objection Deadline may be extended by the Bankruptcy Court upon motion by the Plan Administrator.

**LL.      Estimation of Claims**

Subject to the consent of the Agent, the Plan Administrator may at any time request that the Bankruptcy Court estimate any such Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator or the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation

concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the maximum limitation on such Claim, as determined by the Bankruptcy Court and the Plan Administrator may, subject to the consent of the Agent, elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

### MM.   Reduction of Claims

Notwithstanding the contents of the Bankruptcy Schedules or the Bankruptcy SOFAs, Claims listed therein as undisputed, liquidated, and not contingent shall be reduced by the amount, if any, that was paid by the Debtors before the Effective Date, including pursuant to any Order of the Bankruptcy Court.  To the extent such payments are not reflected in the Bankruptcy Schedules or the Bankruptcy SOFAs, such Bankruptcy Schedules and Bankruptcy SOFAs will be deemed amended and reduced to reflect that such payments were made.  Nothing in the Plan shall preclude the Plan Administrator from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court before the Effective Date.

## ARTICLE IV
## QUESTIONS AND ANSWERS REGARDING THIS
## DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code, but also provides for the liquidation of a debtor, such as the Debtors are seeking to do in these Cases.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless a trustee is appointed.

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under a plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtors' liabilities in accordance with the terms of the confirmed plan.

### B.   Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable

a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims or Interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.     Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  The voting status of each class is set forth in the chart in Article II.B herein.

**D.     What will I receive from the Debtors if the Plan is consummated?**

The chart set forth above at Article II.C provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon, among other things, the ability of the Debtors to obtain Confirmation and satisfy the conditions necessary to obtain Consummation of the Plan.

**E.     What will I receive from the Debtors if I hold an Allowed Administrative Claim, Priority Tax Claim, or Professional Fee Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III and Article IV of the Plan.  These unclassified Claims are treated as follows:

**(i)     Administrative Claims**

Subject to the Administrative Claims Bar Date and other provisions in the Plan, and except to the extent the holder of an Allowed Administrative Claim agrees to different and less favorable treatment, the Plan Administrator shall pay, in full satisfaction and release of such Claim, to each holder of an Allowed Administrative Claim, Cash, in an amount equal to such Allowed Administrative Claim, on the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Claims representing obligations incurred in the ordinary course of business of the Debtors, if any, shall be paid in full in accordance with the terms and conditions of the particular transactions and any applicable agreements.  Cash payments of Allowed Administrative Claims constituting Budgeted Expenses (other than Allowed Professional Fee Claims) shall be paid from the Budgeted Claims Reserve; *provided, however*, that all Allowed Administrative Claims (other than Allowed Professional Fee Claims) not constituting a Budgeted Expense, shall instead be paid from the Gift Reserve; *provided, further, however*, that Allowed Professional Fee Claims shall be paid first from any retainer or deposit held by the Holder of such Claim, and subsequently from the Professional Fee Claims Reserve.

Except for Professional Fee Claims and DIP Facility Claims, all requests for allowance and payment or any other means of preserving and obtaining payment of Administrative Claims (including substantial contribution claims (but not including Professional Fee Claims or Priority Tax Claims)), that have not been paid in the ordinary course, assumed by the Purchaser, released or otherwise settled, must be filed with the Bankruptcy Court and served upon the Plan Administrator no later than thirty (30) days after the Effective Date (the "Administrative Claims Bar Date"). For the avoidance of doubt, the Indenture Trustee and counsel to the Indenture Trustee are not required to file a request for allowance and payment of the Indenture Trustee's Fees. Any request for allowance and payment of Administrative Claims that is not filed by the Administrative Claims Bar Date will be forever disallowed and barred, and holders of such Claims will not be able to assert such Claims in any manner against the Debtors, the Debtors' Estates, the Plan Administrator, the Post-Effective Date Debtors, or any of their respective Affiliates or representatives. Objections to such requests must be filed and served on the requesting party by not later than sixty (60) days after the filing of the applicable request for payment of such Administrative Claims (or such longer period as may be allowed by order of the Bankruptcy Court).

(ii)     **Priority Tax Claims**

Except to the extent the Holder of an Allowed Priority Tax Claim agrees to different and less favorable treatment, the Plan Administrator shall pay, in full satisfaction and release of such Claim, to each Holder of an Allowed Priority Tax Claim, Cash, in an amount equal to such Allowed Priority Tax Claim, on the later of (a) the Effective Date; and (b) the first Business Day after the date that is thirty (30) days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable. Cash payments of Allowed Priority Tax Claims that are Budgeted Expenses shall be paid from the Budgeted Claims Reserve; *provided, however*, that all Allowed Priority Tax Claims not constituting a Budgeted Expense shall instead be paid from the Gift Reserve.[9]

(iii)     **Professional Fee Claims**

Professional Fee Claims shall be subject to approval by the Bankruptcy Court. Each Holder of a Professional Fee Claim seeking an award by the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred through and including the Effective Date (other than substantial contribution claims under section 503(b)(4) of the Bankruptcy Code) must file and serve its respective application for allowance of such Professional Fee Claim no later than the date that is forty-five (45) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court. Objections to applications of such Professionals for compensation and/or reimbursement of expenses must be filed and served on the Plan Administrator and the requesting Professional no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served; *provided, however* that the Plan Administrator shall not have standing or the authority to object to Professional Fee Claims. Cash payments of Allowed

---

[9] The Debtors are subject to an ongoing sales tax audit covering the period from January 2016 to June 2019. The Debtors, and their tax advisors (KPMG), are currently working with state auditors to close out the audit. Out of an abundance of caution, the Debtors have reserved $300,000 to cover any potential liabilities, but the Debtors dispute that any liability is owed.

Professional Fee Claims shall be paid (a) first, from any pre-Effective Date retainer or deposit held by the Holder of such Claim; and (b) second, to the extent any such pre-Effective Date retainer or deposit is insufficient to satisfy such Holder's Allowed Professional Fee Claim in full, from the Professional Fee Claims Reserve.  The balance of any pre-Effective Date retainer or deposit held by the Holder of a Professional Fee Claim shall be paid to the Plan Administrator within two (2) Business Days following satisfaction in full of such Holder's Professional Fee Claim and shall be distributed to the Prepetition Agent pursuant to Section 4.02(b).

### (iv)    Statutory Fees

On or before the Effective Date (or as soon as reasonably practicable after such fees become due), the Debtors shall have paid in full, in Cash (including by check or wire transfer), in U.S. dollars, all fees then due and payable pursuant to section 1930 of title 28 of the United States Code.  After the Effective Date, the Plan Administrator shall pay any and all post-Effective Date fees pursuant to section 1930 of title 28 of the United States Code when due and payable from the Budgeted Claims Reserve until such time as the Bankruptcy Court enters a final decree closing the Cases.

### F.    When will I receive a distribution on account of my Allowed Claim or Interest?

The timing of Distributions is subject to the terms of Articles III, IV, VII, and IX of the Plan.  Except as otherwise specifically provided in the Plan, any Distributions and delivery to be made under the Plan shall be made on the Effective Date or as soon as practicable thereafter.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Any payment, delivery, or Distribution by the Plan Administrator pursuant to the Plan, to the extent delivered by the United States mail, shall be deemed made when deposited by the Plan Administrator (or his or her agent or designee) into the United States mail.  Distributions or deliveries required to be made by the Plan on a particular date shall be deemed to have been made on such date if actually made on such date or as soon thereafter as practicable taking into account the need to establish the Distribution Reserve Accounts and account for Disputed Claims.  Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim (plus any interest accruing on such Claim that is payable in accordance with the Plan and the Bankruptcy Code)

### G.    How will I receive a distribution on account of my Allowed Claim or Interest?

Any Cash payment to be made pursuant to the Plan may be made by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of the Plan Administrator.

### H.    What impact does the Bar Date have on my Claim?

The Debtors filed their schedules of assets and liabilities, schedules of executory contracts, (collectively, the "Bankruptcy Schedules") and statements of financial affairs (collectively, the "Bankruptcy SOFAs") with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code

on December 18, 2019. The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be Filed in a chapter 11 case.

In accordance with the rules governing complex chapter 11 cases, April 8, 2020 was the claims Bar Date for all entities other than Governmental Units (as defined in the Bankruptcy Code) in the Cases, and July 7, 2020 was the claims Bar Date for Governmental Units. *See* Procedures for Complex Chapter 11 Cases in the Southern District of Texas, Section H, available at https://www.txs.uscourts.gov/.

In accordance with Bankruptcy Rule 3003(c)(2), if any person or Entity that is required, but failed, to File a Proof of Claim on or before the Bar Date, except in the case of certain exceptions explicitly set forth in an order of the Bankruptcy Court, such person or Entity will be: (i) barred from asserting such Claims against the Debtors in these Cases; (ii) precluded from voting on any plans of reorganization or liquidation Filed in these Cases; and (iii) precluded from receiving distributions from the Debtors on account of such Claims in these Cases. Notwithstanding the foregoing, a Holder of a Claim shall be able to assert, vote upon, and receive distributions under the Plan, or any other plan of reorganization or liquidation in the Cases, to the extent, and in such amount, as any undisputed, non-contingent, and liquidated Claims identified in the Schedules on behalf of such Claim Holder.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which Proofs of Claim were Filed on or before the Bar Date.

## I.      Are any regulatory approvals required to consummate the Plan?

The Debtors will comply with all applicable state and federal regulatory approvals required to consummate the Plan, but the Debtors are not currently aware of any such approvals that are required. To the extent that regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

## J.      What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, the Debtors may not be able to make distributions as provided in the Plan. The Debtors believe that an alternative plan, or conversion of these Cases to cases under Chapter 7 of the Bankruptcy Code, would provide Holders of Claims or Interests with less than they would receive pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case and/or conversion of these Cases to cases under Chapter 7 of the Bankruptcy Code, *see* Article X of this Disclosure Statement and the Liquidation Analysis attached as **Exhibit B**.

**K.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan, certain conditions must be satisfied or waived so that the Plan can go effective.  The Plan Administrator will make distributions pursuant to the terms of the Plan Administrator Agreement and the Plan.  A copy of the Plan Administrator Agreement will be filed as part of the Plan Supplement.

Article XII of the Plan (which provisions may be waived) includes the following as conditions precedent to Effective Date of the Plan:

(1)    The Confirmation Order shall have been entered in form and substance reasonably acceptable to the Debtors and acceptable to the Agent, and such Order shall have become a Final Order.

(2)    The Plan and the Plan Supplement shall be in form and substance acceptable to the Agent.

(3)    All documents and agreements necessary to implement the Plan, which documents shall be in form and substance acceptable to the Agent shall have (i) been tendered for delivery and (ii) been effected or executed by all Persons party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements;

(4)    All DIP Facility Claims shall have been paid in full in Cash.

(5)    The Plan Administrator Agreement shall have been fully executed in form and substance reasonably acceptable to the Debtors and acceptable to the Agent.

(6)    The Debtors shall have paid in full all accrued and unpaid fees and expenses of the Agent's professionals as of the Effective Date.

(7)    The Post-Effective Date Agent Professional Retainers shall have been fully funded.

(8)    There shall not be in effect any (i) order entered by any court of any competent jurisdiction; (ii) any order, opinion, ruling, or other decision entered by any administrative or governmental entity; or (iii) applicable law, prohibiting or making illegal the consummation of any material Transactions contemplated by the Plan.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.  Each of the conditions set forth above may be waived in whole or in part by the Debtors with the consent of the Agent.  The failure to satisfy or waive any condition to Confirmation or the Effective Date may be asserted by the Agent regardless of the circumstances giving rise to the failure of such condition to be satisfied.

**L.      Is there potential litigation related to the Plan?**

Parties-in-interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation.

In the event that Confirmation of the Plan over the rejection of certain Classes becomes necessary, the Debtors may seek Confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cram down" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired class, if the Bankruptcy Court determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**M.      Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed Unsecured Claims Entitled to Vote under the Plan?**

Article II.C of this Disclosure Statement sets forth a chart of the projected range of recoveries that Holders of Allowed General Unsecured Claims would receive based on estimates of projected Allowed General Unsecured Claims in each of the applicable Classes set forth in the Plan.

Although the Debtors' estimate of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.  The total amount of Class 4 GUC Claims asserted against the Debtors in these cases is $92,471,000, which amount is subject to change.  The projected amount of Allowed General Unsecured Claims set forth in Article II.C of this Disclosure Statement is subject to change.

Finally, the Debtors or other parties in interest may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to vary from the Debtors' estimates.  These changes could affect recoveries to Holders of Allowed General Unsecured Claims, and such changes could be material.

**N.      How will the preservation of certain Causes of Action affect my recovery under the Plan?**

The Plan provides for the retention of all Retained Causes of Action listed on **Exhibit E**, and does not include those that are, or were previously, transferred, retained, waived, relinquished, exculpated, released, compromised, or settled.  All Retained Causes of Action shall vest in the Post-Effective Date Debtors for the benefit of the Holders of Prepetition Secured Claims until the Prepetition Secured Claims are paid in full, and then for the benefit of Holders of Allowed Class 4 GUC Claims.

The Plan Administrator may commence and pursue any and all Retained Causes of Action of the Debtors, whether arising before or after the Petition Date, and the Post-Effective Date Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved

notwithstanding the occurrence of the Effective Date, other than the Causes of Action previously released by the Debtors.

The recoveries received as a result of the successful prosecution of any Retained Causes of Action will vest in the Post-Effective Date Debtors for the benefit of the Holders of Prepetition Secured Claims until the Prepetition Secured Claims are paid in full, and then for the benefit of Holders of Allowed Class 4 GUC Claims.  The value of the Retained Causes of Action is uncertain, unliquidated, and subject to various contingencies.  Accordingly, the Debtors have not included any such value in the projected recoveries summarized in Article II(C).

**O.**     **What is the deadline to vote on the Plan?**

The voting deadline is December 11, 2020 at 4:00 p.m. (prevailing Central Time).

**P.**     **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot or a master ballot including your vote is <u>actually received</u> by Epiq Corporate Restructuring, LLC, the Debtors' Claims, Noticing, and Solicitation Agent, <u>on or before the Voting Deadline, on December 11, 2020 at 4:00 pm (prevailing Central Time)</u>.  *See* Article IX of this Disclosure Statement for more information.

**Q.**     **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party-in-interest may object to Confirmation of the Plan.

**R.**     **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for **December 16, 2020 at 9:00 a.m. (prevailing Central Time)**.  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtors, and certain other parties, by no later than **December 11, 2020 at 4:00 p.m. (prevailing Central Time)** in accordance with the notice of the Confirmation Hearing and the *Order (I) Conditionally Approving Proposed Disclosure Statement; (II) Establishing Solicitation and Voting Procedures; (III) Scheduling Combined Hearing; and (IV) Establishing Notice and Objection Procedures* [Dkt. No. 669] attached hereto as **Exhibit C**  (the "<u>Disclosure Statement Order</u>") and incorporated herein by reference.

**S.**     **What is the purpose of the Confirmation Order?**

Confirmation of the Plan will bind the Debtors and all parties-in-interest, any person acquiring property under a plan of liquidation, any creditor or equity interest holder of a Debtor,

---

and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  The order confirming the Plan will provide for the treatment of all parties in accordance with the terms of the confirmed Plan.

**T.    What is the effect of the Plan on the Debtors' ongoing businesses?**

Pursuant to the Sale Order, the Debtors sold substantially all of their assets.  As a result, the Debtors have *de minimus* assets (other than Available Cash consisting primarily of the remaining Alpine Settlement Proceeds and the remaining Net Sale Proceeds after the $100 million adequate protection payment made in accordance with the Sale Order as described in Article VI(M) below) and have effectively ceased active operations.  The Plan contemplates distributing such Available Cash as part of a liquidation under chapter 11 of the Bankruptcy Code.  Further, after the Effective Date, the Plan Administrator shall liquidate the Debtors' remaining non-Cash assets, distribute the proceeds pursuant to the terms and provisions of the Plan, and, subject to the Agent's consent and consistent with applicable non-bankruptcy law, Wind Up the Post-Effective Date Debtors as expeditiously as practicable.

**U.    Can the Debtors amend or modify the Plan?**

Yes, subject to the consent of the Agent or by announcement on the record at the Confirmation Hearing, the Debtors may alter, amend, or modify the Plan, the Plan Documents, or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time before the Confirmation Date.

Further, if any amendment, modification, or supplement to the Plan (including the Plan Supplement or a modification described in the Plan) or any Exhibit hereto or thereto is made without the consent of the Agent or by announcement on the record at the Confirmation Hearing, then notwithstanding any other agreement to the contrary, the Agent shall have no obligation to support, or take any actions in support of, the Plan.  After the Confirmation Date and before "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, subject to the consent of the Agent, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan, so long as such proceedings do not (i) materially adversely affect the treatment of Holders of Claims or Interests under the Plan; or (ii) materially modify any provision of the Asset Purchase Agreement or any of the Purchaser's rights thereunder; *provided, however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

**V.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims, Noticing, and Solicitation Agent, Epiq Corporate Restructuring, LLC, via one of the following methods:

If by First Class Mail:

> Approach Resources Inc. Claims Processing Center
> c/o Epiq Corporate Restructuring, LLC
> P.O. Box 4419
> Beaverton, OR  97076-4419

If by Hand Delivery or Overnight Mail:

> Approach Resources Inc. Claims Processing Center
> c/o Epiq Corporate Restructuring, LLC
> 10300 SW Allen Blvd.
> Beaverton, OR  97005

By telephone (domestic toll free) at:

> Toll Free U.S.: (855) 930-0678
> Non U.S. Parties: (503) 597-5538

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in these Cases are available upon written request to the Claims, Noticing, and Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Claims, Noticing, and Solicitation Agent at https://dm.epiq11.com/approachresources (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy/ (for a fee).

The Company has filed reports with, and furnishes other information to, the SEC. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.

**W.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize, and have less inherent value than, the value inherent under the Plan.

**X.      Who Does Not Support the Plan?**

At this time, the Debtors are not aware of any Holders of Claims or Interests that do not support the Plan.

### ARTICLE V
### THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

**A.      Overview of the Debtors' Business**

Approach Resources Inc. ("Approach"), a Delaware corporation headquartered in Fort Worth, Texas, is an independent exploration and production company focused on the acquisition

and development of U.S. onshore oil and natural gas resources.  Approach Oil & Gas Inc., a Delaware corporation ("AOG"), and Approach Operating, LLC ("Approach Operating"), Approach Delaware, LLC ("Approach Delaware"), Approach Services, LLC ("Approach Services") and Approach Midstream Holdings LLC ("Approach Midstream"), each a Delaware limited liability company, are wholly-owned subsidiaries of Approach.  Approach Resources I, LP ("Approach LP") is a Texas limited partnership with Approach Operating holding a 1% general partnership interest and Approach Delaware holding a 99% limited partnership interest.

As of the Petition Date, the Debtors engaged in the exploration, development, production, and acquisition of unconventional oil and gas reserves in the Midland Basin of the greater Permian Basin in West Texas, where the Debtors leased approximately 116,000 net acres.  Approach is a holding company with no independent assets or operations.  All of the Debtors' oil and gas leases were held by AOG and Approach LP as of the Petition Date.  As of the Petition Date, all of the Debtors' employees were employed by Approach Operating, and the Debtors' assets were operated by Approach Operating.  As of the Petition Date, Approach Operating managed substantially all of the Debtors' receipts and disbursements.  Approach Midstream, Approach Delaware, and Approach Services currently perform no material services, and hold no material assets.

For the three months ended September 30, 2019, the Debtors produced approximately 863 MBoe (9.4 MBoe/d), made up of 23% oil, 36% natural gas liquids ("NGLs") and 41% natural gas.  As of September 30, 2019, the Debtors owned working interests in 792 producing oil and gas wells.  As of September 30, 2019, the Debtors did not hold interests in wells they did not operate.

### B.    Corporate History

Approach was formed in September 2002 and completed its initial public offering ("IPO") in November 2007.  Beginning in 2004, Approach grew its daily production from zero to a high of 16.6 MBoe/d for the third quarter of 2015, before drilling was suspended due to the ongoing decline in commodity prices.  The Company's long-term business strategy was to create value by growing reserves and production in a cost-efficient manner and at attractive rates of return by pursuing the strategies discussed below.  The rate of growth of the Company's reserves and production, as well as achievable rates of return, were dependent on commodity prices and the availability of capital.

At the time of Approach's IPO, its principal operations were located in the Ozona Northeast field in West Texas, where the Debtors originally acquired approximately 28,000 gross (27,000 net) acres of leasehold interests in 2004.  From 2004 through 2010, the Debtors drilled over 500 vertical gas wells.  During the economic downturn of 2008, natural gas prices fell from a high of $10.79 in July 2008 to below $3.00 in September 2009.  As a result, the Company explored alternative methods of exploiting its acreage position.  The Debtors embarked on a series of Wolfcamp tests and modeling exercises in the Permian Basin beginning in 2009, and in March 2011, the Company completed its first horizontal Wolfcamp shale well.  Since that time, the Company has drilled primarily horizontal wells targeting the Wolfcamp shale.

During 2014 and 2015, the oil and gas industry experienced dramatic commodity price decreases.  Accordingly, beginning in 2015 and through 2016, the Company substantially reduced drilling activity, which led to a natural decline in production.  In 2017, the Company focused on

increasing capital expenditures in a disciplined manner in connection with slowly recovering commodity prices, strengthening its balance sheet and increasing operating cash flow. By way of example, in November 2017, to improve production, leverage, and profitability, the Company acquired additional producing properties adjacent to its existing acreage position through the issuance of Approach equity securities. The drastic decline of commodity prices in 2018, however, raised substantial doubt about the Company's ability to continue as a going concern. Accordingly, the Company began pursuing a number of deleveraging and strategic actions more fully described herein.

Approach's common stock, par value $0.01 per share ("Common Stock") previously traded on the Nasdaq Global Select Market under the symbol "AREX." On November 12, 2019, trading of Approach's Common Stock on the Nasdaq Global Select Market was suspended and subsequently delisted due to Approach's inability to achieve compliance with the $1.00 per share minimum closing bid price required by Nasdaq's continued listing requirements. Effective November 12, 2019, Approach's Common Stock commenced trading on the OTC Pink marketplace.

### C.  The Debtors' Assets and Operations

Since Approach's IPO in November 2007, the Debtors, through a series of strategic leasehold acquisitions, increased their Wolfcamp acreage to approximately 100,000 net acres. The Debtors' core acreage position, which was concentrated within Crockett and Schleicher counties, two adjacent counties in West Texas, provided a competitive advantage through synergies and efficiencies of scale. In Limestone County, the Company also had a 50% working interest and a 40% net revenue interest in nine gross producing gas wells in approximately 2,000 net acres held by production.

As of September 30, 2019, the Debtors held mineral leases in each area of their operation that were still within their original lease term and were not currently held by production. Leases not held by production represented 25% of Debtors' net acreage, and 1% of the Debtors' proved undeveloped reserves. The Debtors' undeveloped acreage included approximately 23,000 net acres subject to continuous development obligations, and the leases with respect to this acreage provided that they could be terminated if certain continuous development obligations were not met.

The Debtors also had an extensive network of centralized production facilities, water transportation, handling, and recycling systems, saltwater disposal wells and gas lift lines.

### D.  The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors' debt obligations consisted of: (i) borrowings of approximately $322 million in principal amount and $0.3 million of issued and undrawn letters of credit outstanding under the Prepetition Credit Facility (as defined below); and (ii) $85.2 million in principal amount of Senior Notes. Additionally, as of the Petition Date, Approach had 93,661,225 shares of Common Stock issued and outstanding. Approach has no preferred stock, warrants, or stock options outstanding.

### (i)    Senior Secured Credit Facility

Certain of the Debtors are party to that certain  Amended and Restated Credit Agreement, dated as of May 7, 2014 (as amended, the "<u>Prepetition Credit Agreement</u>"), by and among Approach, as borrower, JPMorgan Chase Bank, N.A., as an Issuing Bank and as Administrative Agent (the "<u>Prepetition Agent</u>"), and certain lender parties thereto (the "<u>Prepetition Lenders</u>").  All of the remaining Debtors (other than Approach Operating and Approach Delaware) are guarantors under the Prepetition Credit Agreement.  Pursuant to the Prepetition Credit Agreement, the Prepetition Lenders agreed to provide the Debtors with a senior secured reserve-based credit facility, with a current borrowing base of $325 million.  The maturity date of the Prepetition Credit Agreement is May 7, 2020.  The obligations under the Prepetition Credit Agreement are secured by a first-priority lien on and security interest on substantially all of the Debtors' personal property (the "<u>Prepetition Collateral</u>").  Certain of the Debtors, namely (a) Approach LP and (b) AOG, also executed certain deeds of trust (collectively, the "<u>Deeds of Trust</u>") in favor of and for the benefit of the Prepetition Agent and the Prepetition Lenders.  The Deeds of Trust pledged these two Debtors' respective interests in substantially all of their oil, gas, and mineral-related assets.

As set forth in further detail below, the Debtors utilized derivative contracts to economically hedge their exposure to price fluctuations in oil and gas and thereby reduce the variability in the Debtors' cash flows associated with anticipated sales of future oil and natural gas production.  As of September 20, 2019, the aggregate mark-to-market value of all derivative assets and liabilities related to certain  Prepetition hedging agreements (the "<u>Prepetition Hedging Agreements</u>"), calculated using standard industry valuation processes, was a net asset of approximately $0.9 million (subject to daily fluctuations).  The Debtors did not post collateral specific to any of their Prepetition Hedging Agreements because they are secured under the Prepetition Credit Agreement.  The Prepetition Hedging Agreements terminated on November 18, 2019, and the proceeds were applied to the debt of the Prepetition Secured Lenders.

### (ii)    7.00% Senior Notes

Pursuant to a senior indenture dated June 11, 2013 (the "<u>Indenture</u>"), as supplemented by a first supplemental indenture of even date therewith by and among Approach, its subsidiary guarantors and Wilmington Trust, National Association, as successor trustee (the "<u>First Supplemental Indenture</u>"), in June 2013, Approach issued $250 million aggregate principal amount of unsecured 7.00% Senior Notes due June 15, 2021 (the "<u>Senior Notes</u>") in a public offering.  The Senior Notes are fully and unconditionally guaranteed on a senior unsecured basis by each of Approach's subsidiaries, subject to certain customary release provisions.

On December 20, 2016, Approach, its subsidiary guarantors, and Wilmington Trust, National Association, as trustee, entered into a second supplemental indenture (the "<u>Second Supplemental Indenture</u>"), which became effective on January 27, 2017.   The Second Supplemental Indenture, among other things, (a) eliminated certain definitions and references to definitions contained in the First Supplemental Indenture, (b) eliminated and revised, as applicable, certain events of default contained in the First Supplemental Indenture, (c) eliminated certain conditions to consolidation, merger, conveyance, transfer or lease contained in the First Supplemental Indenture, and (d) eliminated certain covenants contained in the First Supplemental Indenture, including substantially all of the restrictive covenants set forth therein.  Following the

Second Supplemental Indenture, the Indenture, as amended, contains limited covenants and events of default, and a payment default under the Prepetition Credit Agreement would not result in an event of default under the First Supplemental Indenture.

As further described below, Approach has completed certain Exchange Transactions (as defined below) to reduce the amount of outstanding principal on the Senior Notes. Specifically, in January and March 2017, Approach completed debt-for-equity exchanges with Wilks Brothers, LLC and its affiliates (collectively "Wilks") and other holders of Senior Notes pursuant to which $130,552,000 and $14,528,000 of outstanding Senior Notes were validly tendered and exchanged for 39,165,600 and 4,009,728 shares of Approach Common Stock, respectively.

As of the Petition Date, approximately $85.2 million in principal amount of Senior Notes remained outstanding. The Debtors estimate that Wilks holds approximately $62.3 million of the outstanding Senior Notes.

### (iii)   Common Stock

As of the Petition Date, there were 93,630,390 shares of Common Stock issued and outstanding. The Common Stock traded on the Nasdaq Global Select Market. As noted above, the Common Stock previously traded on the Nasdaq Global Select Market. On November 12, 2019, trading of Approach's Common Stock on the Nasdaq Global Select Market was suspended and subsequently delisted due to Approach's inability to achieve compliance with the $1.00 per share minimum closing bid price required by Nasdaq's continued listing requirements. Effective November 12, 2019, Approach's Common Stock commenced trading on the OTC Pink marketplace. Approach has never paid dividends on its Common Stock. As of the Petition Date, Wilks owned approximately 48% of the outstanding Common Stock based upon the most recent Schedule 13 D/A filing of Wilks, and, senior management of the Company owned approximately 1% of the outstanding Common Stock.

In connection with the debt-for-equity exchange with Wilks described above, Approach entered into a stockholders agreement with Wilks (the "Wilks Stockholders Agreement"). In accordance with the Wilks Stockholders Agreement, Wilks had authority to select three directors for nomination to the Approach board of directors (the "Board"). In January 2017, pursuant to the Wilks Stockholders Agreement, the Board appointed three Wilks designees, Morgan D. Neff, Matthew D. Wilks and Matthew R. Kahn, to serve as members of the Board. Messrs. Neff and Wilks were both affiliated with Wilks. On October 31, 2019 and November 1, 2019, Messrs. Neff and Wilks resigned from their positions on the Board, respectively. The Wilks Stockholders Agreement also provides that, until certain market capitalization levels are reached or the Wilks Stockholders Agreement expires, Wilks would vote its shares in proportion with the non-Wilks stockholders on typical annual meeting matters (including the election of directors).

### E.   Events Leading to Chapter 11

### (i)   Market Decline and Challenges Faced by the Debtors

Beginning in November 2014, commodity prices, particularly for crude oil, began to decline sharply. The decline continued into 2016. Although commodity prices partially recovered in late 2016 and continued to slowly recover in 2017, commodity prices did not fully recover from

---

their previous highs, and remained volatile throughout the period prior to the Petition Date. The magnitude of these price declines, as well as the slow pace and volatility of recovery, materially and adversely impacted the results of the Debtors' operations and led to substantial reductions in the Debtors' drilling program.

Each year since 2016, the Debtors operated a significantly reduced drilling schedule in an attempt to more closely align capital expenditures with cash flows. This reduced drilling activity led to a decline in production, as Approach was unable to drill and complete enough wells to fully offset natural production decline. The decrease in the price of oil, natural gas, and NGLs, along with the natural decline in production and limited new drilling activity, resulted in a significant reduction in the Debtors' revenue and EBITDAX, which declined approximately 56% and 69%, respectively, from the twelve months ended December 31, 2014 to the twelve months ended December 31, 2018.

Over that time, the Company explored and discussed with select counterparties various alternatives to strengthen its balance sheet and preserve financial flexibility. These alternatives included additional debt repurchases, debt-for-debt or debt-for-equity exchanges or refinancings, strategic investments and joint ventures, sales of assets or working interests, and private or public equity raises and rights offerings.

As of March 31, 2019 (and continuing through the Petition Date), Approach was not in compliance with the consolidated interest coverage ratio and consolidated total leverage ratio financial covenants under the Prepetition Credit Agreement, which represented an event of default under the Prepetition Credit Agreement. Because of this default, the entire outstanding balance under the Prepetition Credit Agreement was classified as a current liability on the Company's balance sheet as of June 30, 2019 and thereafter.

On May 9, 2019, the Debtors entered into a Limited Forbearance Agreement (the "Forbearance Agreement") with certain lenders named therein (the "Consenting Lenders") and JPMorgan Chase Bank, N.A., as an Issuing Bank and as Administrative Agent, with respect to the Prepetition Credit Agreement. Pursuant to the Forbearance Agreement the Administrative Agent and Consenting Lenders agreed, during a "forbearance period," to forbear from exercising their rights and remedies under the Prepetition Credit Agreement (and related loan documents) and applicable law with respect to the occurrence or continuance of certain specified events of default. The Forbearance Agreement was amended 9 times to extend the termination date, and finally expired on October 28, 2019.

On September 16, 2019, and October 1, 2019, to preserve liquidity, Approach did not make its scheduled interest payments under the Prepetition Credit Agreement. At that time, the Debtors did not have sources of additional working capital and, as a result, lacked sufficient liquidity to continue to fund ordinary course operations, maintain the value of their assets, and satisfy ongoing payment obligations under their debt documents.

**(ii)     Operational Initiatives**

In response to the commodity price downturn, the Debtors undertook a number of operational initiatives designed to either (a) recover more hydrocarbons from their operations, or

(b) reduce the cost of hydrocarbon recovery. These measures included, among other things, (a) streamlining drilling and completions activities to maximize efficiencies, (b) exploring various "fracing" formulas designed to both increase recovery, and decrease capital expenditures, (c) streamlining production operations and personnel to reduce costs, (d) building a centralized water recycle center to utilize recycled water while fracing and reducing truck and disposal fees when not fracing, (e) adding water disposal capabilities by converting marginally producing wells to disposal wells, and installing pipelines from the water recycle center to both Approach-owned and third party disposal wells, (f) designing and installing centralized production facilities to minimize gas, oil, and water gathering costs, (g) installing facilities to maximize capture of volatile liquids and reduce natural gas losses, (h) modifying chemical programs for flow assurance at reduced costs, (i) continually soliciting bids on services to ensure the best pricing and utilizing opportunistic dislocations to purchase equipment or utilize services to reduce costs, (j) modifying sales contracts to increase received pricing, (k) adding bolt-on acquisition acreage that increases cash flow with minimal incremental operational costs, (l) releasing non-core acreage that would otherwise require drilling activity to maintain, and (m) implementing both an expense and capital workover strategy focusing on the highest rates of return projects while avoiding expenditures on marginal projects.

These measures helped the Debtors to improve operational performance, stabilize their production and asset base, and preserve value for their stakeholders. Ultimately, however, the Debtors were left with insufficient working capital to continue in operation and did not have the means of raising additional working capital outside of a bankruptcy case, which lead the Debtors to commence these Cases in order to maximize the value of their assets and businesses for the benefit of all stakeholders.

**(iii)     Cost Management Initiatives**

The Debtors have historically been an industry-leader in low cost operations in the Permian Basin, implementing cost reduction strategies throughout the commodity price downturn. In the span of four years, the Debtors reduced their cash operating expenses by $24.6 million, or 34%, from $72.5 million for the year ended December 31, 2014 to $47.9 million for the year ended December 31, 2018.

Similarly, the Debtors worked to reduce their capital expenditures through the commodity price downturn, electing to focus on projects and drilling sites with the highest projected rates of return. For the year ended December 31, 2014, the Debtor's capital expenditures totaled $393.5 million, compared to $1.9 million for the six months ended June 30, 2019.

In the past five years prior to the Petition Date, the Debtors significantly reduced their workforce from 142 employees to 89 employees, a 37% reduction. Additionally, in April 2019, Approach internally replaced three members of its executive management team, which further reduced general and administrative expenses. Approach also reduced 2017 and 2018 executive incentive compensation below amounts otherwise that would have been earned in accordance with the Company's compensation plans previously in place.

### (iv)   Financial Management

In each year since 2015, the Debtors operated with a reduced capital expenditure program as they worked to align capital expenditures with projected operating cash flow.  Moreover, the Company engaged in extensive efforts to improve liquidity and restructure its balance sheet.  To wit, in 2016, Approach's long-term debt peaked at $531.5 million, and through a series of repurchases of Senior Notes and debt-for-equity exchanges over the next four years, Approach reduced its total debt by $124.3 million to $407.2 million as of the Petition Date.  Such efforts are more broadly described below.

In May 2016, Approach entered into an amendment to the Prepetition Credit Agreement to, among other things, increase its flexibility to pursue alternative financing and restructure its balance sheet.  The amendment, among other things, permitted the issuance of up to $150 million of second lien indebtedness and the repurchase of outstanding debt with the proceeds of certain asset sales, equity issuances, or second lien indebtedness.

In May 2016, to improve its leverage position to meet certain financial covenants under the Prepetition Credit Agreement, Approach entered into negotiations with its largest bondholder, Wilks, regarding a debt-for-equity exchange.  On November 2, 2016, Approach entered into an exchange agreement with Wilks to exchange $130,552,000 principal amount of Senior Notes for 39,165,600 newly issued shares of Common Stock (the "Initial Exchange").  On January 26, 2017, holders of Approach Common Stock approved the Exchange Transactions (defined below).  The Initial Exchange closed on January 27, 2017, and the Second Supplemental Indenture became effective, which removed certain covenants and events of default from the indenture governing the Senior Notes and eliminated certain restrictive covenants.

On March 22, 2017, Approach exchanged an additional $14,528,000 principal amount of outstanding Senior Notes for 4,009,728 shares of Common Stock (the "Follow-On Exchange," together with the Initial Exchange, the "Exchange Transactions").  Together, the Exchange Transactions reduced the principal amount of outstanding Senior Notes by $145.1 million and reduced interest payments by $44.3 million over the remaining term of the Senior Notes.

In December 2017, Approach entered into an amendment to the Prepetition Credit Facility to, among other things, extend the maturity date to provide additional flexibility to pursue strategic deleveraging alternatives and to provide a runway in the event of a commodity price recovery.

### (v)   Engagement of Restructuring Advisors to Assist the Debtors

In response to the challenges outlined above, the Debtors sought the advice of various professionals with restructuring expertise.  In February 2018, the Company engaged Intrepid Financial Partners, LLC ("Intrepid") to assist with strategic discussions regarding a potential acquisition of assets.  In May 2018, the Debtors engaged Tudor, Pickering & Holt ("TPH") as financial advisor to explore strategic alternatives to strengthen their balance sheet and maximize the value of the Company.  In March 2019, the Company expanded the engagement of TPH to include its affiliate, Perella Weinberg Partners L.P. (PWP) to provide advice regarding its capital structure restructuring

---

The Debtors also engaged Thompson & Knight LLP ("TK"), its existing corporate counsel, as restructuring counsel, and retained Alvarez & Marsal North America, LLC ("A&M," and together with TPH, PWP and T&K, the "Advisors") as restructuring advisors. Collectively, the Advisors were engaged to assist the Debtors in analyzing and assessing options with respect to a restructuring of the Debtors' prepetition capital structure and balance sheet, analyzing and addressing near-term liquidity issues, and assisting the Debtors in connection with their discussions and negotiations with existing stakeholders and potential third-party investors regarding potential refinancing and restructuring transactions.

**(vi)     Appointment of Special Committee**

Due to potential conflicts of interests resulting from Wilks' representation on the Board, in April 2018, the Board formed a committee of independent directors (the "Special Committee") to evaluate a potential exchange transaction with Wilks as well as other strategic alternatives to reduce leverage. The Special Committee, which is comprised of members of the Approach Board who are not affiliated with Wilks, hired financial and legal advisors to advise the Special Committee on these matters.

**(vii)     Discussions with Stakeholders**

Beginning in early 2018, Approach management and the Board reviewed, pursued, and attempted to negotiate multiple out-of-court restructuring options, none of which proved workable. Most prominently, on April 12, 2018, Wilks disclosed in a Schedule 13D/A filing that they intended to engage in discussions with the Company regarding their investment in the Company, including the possible acquisition of additional shares of Common Stock through the exchange of approximately $62.3 million of Senior Notes then held by Wilks.

The Special Committee engaged in discussions with Wilks regarding an exchange transaction in 2018, but in mid-2018, Wilks and the Committee deferred further discussions regarding a stand-alone exchange transaction pending resolution of the Company's discussions regarding the potential transaction described in the paragraph below.

In addition to the proposed exchange transaction with Wilks, management reviewed and considered numerous cash-flow producing properties for potential acquisition over the last several years in order to grow the Debtors' production base and reduce Approach's leverage ratio to a sustainable level and one that is in compliance with the applicable financial covenants in the Prepetition Credit Agreement.

Beginning in May 2018, Approach, with assistance from Intrepid, reached out to approximately 40 potential sources of financing to fund an asset acquisition with the goal of reducing Approach's leverage metrics and achieving more certain compliance with the Company's financial covenants in the Prepetition Credit Agreement. Of the sources of financing approached, the Company executed 16 Non-Disclosure Agreements, and following extensive discussions, only two external sources of financing were willing to engage in substantive negotiations regarding a financing transaction. Concurrently, Approach reached out to Wilks, its largest equity holder and noteholder for fundraising support, as well as to the Prepetition Lenders with respect to amending the Prepetition Credit Agreement to accomplish a strategic transaction. Despite a deteriorating

commodity price market, discussions with both the seller and financing parties progressed throughout 2018.  Following nine months of negotiation, the parties were unable to reach an agreement.

In March 2019, the Board expanded the scope of the duties of the Special Committee to explore, in addition to a potential exchange transaction with Wilks, other financing alternatives and deleveraging transactions, including without limitation (a) amendments or waivers to the covenants or other provisions of the Prepetition Credit Agreement, (b) raising new capital in private or public markets, and (c) restructuring Approach's balance sheet either in court or through an out-of-court agreement with creditors.  Approach management also reviewed operational matters such as adjusting its capital budget and improving cash flows from operations by continuing to reduce costs, and continued to pursue and consider other strategic alternatives, including: (a) acquiring assets with existing production and cash flows by issuing preferred and common equity to finance such acquisitions; (b) selling existing producing or midstream assets; and (c) merging with a strategic partner.

From March through August 2019, Approach negotiated with the Prepetition Lenders and Wilks regarding a debt-for-preferred-equity exchange with the Wilks, as well as an additional capital infusion and an amendment to the Prepetition Credit Agreement.  Despite best efforts, the Debtors were not able to reach an agreement with their stakeholders.  The Debtors ultimately determined that, given their liquidity position and lack of near-term resolution to such discussions, filing for protection of chapter 11 was a necessary next step.

The Company also filed reports with, and furnished other information to, the SEC. Copies of any document filed with the SEC, which are incorporated as if fully set forth herein, may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.

## ARTICLE VI
## KEY EVENTS IN THESE CASES

### A.     First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed a notice and several motions (collectively, the "First Day Motions") designed to facilitate the administration of these Cases and minimize disruption to the Debtors' operations.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Sergei Krylov in Support of Debtors' Chapter 11 Proceedings and First Day Pleadings*, filed on the Petition Date [Dkt. No. 18] (the "Krylov Declaration").

The First Day Motions were heard by the Bankruptcy Court on an interim basis on November 19, 2019 and, as applicable, on a final basis on December 13, 2019 (collectively, the "First Day Hearings").  After the First Day Hearings, the Bankruptcy Court entered the following orders:

- *Order Directing Joint Administration of Chapter 11 Cases* [Dkt. No. 15];

- *Interim Order (i) Authorizing Debtors to (a) Continue Existing Cash Management System, (b) Honor Certain Related Obligations, (c) Continue Intercompany Arrangements, (d) Maintain Existing Bank Accounts and Business Forms, and (e) Continue Corporate Card Programs; (ii) Waiving Requirements of 11 U.S.C. § 345(b); and (iii) Granting Related Relief* [Dkt. No. 25];

- *Final Order (i) Authorizing Debtors to (a) Continue Existing Cash Management System, (b) Honor Certain Related Obligations, (c) Continue Intercompany Arrangements, (d) Maintain Existing Bank Accounts and Business Forms, and (e) Continue Corporate Card Programs; (ii) Waiving Requirements of 11 U.S.C. § 345(b); and (iii) Granting Related Relief* [Dkt. No. 109];

- *Order (i) Authorizing Debtors to (a) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (b) Maintain Employee Benefit Programs and Pay Related Obligations, and (c) Pay Prepetition Employment and Training Expenses, and (ii) Authorizing Financial Institutions to Honor and Pay All Related Checks Presented and Funds Transfer Requests* [Dkt. No. 28];

- *Order (i) Authorizing Debtors to Pay Prepetition Interest Owner Obligations and Operating Costs and Expenses; (ii) Authorizing Financial Institutions to Receive, Honor, Process and Pay All Checks Presented for Payment and to Honor All Funds Transfer Requests Related to Such Obligations; and (iii) Granting Related Relief* [Dkt. No. 26];

- *Interim Order (i) Authorizing Debtors to Continue Their Insurance Programs and Pay All Obligations with Respect thereto; (ii) Granting Relief from the Automatic Stay with Respect to Workers' Compensation Claims; (iii) Directing Financial Institutions to Honor and Pay All Related Checks Presented and Funds Transfer Requests; and (iv) Granting Related Relief* [Dkt. No. 29];

- *Final Order (i) Authorizing Debtors to Continue Their Insurance Programs and Pay All Obligations with Respect thereto; (ii) Granting Relief from the Automatic Stay with Respect to Workers' Compensation Claims; (iii) Directing Financial Institutions to Honor and Pay All Related Checks Presented and Funds Transfer Requests; and (iv) Granting Related Relief* [Dkt. No. 111];

- *Order (i) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (ii) Establishing Procedures for Resolving Objections by Utility Companies; (iii) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (iv) Granting Related Relief* [Dkt. No. 39];

- *Order (i) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments, and (ii) Authorizing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Funds Transfer Requests Related to Such Obligations* [Dkt. No. 26];

- *Order (a) Extending Time to File (i) Schedules of Assets and Liabilities; (ii) Schedules of Current Income and Expenditures; (iii) Schedules of Executory Contracts and Unexpired Leases; (iv) Statements of Financial Affairs; and (b) Waiving Requirements of Bankruptcy Rules 1007(a)(3) and 2002(d)* [Dkt. No. 31]

- *Interim Order (i) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stock of, and Claims Against, the Debtors and (ii) Granting Related Relief* [Dkt. No. 38];

- *Final Order (i) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stock of, and Claims Against, the Debtors and (ii) Granting Related Relief* [Dkt. No. 112].

The First Day Motions, the Krylov Declaration, and all orders for relief granted in these Cases, can be viewed free of charge at https://dm.epiq11.com/case/approachresources.

**B.      Other Procedural and Administrative Motions**

The Debtors also filed other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of these Cases and reduce the administrative burdens associated therewith.

- **Joint Administration Motion**.  On November 18, 2019, the Debtors filed their *Emergency Motion of Debtors for Order Directing Joint Administration of Chapter 11 Cases* [Dkt. No. 2] (the "Joint Administration Motion"), seeking the procedural consolidation and joint administration of the Debtors' Cases under the case of Approach Resources, Inc.  On the same day, the Court entered an order approving the Joint Administration Motion on a final basis [Docket No. 15].

- **Interim Compensation Procedures Motion**.  On December 9, 2019, the Debtors filed their *Motion of Debtors for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Dkt. No. 90] (the "Interim Compensation Motion"), seeking approval of procedures for the interim compensation and reimbursement of expenses of retained professionals in the Cases.  On December 31, 2019, the Court entered an order approving the Interim Compensation Motion [Dkt. No. 153].

**C.      DIP Financing and Use of Cash Collateral[10]**

On November 20, 2019, the Bankruptcy Court entered the *Interim Order (i) Authorizing Limited Use of Cash Collateral; (ii) Granting Adequate Protection; (iii) Modifying the Automatic*

---

[10] All capitalized terms in this section not herein defined shall have the meanings ascribed to such terms in the *Emergency Motion of Debtors For Entry of Orders (i) Authorizing Limited Use of Cash Collateral on an Interim Basis; (ii) Obtaining Postpetition Credit Secured by Senior Liens Upon Entry of a Final Order; (iii) Granting Adequate Protection; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [Dkt. No. 14] (the "Financing Motion").

*Stay, (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [Dkt. No. 32] (the "Interim Cash Collateral Order"), granting the Financing Motion on an interim basis.  Pursuant to the Interim Cash Collateral Order, the Debtors were authorized, among other things, to:

      (1)    use cash collateral of the Prepetition Secured Lenders (the "Cash Collateral");

      (2)    subject to the Carve Out, grant adequate protection liens and provide superpriority administrative claims and provide other adequate protection with respect to such use of Cash Collateral; and

      (3)    modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the Interim Cash Collateral Order.

On December 13, 2019, the Bankruptcy Court held a hearing to consider approval of the Financing Motion on a final basis.  The same day, an order approving the Financing Motion on a final basis was entered [Dkt. No. 110] (the "Financing Order").  Pursuant to the Financing Order, the Debtors were authorized, among other things, to:

      (1)    use Cash Collateral;

      (2)    obtain post-petition financing of up to $41,250,000 consisting of (i) Revolving DIP Loans of up to $16,500,000 and (ii) Roll-Up Loans of up to $24,750,000 (the "DIP Financing");

      (3)    subject to the Carve Out, grant liens and provide superpriority claims (collectively, the "DIP Superpriority Claims"), and otherwise provide adequate protection with respect to such postpetition financing;

      (4)    obtain authorization to use the proceeds of the DIP Financing in accordance with the terms and conditions set forth in the Plan and in the DIP Credit Agreement and the DIP Documents; and

      (5)    modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Loan Documents and the Final Order.

Importantly, the DIP Financing allowed the Debtors to strengthen their cash position, and sent a positive and credible message to the Debtors' workforce and commercial counterparties that the Debtors would have sufficient liquidity to maintain ordinary course operations and meet their financial commitments throughout the course of the Cases.  Further, the DIP Financing allowed the Debtors to resume a substantial portion of their drilling program in satisfaction of their leasehold requirements.  Absent the DIP Financing, the Debtors would have been unable to fund their capital expenditures program during the course of these Cases, which program was essential to maintaining the Debtors' asset base for the benefit of all of the Debtors' stakeholders.

The Financing Order, as amended by the *Order Approving (a) Bid Procedures; (b) the Form and Manner of Notice; (c) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (d) Granting Related Relief* [Dkt. No. 184]; as further amended by the *Notice of Extension of Milestones Pursuant to Final Order (i) Authorizing the*

*Debtors to (a) Obtain Postpetition Financing Secured by Senior Priming Liens and (b) Use Cash Collateral, (ii) Granting Liens and Providing Superpriority Administrative Expense Status, (iii) Granting Adequate Protection, (iv) Modifying the Automatic Stay, (v) Scheduling a Final Hearing, and (vi) Granting Related Relief* [Dkt. No. 303], set forth various milestones that required the Debtors to achieve various events by dates certain.  The Debtors, through negotiations with the Agent, extended those milestones from time to time.  *See, e.g.* Notices of Extensions of Milestones [Dkt. Nos. 318, 337, 492, 540, 558, and 623].  As extended, the most recent Notice of Extension of Milestones provides in pertinent part as follows:

    (a) On or before October 6, 2020, the Debtors shall have filed the Plan and Disclosure Statement, and a motion seeking approval of the Disclosure Statement.

    (b) On or before October 20, 2020, the Debtors shall have obtained entry of an order conditionally approving the Disclosure Statement.

    (c) On or before December 4, 2020, the Debtors shall have obtained entry of the Confirmation Order.

    (d) On or before December 18, 2020, the Effective Date of the Plan shall have occurred.

The DIP Financing matured on June 18, 2020, at which point the Debtors were required to pay the DIP Loans in full.  The $100 million adequate protection payment described below was used, in part, to pay down the DIP Facility Claims, and the Debtors are presently financing these cases through the consensual use of cash collateral, including use of the remaining portion of the Settlement Payment (as defined below), based upon a budget approved by the Agent.

### D.    Retention of Professionals by the Debtors

The Debtors have filed retention applications for certain professionals to represent and assist them in the administration of the Cases.  Many of these professionals have been actively involved with the negotiation and development of the terms of the Plan and the transactions contemplated thereunder, and many of these professionals will continue to provide needed services throughout the Cases.

The Debtors retained TK as their counsel.  TK is being compensated on an hourly basis subject to Bankruptcy Court approval through the fee application process.  The Debtors will also reimburse TK for all reasonable out of pocket expenses.  TK was approved as bankruptcy counsel pursuant to that *Order Employing Thompson & Knight LLP as Counsel to Debtors in Possession* [Dkt. No. 158] entered on December 31, 2019.

The Debtors retained A&M to act as the Debtors' financial advisors and assist the Debtors in navigating these Cases.  A&M is being compensated by the Debtors on an hourly basis subject to Bankruptcy Court approval through the fee application process.  The Debtors will also reimburse A&M for all reasonable out of pocket expenses.  A&M was approved as Debtors' financial advisors pursuant to that *Order Employing Alvarez & Marsal North America, LLC as Financial to Debtors in Possession* [Dkt. No. 155] entered on December 31, 2019.

The Debtors retained PWP to serve as their investment banker and to advise the Debtors on various transaction opportunities that may arise through these Cases. The engagement agreement with PWP provides that PWP will receive a monthly advisory fee, and will receive additional compensation depending upon what type of transaction is consummated. PWP was approved as Debtors' Investment Banker pursuant to that *Order Employing Perella Weinberg Partners, LP as Investment Banker to the Debtors in Possession* [Dkt. No. 157] entered on December 31, 2019.

The Debtors retained Epiq Corporate Restructuring, LLC ("Epiq") to serve as their claims, noticing, and solicitation agent (the "Claims and Noticing Agent"). The Debtors will pay Epiq reasonable and customary compensation for its services as Claims and Noticing Agent, plus reimbursement for reasonable out of pocket expenses. Epiq will perform administrative tasks only and will not make any recommendation to any holder of a Claim with respect to its acceptance or rejection of the Plan. Epiq was approved as the Debtors' Claims and Noticing Agent pursuant to that *Order Appointing Employ Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent* [Dkt. No. 30] entered on November 19, 2019.

The Debtors also retained KPMG LLP ("KPMG") as tax advisors to the Debtors. Pursuant to the engagement letter with KPMG, the Debtors will pay KPMG at its normal and customary hourly rate, with approximately a 25% discount for Tax Provision Services, a 35% discount for Tax Restructuring Services, and a 30% discount for R&D Services (as defined in the *Application of Debtors to Employ KPMG LLP as Tax Consultant to Debtors Nunc Pro Tunc to the Petition Date* [Dkt. No. 86] (the "KPMG Motion")), as well as additional compensation depending upon the benefits conferred to the Debtors. The KPMG Motion was approved pursuant to the *Order Authorizing Debtors to Employ KPMG LLPs as Tax Consultant to Debtors Nunc Pro Tunc to the Petition Date* [Dkt. No. 156] entered on December 31, 2019.

The Debtors have also retained various ordinary professionals utilized in the ordinary course of business, such as accountants, consultants, and engineers. The Debtors filed their *Motion of Debtors for Entry of an Order Authorizing Debtors to Employ Professionals Used in Ordinary Course of Business Effective as of Petition Date* [Dkt. No. 89] (the "Ordinary Course Professionals Motion") on the Petition Date. The Bankruptcy Court entered the *Order Authorizing the Debtors to Employ Professionals Used in Ordinary Course of Business Effective as of Petition Date* [Dkt. No. 154] entered on December 31, 2019.

### E.      Employee Compensation Plans

As of the Petition Date, the Debtors had approximately 89 full-time employees. As is typical for any organization of similar size, scope, and complexity, the Debtors provided various employee benefits and developed programs to encourage and reward exceptional employee performance.

On November 18, 2019, the Debtors filed their *Emergency Motion for an Order (i) Authorizing Debtors to (a) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (b) Maintain Employee Benefit Programs and Pay Related Obligations, and (c) Pay Prepetition Employment and Training Expenses, and (ii) Authorizing Financial Institutions to Honor and Pay All Related Checks Presented and Funds Transfer Requests*

[Dkt. No. 8] (the "Wages Motion").  The Wages Motion sought authorization to pay employee salaries and wages, and continue to fund employee benefits such as health insurance and retirement accounts.  On November 19, 2019, the Bankruptcy Court entered an order approving the Wages Motion [Dkt. No. 28].

The Debtors have traditionally paid employees a discretionary, performance-based holiday bonus.  On December 18, 2019, the Debtors filed their *Emergency Motion for an Order (i) Authorizing and Approving the Debtors' Non-Insider Annual Bonus Program Pursuant to 11 U.S.C. §§ 105, 363, and 503; and (ii) Granting Related Relief* [Dkt. No. 133] (the "Employee Bonus Motion").  The Employee Bonus Motion sought approval to pay approximately 81 non-insider employees their annual holiday bonuses.  A hearing was held on December 27, 2019, and the Bankruptcy Court entered an order approving the Employee Bonus Motion [Dkt. No. 146] the same day.

On January 28, 2020 the Debtors filed their *Emergency Motion for an Order (i) Authorizing and Approving the Key Employee Incentive Program Pursuant to 11 U.S.C. §§ 105, 363, 503; and (ii) Granting Related Relief* [Dkt. No. 221] (the "KEIP Motion"), seeking authority to implement a key employee incentive plan (the "KEIP").  The KEIP provides for the payment of incentive based cash awards based on the Debtors' achievement of certain Performance Targets (as defined in the KEIP Motion).  On February 18, 2020, the Bankruptcy Court entered an order approving the KEIP [Dkt. No. 269].  On September 28, 2020, the Debtors filed the *Emergency Motion to Enter Stipulation and Agreed Order Regarding Payments Under Previously-Approved Key Employee Incentive Plan* [Dkt. No. 621], seeking the entry of an agreed order to fix the amount of the KEIP payments based on the original Transaction Value Target Metric (as defined in the KEIP Motion).  On September 28, 2020, the Court entered the stipulation and agreed order relating to same [Dkt. No. 622], and upon the closing of the sale of substantially all of the Debtors' assets to Zarvona (as further described below), the KEIP participants were paid, in the aggregate, $1,126,250.00 pursuant to such agreed order.

On February 27, 2020, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order Authorizing Debtors to Implement a Non-Insider Severance Plan Pursuant to Sections 105(a) and 363 of the Bankruptcy Code* [Dkt. No. 278] (the "Severance Plan Motion").  On March 13, 2020 the Court entered an Order Approving the Severance Plan Motion [Dkt. No. 312], which, among other things, required any severance payments made to be reduced on a dollar-for-dollar basis by the amount of any prepetition prepaid cash award received, if any, by the severance payment recipient (a "Prepaid Award").  The Prepaid Awards were subject to clawback through the earlier of (i) September 27, 2020; and (ii) the date the Debtors confirmed a plan of reorganization (the "Clawback Deadline").  The Clawback Deadline expired on September 27, 2020.

On September 30, 2020, upon the closing of the sale of substantially all of the Debtors' assets to Zarvona, 52 employees were terminated by the Debtors and simultaneously hired by Zarvona.  As a result, as of October 1, 2020, the Debtors had 25 remaining employees, who will be terminated as of or prior to the Effective Date.  Certain terminated employees will be eligible for severance payments pursuant to the Severance Plan Motion.

Due to the expiration of the Clawback Deadline, the Debtors no longer believe that reducing any severance payment made by the amount of any Prepaid Award is appropriate. Accordingly, on November 4, 2020, the Debtors filed the *Emergency Motion to Enter Stipulation and Agreed Order Regarding Payments Under Previously Approved Non-Insider Severance Plan* [Dkt. No. 650] (the "Severance Stipulation Motion"), which seeks Court approval of a Stipulation between the Debtors and the Agent whereby the Debtors would be allowed to make all severance payments authorized pursuant to the Severance Plan Motion without the need to reduce the severance payment by the amount of any Prepaid Award. On November 9, 2020, the Court entered an order approving the Severance Stipulation Motion [Dkt. No. 657].

### F.    Monthly Operating Reports

As required by Bankruptcy Rule 2015 and in accordance with the guidelines set forth by the Office of the U.S. Trustee, the Debtors have filed monthly operating reports at Dkt. Nos. 240, 280, 350, 436, 474, 495, and 573 (collectively, the "Monthly Operating Reports"), which Monthly Operating Reports are incorporated fully herein by reference.

### G.    Schedules and Statements

The Debtors filed their Bankruptcy Schedules and Bankruptcy SOFAs with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code on December 18, 2019. A copy of the Bankruptcy Schedules and Bankruptcy SOFAs may be obtained by (i) calling the Debtors' claims agent at (855) 930-0678 (Toll-Free) or (503) 597-5538 (if calling from outside the U.S.); (ii) writing to Approach Resources Inc. Ballot Processing Center, c/o Epiq Corporate Restructuring, LLC, 1030 SW Allen Blvd., Beaverton, OR 97005; (iii) emailing the Debtors' Claims and Noticing Agent at approachresources@epiqglobal.com with a reference to "Approach" in the subject line of the email; and/or (iv) visiting the Debtors' restructuring website at https://dm.epiq11.com/case/approachresource (documents may be downloaded free of charge). Parties may also obtain any documents filed in the Cases for a fee via PACER at https://ecf.txsb.uscourts.gov/. Note that a PACER password and login are needed to access documents on the PACER website. A PACER password can be obtained at: https://www.pacer.gov/.

### H.    Denial of Request for Appointment of Equity Committee

On November 26, 2019, the Bankruptcy Court received a letter from a shareholder requesting the appointment of an Equity Committee [Dkt. No. 66]. Over the course of the case, several other letters regarding appointment of an Equity Committee were received [Dkt. Nos. 78, 181, 185, 194, 196, 222, 225, 228, and 232]. After several status conferences with the letter writers, the Bankruptcy Court, treating the letters as motions for the appointment of an Equity Committee, set an evidentiary hearing on the motion for January 31, 2020. Following the hearing, the Court entered an order denying the appointment of an Equity Committee without prejudice [Dkt. No. 235].

### I.      Sublease Motion

On December 23, 2019, the Debtors filed their *Emergency Motion to Sublease Office Space to Emerge Energy Services LP* [Dkt. No. 138] (the "Sublease Motion").  The Sublease Motion sought permission to sublease approximately 18,000 square feet of unused office space, reducing the Debtors' rent by over $14,000 per month.  On January 7, 2020, the Court entered an order approving the Sublease Motion [Dkt. No. 175].

### J.      Pfluger Lease Amendment

On January 1, 2020, the Debtors filed the *Motion of Debtors for an Order (i) Authorizing Debtors to Execute and Perform Amendment to Pfluger Lease Pursuant To Bankruptcy Code Sections 105 and 363; and (ii) Granting Related Relief* [Dkt. No. 165] (the "Pfluger Lease Motion").  Under the original Pfluger Lease, the Debtors were required to drill an additional well by February 1, 2020 or risk losing approximately 6,500 gross acres.  The amendment permitted the Debtors to satisfy their drilling obligations by, *inter alia*, drilling six horizontal wells between July 6, 2019 and June 1, 2022, and, thereafter, two wells per year after that.  On January 27, 2020, the Court entered an order approving the Pfluger Lease Motion [Dkt. No. 211].

### K.      Alpine Transaction

Shortly after the Petition Date, the Debtors initiated a marketing process for the sale of substantially all of the Debtors' assets, which targeted parties that were likely to be interested in purchasing such assets as described below.

### (i)      Bid Procedures

On December 11, 2019, the Debtors filed their *Motion for (i) Entry of an Order Approving (a) Bid Procedures; (b) the Form and Manner of Notice; (c) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (ii) Entry of an Order Approving (a) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (b) the Assumption and Assignment of Certain Contracts and Unexpired Leases* [Dkt. No. 100] (the "Bid Procedures and Sale Motion").  On January 9, 2020, the Bankruptcy Court entered the *Order Approving (a) Bid Procedures; (b) the Form and Manner of Notice; (c) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and Granting Related Relief* [Dkt. No. 184] (the "Bid Procedures Order").  The Bid Procedures Order sets forth, among other things, the procedures for the solicitation and consideration of competing bids and the mechanics of an auction (the "Auction"), if necessary.  The bid procedures (the "Bid Procedures") were formulated in consultation with the Debtors' professionals in order to enable the Debtors to obtain the highest or best offer(s) for their assets.

### (ii)      Stalking Horse

Material marketing efforts by the Debtors and their professionals culminated in the Debtors' soliciting formal proposals from prospective bidders who had indicated an interest in acquiring the Debtors' assets.  On February 4, 2020, the Debtors filed their *Notice of Stalking Horse Bid in Connection with the Sale of the Debtors' Assets* [Dkt. No. 243] (the "Stalking Horse

Notice"), which sought to designate Alpine Energy Acquisitions, LLC ("Alpine") as the stalking horse bidder (the "Stalking Horse Bidder"). On February 10, 2020, the Bankruptcy Court entered the *Order (a) Authorizing Debtors to Enter into Stalking Horse Purchase Agreement, (b) Approving Related Break-Up Fee and Expense Reimbursement and (c) Granting Related Relief* [Dkt. No. 251] (the "Stalking Horse Order"). The Stalking Horse Order designated Alpine as the Stalking Horse Bidder and authorized, among other things, that certain Asset Purchase Agreement by and among certain of the Debtors and Alpine (the "Alpine APA").

The Debtors did not receive any other Qualifying Bids by the February 14, 2020 Bid Deadline. Therefore, in accordance with the Bid Procedures Order, (a) Alpine was declared the Prevailing Purchaser (as defined in the Bid Procedures and Sale Motion) and (b) the Auction that was scheduled to be held at 1:00 p.m. (prevailing Central Time) on February 26, 2020, was not held.

### (iii)   The Alpine Sale Hearing

The Court conducted a sale hearing on March 4, 2020 and subsequently entered an order approving the sale of substantially all of the Debtors' assets to Alpine [Dkt. No. 301] (the "Alpine Sale Order").

### (iv)   Alpine's Termination Notice

Shortly following the entry of the Alpine Sale Order, wide-spread "stay-at-home" orders were instituted beginning on March 19, 2020 in response to the COVID-19 pandemic,[11] Russia and Saudi Arabia began a commodity price war on March 9, 2020,[12] and commodity prices fell precipitously.[13]

On March 26, 2020, Alpine sent a notice to the Debtors alleging multiple material breaches of the Alpine APA and purporting to terminate the sale (the "Buyer Notice"). On March 31, 2020, the Debtors transmitted to Alpine the Debtors' response to the Buyer Notice, which, among other things, denied both that the Debtors had breached its obligations under the Alpine APA and that Alpine had any contractual or other basis for terminating the Alpine APA. In their response to Alpine, the Debtors also stated their intent to close the transaction as contemplated.

---

[11]   *See* "When State Stay-at-Home Orders Due to Coronavirus Went into Effect," https://www.kff.org/other/slide/when-state-stay-at-home-orders-due-to-coronavirus-went-into-effect/ (last visited September 16, 2020).

[12]   *See* "5 Charts that Explain the Saudi Arabia-Russia Oil Price War So Far," https://www.cnbc.com/2020/04/01/5-charts-that-explain-the-saudi-arabia-russia-oil-price-war-so-far.html (last visited September 16, 2020).

[13]   On the date Alpine executed the Alpine APA, the DJIA closed at 28,807.63, and the price of WTI was $49.61/barrel. On March 26, 2020, when Alpine attempted to terminate the Alpine APA, the DJIA had plunged over 6,250 points and the price of oil at WTI was $22.60/barrel. *See* MACRO MACROTRENDS DOW JONES HISTORICAL PRICE CHART, https://www.macrotrends.net/1319/dow-jones-100-year-historical-chart (last visited March 31, 2020); MACROTRENDS CRUDE OIL HISTORICAL PRICE CHART, https://www.macrotrends.net/1369/crude-oil-price-history-chart (last visited March 31, 2020).

(v)     **Motions to Compel and Related Settlement**

On April 1, 2020, Alpine filed the *Motion for Entry of an Order Compelling (a) Debtors' Payment of Expense Reimbursement Amount and (b) Return of Escrowed Funds* [Dkt. No. 346] (the "Buyer's Motion to Compel"), requesting an order forcing the Debtors to return a good faith deposit, and pay an expense reimbursement allowed for in certain circumstances under the Alpine APA.

On April 6, 2020, the Debtors filed the *Emergency Motion for Entry of an Order (i) Enforcing Sale Order and Asset Purchase Agreement; (ii) Compelling Performance; and (iii) Awarding Fees and Expenses Incurred by the Debtors' Estates as a Result of Delayed* Closing [Dkt. No. 356] (the "Debtors' Motion to Enforce," and, together with the Buyer's Motion to Compel, as amended, the "Dispute Motions"), seeking an order, among other things, compelling Alpine to close the sale contemplated by the Alpine APA.

After limited discovery, an evidentiary hearing on the Dispute Motions began on April 29, 2020.  After a full day of testimony, the Court continued the Hearing to May 5, 2020.  On May 4, 2020, the Debtors filed the *Emergency Motion to Strike Evidence and Testimony* [Dkt. No. 346] (the "Motion to Strike").  Before the Hearing resumed on May 5, 2020, the Debtors and Alpine agreed to engage in settlement discussions, and the hearing was continued to May 20, 2020.  On May 19, 2020, the Court held a status conference in which the Debtors announced that they had reached an agreement in principle with Alpine to settle the Dispute Motions and Motion to Strike. On June 9, 2020, the Debtors filed the *Motion for Approval of Settlement with Alpine Energy Acquisitions, LLC and Alpine Energy Capital, LLC* [Dkt. No. 481] (the "Settlement Motion"), in which the Debtors sought approval of a settlement agreement with Alpine (the "Alpine Settlement Agreement") pursuant to which the Debtors would settle all of the controversies raised in the Dispute Motions and the Motion to Strike in exchange for, among other things, Alpine paying the Debtors $22.125 million in cash (the "Settlement Payment").  On July 2, 2020, the Court entered an order approving the Settlement Motion [Dkt. No. 499].  On July 7, 2020, the Debtors received the Settlement Payment from Alpine as part of the consummation of the Alpine Settlement Agreement that occurred on that date.  In compliance with the Settlement Agreement, on July 7, 2020 the Debtors filed the *Notice of Withdrawal of Emergency Motion to Strike Evidence and Testimony* [Dkt. No. 508] and Alpine filed the *Amended Motion for Entry of an Order Compelling (a) Debtors' Payment of Expense Reimbursement Amount and (b) Return of Escrowed Funds* [Dkt. No. 505].  In light of the settlement, on August 19, 2020, the Court mooted the Dispute Motions [Dkt. No. 567].

**L.     Zarvona Transaction**

(i)     **Renewed Marketing Process**

When it became clear the sale to Alpine would not close, as soon as contractually permitted to do so by the terms of the Alpine Settlement Agreement, the Debtors renewed their marketing efforts for the sale of substantially all of their assets.[14]  Despite the precipitous fall in commodity

---

[14] A full explanation of the renewed marketing process can be found in the *Declaration of Alexander Svoyskiy in Support of Sale of Debtors' Assets to Zarvona III-A, L.P.*  [Dkt. No. 590] and the *Declaration of Sergei Krylov in Support of Sale of Debtors' Assets to Zarvona III-A, L.P.* [Dkt. No. 591].

prices that had preceded the renewal of those marketing efforts, a number of parties expressed an interest in purchasing the Debtors' assets, albeit at materially reduced purchase prices as compared to the purchase price in the Alpine APA that had been negotiated before commodity prices plunged. Ultimately, some of those parties submitted proposals for the acquisition of the Debtors' assets. After setting a final bid deadline, the Debtors received proposals from three different entities who were the finalists in the Debtors' renewed marketing process.

Shortly after that final bid deadline, the Debtors selected the proposal submitted by Zarvona as the "highest and best" bid for the disposition of the Assets, which resulted in their filing, on September 3, 2020, the *Emergency Motion of Debtors for Entry of an Order (a) Authorizing the Debtors to Enter Into and Perform Under the Asset Purchase Agreement with Zarvona III-A, L.P.; and (b) Granting Related Relief* [Dkt. No. 577] (the "Zarvona Sale Motion") seeking the authorization to pursue a sale of substantially all of the Debtors' assets to Zarvona III-A, L.P. ("Zarvona"). That same day, the Debtors also filed the *Notice of Executory Contracts and Unexpired Leases that May Be Assumed and Assigned, Pursuant to Section 365 of the Bankruptcy Code, in Connection With the Sale of Substantially All of the Debtors' Assets to Zarvona III-A, L.P. and the Proposed Cure Amounts With Respect Thereto* [Dkt. No. 578] (the "Renewed Assumption Notice").

### (ii)   Zarvona Sale Hearing

The hearing on the Zarvona Sale Motion was held on September 11, 2020 at 1:30 p.m. (prevailing Central Time). The Court subsequently entered the *Order Approving (a) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (b) the Assumption and Assignment of Certain Contracts and Unexpired Leases* [Dkt. No. 605] (the "Zarvona Sale Order"), approving the sale of the substantially all of the Debtors' assets to Zarvona subject to the requirement to provide additional notice of proposed cure amounts. The sale to Zarvona closed on September 30, 2020.

### M.   Adequate Protection Motions

On March 13, 2020 the Agent filed the *Emergency Morgan of JPMorgan Chase Bank, N.A. Pursuant to Bankruptcy Code Sections 105(a) and 363(e) for Adequate Protection* [Dkt. No. 314] (the "First Adequate Protection Motion") requesting an adequate protection payment of $158,750,000 upon the closing of the Alpine Transaction. Due to the failure of the Alpine Transaction to be consummated, the First Adequate Protection Motion was abated.

On September 4, 2020 the Agent filed the *Emergency Motion of JPMorgan Chase Bank, N.A. Pursuant to Bankruptcy Code Sections 105(a) and 363(e) for Adequate Protection* [Dkt. No. 581] (the "Second Adequate Protection Motion") requesting an adequate protection payment to the Agent of $100,000,000 upon closing of the Zarvona Transaction. Because the Zarvona Sale Motion provided for such payment, the Second Adequate Protection Motion was deemed granted at the Sale Hearing. On September 30, 2020, the Zarvona Transaction closed and the $100,000,000 adequate protection payment was made to the Agent pursuant to the Second Adequate Protection Motion and Sale Order.

### N.     Exclusive Period for Filing a Plan and Soliciting Votes

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan for an initial period of 120 days from the date on which the debtor filed for voluntary relief.  If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan.  During these exclusive periods, no other party in interest may file a competing plan; however, a court may extend these periods upon request of a party in interest and "for cause."

The Debtors' initial exclusive periods to file a plan and solicit acceptances of a plan (the "Exclusive Periods") was set to expire on March 17, 2020, and May 18, 2020, respectively.  During these Cases, the Debtors, from time to time, sought and obtained extensions of the Exclusive Periods.  *See* [Dkt. Nos. 366, 466, 537, 602, and 640].  On October 28, 2020, the Debtors filed the *Sixth Motion to Extend Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement* [Dkt. No. 641] (the "Sixth Exclusivity Motion"), seeking an extension of the Exclusive Periods through November 27, 2020 and January 27, 2021, respectively.  The Sixth Exclusivity Motion is currently pending.

### O.     Litigation Matters

### (i)     Prepetition Litigation

The Debtors are currently involved in the following two ongoing lawsuits initiated prior to the Petition Date (the "Prepetition Lawsuits"):

*Creek Swabbing & Roustabout Services Inc. and David Creek v. Approach Resources Inc. and Bill Halfmann*, Cause No. 5868, 112th Judicial District, Sutton County (Sonora), Texas: This lawsuit was filed in May 2013 and alleges defamation and slander arising out of the Debtors' internal investigation of missing oil in February 2013.  The lawsuit claims that employees or agents of Approach were the source of rumors that plaintiffs were involved in the theft of Approach oil.  Plaintiffs seek unspecified compensatory damages and punitive damages.  The Company believes the lawsuit is without merit.

*Cressman Tubular Products Corp. v. Approach Resources Inc. & Approach Operating, LLC*, Cause No. 017-307519-19, 17th Judicial District Court, Tarrant County, Texas: This lawsuit was filed in April 2019 by Cressman Tubular Products Corporation ("Cressman") and arose from an alleged order of production casing by the Company in 2015.  In June 2019, Cressman added Approach Operating as a defendant.  Cressman alleges that the Company breached a contract related to the supply of surface and production casing by Cressman.  Cressman seeks actual damages from defendants, pre- and post-judgment interest, attorney's fees and costs.  Prior to the lawsuit being filed, the Company had refused plaintiff's demands for payment, citing (a) no binding commitment to purchase had been made, (b) prior failure of plaintiff's casing caused damages to Approach of approximately $2.4 million, and (c) subsequent communications from plaintiff's salespersons indicated that the pipe for which plaintiff claimed damages previously had been sold.  In June 2019, the Company responded to plaintiff's lawsuit by denying plaintiff's allegations and Approach Operating counterclaimed for damages relating to the failure of

plaintiff's casing.  Prior to the bankruptcy filing, trial was set for September 14, 2020.  The Company believes the plaintiffs' claims are without merit.

The Prepetition Lawsuits were stayed as of the Petition Date.

Other than the two lawsuits described above, the Debtors are not currently aware of any potential lawsuits or causes of action against them.

**(ii)     Postpetition Litigation**

As of the date hereof, the Debtors are not engaged in any litigation that arose after the Petition Date.

**(iii)    Litigation Not Yet Commenced**

The Plan preserves all Causes of Action, unless expressly otherwise released or assigned to a third party, and provides for them to be transferred to the Post-Effective Date Debtors on the Effective Date of the Plan.[15]  The Causes of Action include certain Avoidance Actions and other claims that the Debtors hold against third parties.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Plan further provides that the Plan Administrator will have standing, on and after the Effective Date of the Plan, to pursue the Retained Causes of Action and will be deemed appointed as the representative of the Estates for the purpose of enforcing, prosecuting, and settling them.  The Retained Causes of Action are listed on **Exhibit E**, all of which shall be preserved and vest in the Post-Effective Date Debtors (unless expressly otherwise released by the Plan).

**ARTICLE VII**
**EFFECT OF THE PLAN ON CLAIMS AND INTERESTS**

**A.     Compromise and Settlements**

Except for those Retained Causes of Action that vest in the Post-Effective Date Debtors, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising before the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness.  The Indenture Trustee Distribution is being made with the express consent and agreement of the Holders of Allowed Prepetition Secured Claims in Class 2 as a good faith

---

[15] As noted above, the Debtors engaged in litigation relating to the Alpine Transaction, which litigation was settled and compromised and is therefore not currently pending.

compromise and settlement of Claims and controversies between the Debtors, the Holders of Allowed Prepetition Secured Claims, and the Indenture Trustee.

**B.     Satisfaction of Claims**

The rights afforded in the Plan and the treatment of all Claims and Interests in the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever against the Debtors or their Estates, assets, properties, or interests in property.  The treatment set forth in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Person holding a Claim or an Interest may have in or against the Debtors or the Estates.  This treatment supersedes and replaces any agreements or rights that any Person may have in or against the Debtors, the Estates, or their respective property.  Except as otherwise provided in the Plan and/or the Confirmation Order, on the Effective Date, all Claims against and Interests in the Debtors shall be satisfied and released in full.  Neither the Debtors nor their Affiliates, their successors or assigns, shall be responsible for any pre-Effective Date obligations of the Debtors, except those expressly assumed by the Debtors and not assigned to the Purchaser.  Except as otherwise provided in the Plan and/or the Confirmation Order, all Persons and Entities shall be precluded and forever barred from asserting against the Debtors and their Affiliates, their successors or assigns, or their Estates, assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence before the Effective Date, whether or not the facts of or legal bases therefore were known or existed before the Effective Date.

**C.     Releases**

**(i)     Releases by Debtors and Estates.**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided in the Plan and/or the Confirmation Order, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious formulation and implementation of the Plan and the consummation of the transactions contemplated by the Plan, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, the Debtors, on their own behalf and as representatives of their Estates, and each of their respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, and extinguish unconditionally, each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that may or could have been asserted by or on behalf of the Debtors or the Debtors' Estates, directly or indirectly, derivatively or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to any of the Debtors (including any of the Debtors' capital structure, management, ownership, or operation thereof), or the Debtors' respective assets,**

operations, finances, contracts, potential contracts, business relationships, intercompany transactions between or among the Debtors, securities, property and Estates, the Cases, the Alpine Sale, the Debtors' in- or out-of-court restructuring efforts, or the negotiation, formulation, preparation, or solicitation of votes of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents, the Alpine APA, the Alpine Settlement Agreement, the Asset Purchase Agreement, the DIP Facility, the Disclosure Statement (including any contract, instrument, release, or other agreement or document—including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion— created or entered into in connection with the Plan or Plan Supplement), or any pleadings filed during the Cases, and any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

(ii)     Releases by Lender Parties.

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided in the Plan and/or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Lender Party shall, and shall be deemed to, completely and forever release, waive, void, and extinguish unconditionally, in each case only in its capacity as such and not otherwise, each and all of the Debtors and the Debtors' Related Persons who do not submit an opt-out form and therefore provide a mutual release to the Lender Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors (including the capital structure, management, ownership, or operation thereof), or the Debtors' respective assets, operations, finances, contracts, potential contracts, business relationships, intercompany transactions between or among the Debtors, securities, property and Estates, the Cases, the Alpine Sale, the Debtors' in- or out-of-court restructuring efforts, or the negotiation, formulation, preparation, or solicitation of votes of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents, the Alpine APA, the Alpine Settlement Agreement, the Asset Purchase Agreement, the DIP Facility, the Disclosure Statement (including any contract, instrument, release, or other agreement or document—including the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion—created or entered into in connection with the Plan or Plan Supplement), or any pleadings filed during the Cases, and any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

(iii)     **Releases by Releasing Parties.**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided in the Plan and/or the Confirmation Order, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious formulation and implementation of the Plan and the consummation of the transactions contemplated by the Plan, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Releasing Party shall, and shall be deemed to completely and forever release, waive, void, and extinguish unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors (including the capital structure, management, ownership, or operation thereof), or the Debtors' respective assets, operations, finances, contracts, potential contracts, business relationships, intercompany transactions between or among the Debtors, securities, property and Estates, the Cases, the Alpine Sale, the Debtors' in- or out-of-court restructuring efforts, or the negotiation, formulation, preparation, or solicitation of votes of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents, the Alpine APA, the Alpine Settlement Agreement, the Asset Purchase Agreement, the DIP Facility, the Disclosure Statement (including any contract, instrument, release, or other agreement or document—including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion—created or entered into in connection with the Plan or Plan Supplement), or any pleadings filed during the Cases, and any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.**

**Releasing Parties** means, collectively, and in each case only in its capacity as such (but in each case excluding the Lender Parties, and each such Lender Party's current and former Affiliates, and each such Lender Party's and its current and former Affiliates' and subsidiaries' Related Persons, each in their capacity as such): (a) each of the Debtors' current and former directors or officers; (b) all Holders of Claims or Interests who vote to accept the Plan; (c) the Indenture Trustee; (d) all Holders of Claims or Interests who (i) are presumed to accept the Plan; (ii) are deemed to reject the Plan; or (iii) are entitled to vote on the Plan but abstain from voting, are not entitled to vote, or vote to reject the Plan, and in each case of (i) through (iii) do not opt out of the Third Party Release on a timely submitted Ballot or opt-out form, as applicable; and (e) with respect to each of the foregoing (a) through (d), such Person and its current and former Affiliates and subsidiaries, and such Persons' and their current and former Affiliates' and subsidiaries' Related Persons, each in their capacity as such.

**Released Parties** means, collectively and individually, and in each case only in its capacity as such: (a) each of the Debtors and the Debtors' Related Persons who do not opt out of the releases contained in the Plan, (b) the Lender Parties and each of their respective Related Persons, and (c) the Indenture Trustee.

**Related Parties** means, collectively, with respect to any Person, such Person's predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present and former Affiliates and subsidiaries and each of their respective current and former members, management companies, fund advisors or managers, managed accounts or funds, partners, limited partners, general partners, principals, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, officers, directors, advisory board members, employees, managers, shareholders, representatives, heirs, executors, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members, and professionals).

**Debtors' Related Persons** means each Debtor's officers, directors, advisory board members, employees, managers, financial advisors, attorneys, accountants, investment bankers, consultants, and professionals, each acting in such capacity

(iv)     **Injunction Related to Releases.**

Except as provided in the Plan and/or the Confirmation Order, as of the Effective Date, (a) all Entities who hold or may hold Claims or Interests and all Entities acting on behalf of such Holders; (b) the Releasing Parties; (c) all other parties in interest; and (d) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such released or enjoined Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest:

**(w) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (x) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (y) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (z) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan and/or the Confirmation Order.**

### (v)     Deemed Consent.

Each Releasing Party shall, and shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 15.03(c).

### (vi)     Plan Obligations.

Notwithstanding the foregoing, nothing in this Section shall release any Debtor, Released Party, or other Person from its respective rights and obligations under the Plan, the Confirmation Order, the Plan Administrator Agreement, or any other Plan Document.

### D.     Exculpation

**The Exculpated Parties[16] shall not be liable for any Cause of Action arising in connection with or out of the administration of the Cases, the planning of the Cases, the formulation, negotiation or implementation of the Plan, the good faith solicitation of acceptances of the Plan in accordance with section 1125(e) of the Bankruptcy Code, pursuit of Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the Acquired Property sold pursuant to the Asset Purchase Agreement or to be distributed under the Plan, except for (i) intentional fraud, criminal conduct, gross negligence, or willful misconduct as determined by a Final Order of the Bankruptcy Court or other court of competent jurisdiction, and (ii) obligations under the Plan, the Plan Supplement, and the Confirmation Order.  All Holders of Claims and Interests are enjoined from asserting or prosecuting any Claim or Cause of Action against any protected Person as to which such Released Party has been exculpated from liability pursuant to the preceding sentence.**

### E.     Permanent Injunction

As of the Effective Date, in each case whether or not: (i) a Proof of Claim or Interest based upon such debt, right, Claim, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has accepted the Plan, and in order to, *inter alia*, preserve and promote the settlements contemplated by and provided for in the Plan, except as otherwise expressly provided in the Plan and/or the

---

[16] "Exculpated Parties" means, in each case only in its capacity as such, (a) the Debtors and each of their respective Related Persons, and (b) the Indenture Trustee solely in its capacity as disbursing agent with respect to the Senior Notes Claims.

Confirmation Order, all Persons and any Person claiming by or through them, which have held or asserted, which currently hold or assert or which may hold or assert any Claims or any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action, or liabilities of any nature whatsoever, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Interest in the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties, and/or their successors and assigns, for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest, arising before the Effective Date (including before the Petition Date), including, but not limited to:

(i)    **commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;**

(ii)   **enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;**

(iii)  **creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;**

(iv)   **except as otherwise expressly provided in the Plan and/or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest; and**

(v)    **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, the Plan Supplement and/ or the Confirmation Order relating to such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest.**

### F.    No Waiver.

Notwithstanding anything to the contrary contained in the Plan, the releases and injunctions set forth in the Plan shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Plan Administrator, on behalf of the Post-Effective Date Debtors (but subject to the consent of the Agent), to enforce, sue on, settle or compromise the rights, Claims and other matters that vest in the Post-Effective Date Debtors pursuant to the Plan and/or the Confirmation Order.

### G.    Bankruptcy Rule 3016 Compliance.

The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

### H.    Integral to Plan.

Each of the releases and injunctions provided in the Plan is an integral part of the Plan and is essential to its implementation. Each of the Released Parties and any other Persons protected by the injunctions set forth in the Plan shall have the right to independently seek the enforcement of such injunctions.

### I.    Setoffs

Except as otherwise expressly provided for in the Plan and/or the Confirmation Order pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, and subject to the consent of the Agent, the Debtors, the Post-Effective Date Debtors or the Plan Administrator, as applicable, may set off against any Allowed Claim or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before such distribution is made), any Claims, rights, and Causes of Action of any nature that such Debtors or Post-Effective Date Debtors, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or before the Effective Date (whether pursuant to the Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by the Debtors, the Post-Effective Date Debtors, or the Plan Administrator of any such Claims, rights, and Causes of Action that the Debtors or the Post-Effective Date Debtors may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to setoff or offset any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Post-Effective Date Debtors or their successors or assigns unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff within thirty (30) days of the Effective Date and provided

notice thereof in writing to the Plan Administrator and the Post-Effective Date Debtors, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or offset pursuant to section 553 of the Bankruptcy Code or otherwise. **Failure by a Holder of Claims or Interests to assert the right to setoff or recoupment within this thirty (30) period shall result in a permanent waiver of the right to setoff by the Holder and the Claim will no longer be enforceable against the Debtors or the Post-Effective Date Debtors or their successors or assigns.**

### J.      Recoupment

Except as provided in the Plan and/or the Confirmation Order, any Holder of a Claim or Interest shall not be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Plan Administrator and the Post-Effective Date Debtors within thirty (30) days of the Effective Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment. **Failure by a Holder of Claims or Interests to assert the right to recoupment within this thirty (30) period shall result in a permanent waiver of the right to setoff or recoupment by the Holder and the Claim will no longer be enforceable against the Debtors or their successors or assigns.**

### K.      Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan and expressly excluding the Liens of the Prepetition Agent as provided in Section 4.02(b), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns.

### L.      Good Faith

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptance or rejections of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

**ARTICLE VIII**
**RISK FACTORS**

Holders of Claims or Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

A.      **Bankruptcy Law Considerations.**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

(i)      **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(ii)      **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in Article XII of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place.

(iii)      **The Debtors May Fail to Satisfy Voting Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

(iv)      **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization, <u>unless</u> such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

No assurance is given that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of liquidation is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to liquidate their business and what, if anything, Holders of Allowed Claims or Allowed Interests against them would ultimately receive with respect to their Claims or Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.  Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from bankruptcy.

### (v)      Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### (vi)     These Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of, among other things (a) additional administrative expenses involved in the appointment of a chapter 7 trustee who would be required to become familiar with the many legal and factual issues in the Debtors' Cases; and (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the chapter 7 liquidation.

**(vii)  The Debtors May Object to the Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.  Further, other parties in interest may object to the amount or classification of any Claim under the Plan in accordance with the Bankruptcy Code.

**(viii)  Risk of Non-Occurrence of the Effective Date.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**(ix)  Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.**

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

**(x)  Releases, Injunctions, and Exculpations Provisions May Not Be Approved**

**The Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third party releases that may otherwise be asserted against the Debtors, the Plan Administrator, or the Released Parties.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.**

**B.      Risks Associated with Forward-Looking Statements**

**(i)      The Financial Information Contained Herein Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

The financial information contained in this Disclosure Statement has not been audited.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**(ii)      Financial Projections and Other Forward-Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary.**

This Disclosure Statement contains various projections concerning the financial results of the Debtors' operations that are, by their nature, forward-looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Debtors may turn out to be different from those stated in this Disclosure Statement.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and consummation of the Plan in accordance with its terms; (b) general business and economic conditions; (c) overall industry performance and trends; and (d) anticipated future commodity prices.

**DUE TO THE INHERENT UNCERTAINTIES ASSOCIATED WITH PROJECTING FINANCIAL RESULTS GENERALLY, THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD _NOT_ BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS OR THE AMOUNT OF CLAIMS THAT MAY BE ALLOWED IN THE VARIOUS CLASSES.  WHILE THE DEBTORS BELIEVE THAT THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE REASONABLE, THERE CAN BE NO ASSURANCE THAT THEY WILL BE REALIZED.**

**ARTICLE IX**
**SOLICITATION AND VOTING PROCEDURES**

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached as **Exhibit C**.

The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.

### A.    Holders of Claims or Interests Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article II.B of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim or Interest within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As set forth in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims or Interests in Classes 2 and 4 (collectively, the "Voting Classes").  The Holders of Claims or Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are not soliciting votes from Holders of Claims or Interests in Classes 1, 3, 5, or 6.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

The Voting Record Date is **November 5, 2020**.  The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.    Voting on the Plan

The Voting Deadline is **December 11, 2020, at 4:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be (i) electronically submitted utilizing the online balloting portal maintained by the Claims, Noticing, and Solicitation Agent (*i.e.*, Epiq Corporate Restructuring, LLC) on or before the Voting Deadline (but only if the instructions included with your ballot permit submission of your ballot via the online balloting portal); or (ii) properly executed, completed, and delivered (either by using the envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots (or a master ballot reflecting your vote, as applicable) are actually received by the Claims, Noticing, and Solicitation Agent on or before the Voting Deadline at the following address:

**Master Ballot Address for Class 4 GUC Claims arising under the Indenture**
First Class Mail/Overnight Courier/Hand Delivery
Approach Resources Inc. – Master Ballot Processing
c/o Epiq Corporate Restructuring, LLC
777 Third Avenue, 12th Floor

New York, NY 10022

By Email to:

Tabulation@epiqglobal.com and reference "Approach Master Ballot" in the subject line.

**Address for ballots from Class 4 GUC Claims and Prepetition Secured Claims**

First Class Mail
Approach Resources Inc. - Ballot Processing
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4422
Beaverton, OR 97076-4422

Overnight courier or hand delivery
Approach Resources Inc. - Ballot Processing
c/o Epiq Corporate Restructuring, LLC
10300 SW Allen Boulevard
Beaverton, OR 97005

**Holders of Class 4 GUC Claims and Prepetition Secured Claims cannot submit Ballots by email.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS, NOTICING, AND SOLICITATION AGENT TOLL FREE AT (855) 930 0678 (TOLL FREE INSIDE THE U.S.) OR (503) 597-5538 (OUTSIDE THE U.S.).   ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL _NOT_ BE COUNTED.**

D.    **Ballots Not Counted**

No ballot will be counted toward Confirmation if, among other things: (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no Proof of Claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was not sent to the Claims, Noticing, and Solicitation Agent even if it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims, Noticing, and Solicitation Agent), the Debtors' financial or legal advisors, or anyone else; (vii) it is unsigned; or (vii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.

### E.      Votes Solicited in Good Faith

The Debtors have, and upon the Confirmation Date shall be deemed to have, solicited votes on the Plan from the Voting Classes in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with the solicitation.  Accordingly, the Debtors shall be entitled to, and upon the Confirmation Date will be granted, the protections of section 1125(e) of the Bankruptcy Code.

## ARTICLE X
## CONFIRMATION OF THE PLAN

### A.      Joint Plan

The Plan is being proposed as a joint plan of liquidation for all of the Debtors.  As such, the Plan is also a motion requesting that the Bankruptcy Court consolidate the Debtors and their respective Estates solely for purposes of voting on the Plan, confirming the Plan, and making distributions pursuant to the Plan.  Voting on the Plan shall be counted on a consolidated basis. Thus, the Plan must meet the requirements for section 1129 of the Bankruptcy Code with respect to the Debtors on a consolidated basis in order to be confirmed.

On the Effective Date, solely for purposes of voting on the Plan, objecting to the allowance of Claims provided for under the Plan, and making distributions under the Plan: (i) the Assets of the Debtors will be pooled and vest in the Post-Effective Date Debtors in accordance with the terms of the Plan for the purpose of paying Allowed Claims against the Debtors; (ii) any Claim filed or asserted against any of the Debtors shall be deemed a Claim against all of the Debtors; (iii) all Claims of each Debtor against any other Debtor shall be eliminated; and (iv) any obligation of any of the Debtors and all guarantees thereof executed by any of the Debtors shall be deemed to be an obligation of each of the Debtors.  Additionally, Holders of Allowed Claims or Allowed Interests who assert identical Claims against or Interests in multiple Debtors shall be entitled to only a single satisfaction of such Claims or Interests, and any such duplicate Claims shall be deemed disallowed, expunged, and void as against the Debtors without need for the filing of a Claim objection or further order of the Bankruptcy Court and such duplicate Claims or Interests shall receive no Distribution under the Plan.

### B.      Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (i) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (ii) the Debtors have complied, or will have complied, with all of the necessary

requirements of chapter 11 for plan confirmation; and (iii) the Plan has been proposed in good faith.

### C.      Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtor liquidated under chapter 7.

Attached as **Exhibit B** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of their advisors.   As demonstrated by the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.   Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a greater return to Holders of Claims or Interests than would a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code.

### D.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (i.e. that a plan is "feasible") unless the liquidation is proposed in such plan.   In these Cases, the Plan is a plan of liquidation carried out by a Plan Administrator subject to an adequately funded Wind-Down Budget that is attached as **Exhibit D**.   Thus, the Plan satisfies the feasibility requirements of the Bankruptcy Code.

### E.      Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.   A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[17]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan.   Thus, a Class of Claims will have voted to accept the Plan only if two-

---

[17] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

thirds in amount and a majority in number of the Allowed Claims in such Class that vote on the Plan actually and properly cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have <u>actually</u> voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such Class that vote on the Plan actually cast their ballots in favor of acceptance.

### F.   Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if not all impaired classes have accepted it; *provided, however*, that at least one impaired class has accepted the plan. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class' rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under and has not accepted the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### (i)   No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. For instance, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### (ii)   Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g. secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Allowed Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## ARTICLE XI
## CERTAIN UNITED STATES FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain material U.S. federal income tax consequences expected to result from the consummation of the Plan.  This discussion is based on current provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service (the "Service").  There can be no assurance that the Service will not take a contrary view or that such a contrary view would not be sustained by a court.  No ruling from the Service has been or will be sought, nor will any counsel provide a legal opinion as to any of the expected U.S. federal income tax consequences set forth below.

Legislative, judicial, or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to U.S. Holders (as defined below) or the Debtors.  It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the U.S. federal income tax consequences described herein.

The following summary is for general information only.  The U.S. federal income tax treatment of a U.S. Holder may vary depending upon such U.S. Holder's particular situation.  This summary does not address the tax consequences of receiving distributions of property with respect to a Claim in multiple tax years.  This summary does not address all of the tax consequences that may be relevant to a U.S. Holder, including any alternative minimum tax consequences or any foreign, state, local, estate or gift tax consequences, and does not address the tax consequences to a U.S. Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan.  This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan, Non-U.S. Holders (as defined below), or U.S. Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, partnerships and other pass-through entities, persons holding Claims through a partnership or other pass-through entity, U.S. Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion," or other integrated transaction, U.S. Holders that have a "functional currency" other than the United States dollar,

U.S. Holders that hold any Claim that is treated as debt for U.S. federal income tax purposes and is considered to have been acquired with "market discount", U.S. Holders subject to special tax accounting rules as a result of any item of gross income with respect to the Claims being taken into account in an applicable financial statement, and U.S. Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by U.S. Holders as "capital assets" within the meaning of Section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (i) an individual citizen or resident of the United States for U.S. federal income tax purposes; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity or arrangement taxed as a partnership) holds a Claim, the U.S. federal income tax treatment of a partner in the partnership generally will depend upon the status of the partner and upon the activities of the partnership.

### B.      Certain U.S. Federal Income Tax Consequences to the Debtor

### (i)      Tax Consequences of the Sale

The sale of the Debtors' assets is a taxable transaction for U.S. federal income tax purposes. Thus, the Debtors must recognize any gain or loss realized upon such sale.  The net gain or loss realized with respect to the sale of such assets will equal the difference between (a) the greater of (i) fair market value of such assets, and (ii) the sum of any cash and the fair market value of any property received by the Debtors plus the amount of any of the Debtors' liabilities assumed by the Purchaser in the Sale, and (b) the selling Debtor's tax basis in such assets.

Although remaining subject to ongoing analysis, the Debtors generally believe that taxable asset dispositions pursuant to the Sale will give rise to net taxable loss, rather than net taxable income or gain.  However, even in the event the Debtors were to recognize net taxable income or gain in connection with the Sale, the Debtors currently anticipate that they will have sufficient net operating loss ("NOL") carryforwards or other tax attributes to fully offset the amount of any gain recognized.

Upon consummation of the Plan, none of the Debtors' tax attributes (*e.g.*, NOLs) will survive the restructuring process, because, pursuant to the Plan, the Debtors will ultimately be liquidated.

### (ii)     Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of indebtedness ("COD") income, for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under Section 108 of the IRC, a debtor is not required to include COD income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD income that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD income exceeds its tax attributes, the excess COD income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

As a result of the consummation of the Plan, the Debtors expect to realize COD income. Because the Debtors are in a chapter 11 bankruptcy proceeding, however, the Debtors will not be required to recognize COD income, but must instead reduce certain tax attributes by the amount of excluded COD income on the first day of the following tax year in the manner described above. Because, pursuant to the Plan, the Debtors will ultimately be liquidated, the amount of any tax attributes remaining after reduction under Section 108 of the IRC will not survive the restructuring process.

### C.     Certain U.S. Federal Income Tax Consequences to the U.S. Holders

The U.S. federal income tax consequences of the implementation of the Plan to a U.S. Holder of a Claim and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the U.S. Holder in exchange for the Claim and

whether the U.S. Holder receives distributions under the Plan in more than one taxable year; (iii) whether the U.S. Holder falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the U.S. Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the U.S. Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the U.S. Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the U.S. Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the U.S. Holder. Therefore, each U.S. Holder should consult its own tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such U.S. Holder of the transactions contemplated by the Plan.

### (i)    U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Class 2 and Class 4 Claims

Generally, a U.S. Holder of an Allowed Class 2 or Class 4 Claim (such Holders, "U.S. Plan Recipients") will be treated as exchanging its Claim in a taxable exchange under Section 1001 of the IRC, and, subject to the rules regarding accrued but untaxed interest, will realize a gain or loss on such exchange under the Plan of its Allowed Claim for cash and other property in an amount equal to the difference between (a) the sum of the amount of any cash and the fair market value on the date of the exchange of any other property received by the holder, and (b) the adjusted basis of the Allowed Claim exchanged therefor.  The character of such gain as capital gain or ordinary income will be determined by a number of factors including the tax status of the U.S. Plan Recipient, the rules regarding accrued but untaxed interest and market discount, whether the Claim constitutes a capital asset in the hands of the U.S. Plan Recipient, and whether and to what extent the U.S. Plan Recipient had previously claimed a bad debt deduction with respect to its Claim. Any gain recognized generally will be a capital gain (except to the extent the gain is attributable to accrued but unpaid interest, as described below) if the Claim was a capital asset in the hand of an exchanging U.S. Plan Recipient, and such gain would be a long-term capital gain if the U.S. Plan Recipient's holding period for the Claim surrendered exceeded one (1) year at the time of the exchange.

Any loss recognized by a U.S. Plan Recipient of an Allowed Claim will be a capital loss if the Claim constitutes a "security" for federal income tax purposes or is otherwise held as a capital asset.  Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Holders should consult their own tax advisors regarding the status of their claims as securities.

### (ii)     Accrued Interest

To the extent that any amount received by a U.S. Holder is attributable to accrued interest not theretofore included in income, such amount would be taxable to the U.S. Holder as interest income.  Conversely, a U.S. Holder of an Allowed Claim treated as debt for U.S. federal income tax purposes may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the U.S. federal income tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class may be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The Service could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### (iii)     Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns), or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### (iv)     Net Investment Income Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on consideration received pursuant to the Plan.

### (v)     Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the IRC.

---

Under the backup withholding rules of the IRC, U.S. Holders of Claims may be subject to backup withholding (currently, at a rate of 24%) with respect to payments made pursuant to the Plan unless such U.S. Holder (a) is a corporation or comes within certain other exempt categories and, when required, demonstrates this fact, or (b) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the U.S. Holder is not subject to backup withholding because of a failure to report all dividends and interest income.

Backup withholding is not an additional tax.  Any amount withheld under these rules will be credited against the U.S. Holder's federal income tax liability.  U.S. Holders of Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

THE FOREGOING DISCUSSION OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE.   HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN DESCRIBED HEREIN, AS WELL AS ANY OTHER TAX CONSEQUENCES, INCLUDING ANY TAX CONSEQUENCES ARISING UNDER STATE, LOCAL OR FOREIGN TAX LAWS.  NEITHER THE PROPONENTS OF THE PLAN NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON ARISING FROM OR RELATED TO THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, OR ANY OTHER TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

## ARTICLE XII
## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' Creditors than would otherwise result in any other available scenario.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan and support confirmation of the Plan.

Dated: November 11, 2020

APPROACH RESOURCES INC.

By:   */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer

Dated: November 11, 2020

APPROACH MIDSTREAM HOLDINGS LLC

By:   */s/ Sergei Krylov*

Name:  Sergei Krylov
Title:   President and Chief Executive Officer

Dated: November 11, 2020

APPROACH OIL & GAS INC.

By:   */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer

Dated: November 11, 2020

APPROACH OPERATING, LLC

By:   */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer

Dated: November 11, 2020

APPROACH DELAWARE, LLC

By:   */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer

Dated: November 11, 2020

APPROACH SERVICES, LLC

By:   */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer

Dated: November 11, 2020

APPROACH RESOURCES I, LP

By:   */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer

**Exhibit A**

**The Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| APPROACH RESOURCES INC., *et al.*, | § | Case No. 19-36444 (MI) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

## AMENDED JOINT PLAN OF LIQUIDATION OF APPROACH RESOURCES INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

## DATED: NOVEMBER 12, 2020

**THOMPSON & KNIGHT LLP**
David M. Bennett
State Bar No. 02139600
Email: david.bennett@tklaw.com
1722 Routh St., Suite 1500
Dallas, TX 75201
Telephone: (214) 969-1700
Facsimile: (214) 969-1751

**THOMPSON & KNIGHT LLP**
Demetra Liggins
State Bar No. 24026844
Email: demetra.liggins@tklaw.com
Anthony F. Pirraglia
State Bar No. 24103017
Email: anthony.pirraglia@tklaw.com
811 Main Street, Suite 2500
Houston, TX 77002
Telephone: (713) 654-8111
Facsimile: (713) 654-1871

**COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Approach Resources Inc. (4817); Approach Midstream Holdings LLC (4122); Approach Oil & Gas Inc. (7957); Approach Operating, LLC (1981); Approach Delaware, LLC (7483); Approach Services, LLC (3806); and Approach Resources I, LP (5316).  The Debtors' mailing address is One Ridgmar Centre, 6500 West Freeway, Suite 900, Fort Worth, Texas 76116.

## TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF CONSTRUCTION AND
    INTERPRETATION,  AND COMPUTATION OF TIME ........................................2
    Section 1.01    Scope of Defined Terms; Rules of Construction  and
                    Interpretation ................................................................... 2
    Section 1.02    Defined Terms ................................................................... 2
    Section 1.03    Computation of Time .......................................................17
    Section 1.04    Reference to Monetary Figures ........................................17
    Section 1.05    Exhibits and Plan Supplement.........................................18
ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS AGAINST THE DEBTORS .......18
    Section 2.01    Administrative Claims .....................................................18
    Section 2.02    Administrative Claims Bar Date ......................................19
    Section 2.03    Priority Tax Claims ..........................................................19
    Section 2.04    Professional Fee Claims ..................................................19
    Section 2.05    DIP Facility Claims ..........................................................20
    Section 2.06    Statutory Fees ..................................................................20
ARTICLE III CLASSIFICATION OF CLAIMS AND INTERESTS.......................................20
    Section 3.01    General Notes on Classification  and Treatment of Classified
                    Claims and Interests ........................................................20
    Section 3.02    Voting; Presumptions ......................................................21
    Section 3.03    Identification of Claims and Interests .............................21
ARTICLE IV TREATMENT OF CLAIMS AND INTERESTS .............................................22
    Section 4.01    Priority Non-Tax Claims .................................................22
    Section 4.02    Prepetition Secured Claims .............................................23
    Section 4.03    Miscellaneous Secured Claims........................................23
    Section 4.04    Class 4 GUC Claims.........................................................24
    Section 4.05    Intercompany Claims .......................................................24
    Section 4.06    Interests ...........................................................................25
ARTICLE V ACCEPTANCE OR REJECTION OF THIS PLAN ..........................................25
    Section 5.01    Designation of Unimpaired Classes..................................25
    Section 5.02    Designation of Impaired Classes......................................25
    Section 5.03    Classes Entitled to Vote ...................................................25
    Section 5.04    Classes Not Entitled to Vote ............................................25
    Section 5.05    Sources of Cash for Distributions.....................................25
    Section 5.06    Cram Down – Nonconsensual Confirmation.....................26
ARTICLE VI MEANS FOR IMPLEMENTATION OF THIS PLAN AND POST
    EFFECTIVE DATE GOVERNANCE....................................................26
    Section 6.01    Plan Funding.....................................................................26
    Section 6.02    Application of Available Cash ..........................................26
    Section 6.03    Retained Causes of Action...............................................27
    Section 6.04    Vesting of Assets in the Post-Effective Date Debtors........................27
    Section 6.05    Corporate Form.................................................................27
    Section 6.06    Officers and Directors .....................................................27

Section 6.07    Corporate Existence ....................................................................27
Section 6.08    Cancellation of Notes, Instruments, Certificates, and Other
                Documents ....................................................................................28
Section 6.09    Authorization for Transactions...................................................29
Section 6.10    Preservation of Rights of Action; Settlement ...........................29
Section 6.11    Employee Benefit Plans...............................................................30
Section 6.12    Exclusivity Period .......................................................................30
Section 6.13    Effectuating Documents ..............................................................31
Section 6.14    Exemption from Certain Transfer Taxes.....................................31
Section 6.15    Plan Administrator Closing of the Chapter 11 Cases..................31

ARTICLE VII PLAN ADMINISTRATOR ....................................................................31
Section 7.01    The Plan Administrator Agreement .............................................31
Section 7.02    The Plan Administrator ...............................................................32
Section 7.03    Retention of Professionals ..........................................................32
Section 7.04    Compensation of the Plan Administrator ....................................32
Section 7.05    Liability; Indemnification ...........................................................33
Section 7.06    Powers and Duties of the Plan Administrator..............................33
Section 7.07    Access and Preservation of Records ...........................................35
Section 7.08    Distribution Procedures ..............................................................35
Section 7.09    Closing of the Chapter 11 Cases .................................................35
Section 7.10    Termination ..................................................................................36
Section 7.11    Maintenance of Books and Records ............................................36

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY ....................36
Section 8.01    Timing and Delivery of Distributions .........................................36
Section 8.02    Method of Cash Distributions .....................................................36
Section 8.03    Failure to Negotiate Checks ........................................................36
Section 8.04    Fractional Dollars........................................................................37
Section 8.05    Compliance with Tax Requirements............................................37
Section 8.06    De Minimis Distributions ............................................................37
Section 8.07    Setoffs .........................................................................................37
Section 8.08    Distribution Record Date.............................................................38
Section 8.09    Date of Distributions on Account of Allowed Claims ................38
Section 8.10    No Distributions Pending Allowance ..........................................38
Section 8.11    Distributions After Allowance ....................................................39

ARTICLE IX RESERVES AND POST-EFFECTIVE DATE AGENT PROFESSIONAL
            RETAINERS .................................................................................39
Section 9.01    Establishment of Distribution Reserve Accounts .......................39
Section 9.02    Undeliverable Distribution Reserve.............................................39
Section 9.03    Budgeted Claims Reserve Distribution........................................40
Section 9.04    Gift Reserve Distribution.............................................................40
Section 9.05    Post-Effective Date Agent Professional Retainers.......................40
Section 9.06    Professional Fee Claims Reserve Distribution ...................................40

ARTICLE X EXECUTORY CONTRACTS, UNEXPIRED LEASES, AND OTHER
            AGREEMENTS .............................................................................41
Section 10.01   Assumption/Rejection .................................................................41

Section 10.02   Cure Amounts ........................................................................42
Section 10.03   Insurance Policies ................................................................42
Section 10.04   Claims Based on Rejection of Executory Contracts and
                Unexpired Leases ................................................................42
Section 10.05   Reservation of Rights .........................................................43
Section 10.06   Nonoccurrence of Effective Date .......................................43

ARTICLE XI PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND
        UNLIQUIDATED CLAIMS................................................................43
Section 11.01   Expunging of Certain Claims ..............................................43
Section 11.02   Objections to Claims ..........................................................44
Section 11.03   Estimation of Claims ..........................................................44
Section 11.04   Reduction of Claims ...........................................................45

ARTICLE XII CONDITIONS PRECEDENT TO EFFECTIVENESS OF THIS PLAN ............45
Section 12.01   Occurrence of the Effective Date .......................................45
Section 12.02   Substantial Consummation .................................................46
Section 12.03   Waiver of Conditions ..........................................................46
Section 12.04   Revocation, Withdrawal, or Non-Consummation..............46

ARTICLE XIII AMENDMENTS AND MODIFICATIONS ....................................................46

ARTICLE XIV RETENTION OF JURISDICTION................................................................47

ARTICLE XV EFFECT OF THIS PLAN ON CLAIMS AND INTERESTS ...........................48
Section 15.01   Compromise and Settlements.............................................48
Section 15.02   Satisfaction of Claims.........................................................49
Section 15.03   Releases...............................................................................49
Section 15.04   Exculpation..........................................................................52
Section 15.05   Permanent Injunction .........................................................52
Section 15.06   Setoffs .................................................................................54
Section 15.07   Recoupment ........................................................................55
Section 15.08   Release of Liens ..................................................................55
Section 15.09   Good Faith ...........................................................................55

ARTICLE XVI MISCELLANEOUS PROVISIONS ............................................................55
Section 16.01   Severability of Plan Provisions ..........................................55
Section 16.02   Successors and Assigns ......................................................56
Section 16.03   Binding Effect......................................................................56
Section 16.04   Notices .................................................................................56
Section 16.05   Term of Injunctions or Stay ................................................57
Section 16.06   No Admissions .....................................................................57
Section 16.07   Notice of the Effective Date................................................57
Section 16.08   Default Under Plan..............................................................58
Section 16.09   Governing Law ....................................................................58
Section 16.10   Plan Documents...................................................................58
Section 16.11   Entire Agreement ................................................................58

ARTICLE XVII CONFIRMATION REQUEST ....................................................................59

# INTRODUCTION

Approach Resources Inc. and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned Cases filed for voluntary chapter 11 bankruptcy protection on November 18, 2019. This Plan provides for the treatment of outstanding creditor Claims against, and Interests in, the Debtors. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, historical financial information, and assets, and for a summary and description of this Plan and certain related matters. No materials other than the Disclosure Statement, this Plan and any exhibits and schedules attached hereto or thereto or referenced herein or therein have been authorized by the Debtors for use in soliciting acceptances or rejections of this Plan.

As more fully described in the Disclosure Statement, the Debtors previously determined, in the discharge of their fiduciary duties, that the sale of substantially all of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code was in the best interests of the Debtors, their creditors, and their Estates. The Debtors closed the sale of the Acquired Property to the Purchaser pursuant to the Asset Purchase Agreement and Sale Order on September 30, 2020. This Plan proposes to, among other things, distribute certain proceeds from such sale and the Debtors' other assets (consisting primarily of Available Cash) in accordance with the provisions herein. The execution and consummation of this Plan will be facilitated through the appointment of a Plan Administrator who shall, among other things, resolve and compromise Claims, distribute the Debtors' remaining assets, and wind-down the Debtors' affairs.

As more fully described herein, subject to certain terms and conditions, the Plan generally provides for, among other things, (a) the payment in full of all Allowed Administrative Claims, DIP Facility Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Miscellaneous Secured Claims; (b) payment to the Prepetition Secured Lenders of all amounts not otherwise distributed pursuant to the Plan; (c) payment to Holders of Class 4 GUC Claims of their Pro Rata share of the distributions made from the Gift Reserve; and (d) the cancellation and extinguishment of Allowed Interests and Intercompany Claims, such that Holders of Interests and Intercompany Claims shall not receive or retain any property or assets on account of their Interests or Claims.[2]

**ALL HOLDERS OF CLAIMS OR INTERESTS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING ON THIS PLAN**.

---

[2] The description of the treatment of Claims in this Introduction is for illustrative purposes only and is qualified in its entirety by the terms and conditions of the Plan.

# ARTICLE I

## DEFINED TERMS, RULES OF CONSTRUCTION AND INTERPRETATION, AND COMPUTATION OF TIME

### Section 1.01    Scope of Defined Terms; Rules of Construction and Interpretation

For purposes of this Plan, except as expressly defined elsewhere in this Plan or unless the context otherwise requires, all capitalized terms used herein shall have the meanings ascribed to them in Article I of this Plan.  Any term used but not defined herein that is defined in the Bankruptcy Code or the Bankruptcy Rules, as the case may be, shall have the meaning ascribed in the Bankruptcy Code or the Bankruptcy Rules.  Whenever the context requires, such terms shall include the plural as well as the singular.  The masculine gender shall include the feminine, and the feminine gender shall include the masculine.  The terms "and" and "or," as used herein, shall be construed both conjunctively and disjunctively, and each shall include the other whenever applicable.

For purposes of this Plan, (a) except as provided in Article XIII, any reference in this Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) except as provided in Article XIII, any reference in this Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit as it may have been or may be amended, modified, or supplemented as permitted herein; (c) unless otherwise specified, all references in this Plan to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to this Plan; (d) the words "herein," "hereto," and "hereof" refer to this Plan in its entirety rather than to a particular portion of this Plan; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; and (f) the rules of construction set forth in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

### Section 1.02    Defined Terms

(1)    **Acquired Property** means the Debtors' assets and properties that were purchased by the Purchaser pursuant to the Asset Purchase Agreement and the Sale Order.

(2)    **Administrative Claims** means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of Title 28 of the United States Code; (c) all Allowed Professional Fee Claims; (d) any Cure Costs; and (e) all Claims for compensation or expense reimbursement for making a substantial contribution in the Cases Allowed by the Bankruptcy Court pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; *provided, however,* that, for the avoidance of doubt, any Claim assumed by the Purchaser shall not be an Administrative Claim.

(3)     **Administrative Claims Bar Date** shall have the meaning set forth in Section 2.02 of this Plan.

(4)     **Adequate Protection Liens** has the meaning set forth in the DIP Orders.

(5)     **Affiliate** has the meaning set forth in section 101(2) of the Bankruptcy Code. For purposes of Article XVI of this Plan and the definition of Related Person, an Affiliate of a Person shall also include another Person controlling, controlled by, or under common control with such first Person. For purposes of this definition, "control" means, when used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

(6)     **Agent** means, collectively, the DIP Agent and the Prepetition Agent.[3]

(7)     **Allowed** means with reference to any Claim or Interest: any Claim or Interest or any portion thereof (a) as to which no objection to allowance has been interposed on or before the later of (i) the Claim Objection Deadline or (ii) the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or is listed on the Bankruptcy Schedules as liquidated, non-contingent, and undisputed; (b) as to which any objection to its allowance has been settled, waived through payment, or withdrawn, as permitted herein, or denied by a Final Order; (c) as to which liability of the Debtors and the amount thereof has been determined and expressly allowed by this Plan or a Final Order; (d) as to which the liability of the Debtors and the amount thereof are determined and expressly allowed by Final Order of a court of competent jurisdiction other than the Bankruptcy Court; or (e) that is expressly deemed allowed in a liquidated amount in this Plan; *provided, however,* that with respect to an Administrative Claim, "Allowed Administrative Claim" means an Administrative Claim as to which a timely request for payment has been made by the Administrative Claims Bar Date in accordance with this Plan (if such written request is required) or other Administrative Claim, in each case as to which the Debtors, the Agent, or the Plan Administrator (i) have not interposed a timely objection or (ii) have interposed a timely objection and such objection has been settled, waived through payment or withdrawn, as permitted herein, or denied by a Final Order; *provided further* that, except as otherwise set forth herein, the amount of any Secured Claim or Miscellaneous Secured Claim for purposes of this Plan shall be determined in accordance with the Bankruptcy Code, including without limitation sections 502(b)(6), 503(b), and 506.

(8)     **Alpine** means Alpine Energy Acquisitions, LLC.

---

[3] No determination, agreement, decision, consent, election, approval, acceptance, waiver, designation, authorization, or other similar circumstance or matter of or by the Agent hereunder or related hereto (the "**Agent Consent**") requested of the Agent by the Debtors, the Post-Effective Date Debtors, or the Plan Administrator pursuant to the terms of this Plan or otherwise shall be inferred from any action, inaction, or acquiescence of the Agent, and shall not be given other than by a writing acceptable to the Agent that is signed by the Agent or its authorized representative or attorney and expressly states such Agent Consent or by announcement on the record at a hearing in these Cases, without limitation.

(9)      **Alpine APA** means that certain asset purchase agreement between Alpine and the Debtors dated February 4, 2020.

(10)      **Alpine Sale** means the sale of substantially all of the Debtors' assets to Alpine, which was approved by the Alpine Sale Order but did not close.

(11)      **Alpine Sale Order** means the order approving the sale of substantially all of the Debtors' assets to Alpine [Dkt. No. 301].

(12)      **Alpine Settlement Agreement** means the settlement agreement attached as an exhibit to the Alpine Settlement Order.

(13)      **Alpine Settlement Order** means the *Order Approving Settlement Among the Debtors, Alpine Energy Acquisitions, LLC and Alpine Energy Capital, LLC* [Dkt. No. 499].

(14)      **Asset Purchase Agreement** means the agreement for the purchase and sale of the Acquired Property between the Debtors and the Purchaser, as approved by the Bankruptcy Court, as amended and restated, or otherwise modified from time to time.

(15)      **Assets** means all of the Debtors' assets and property existing as of the Effective Date.

(16)      **Assigned Contracts** means any and all executory contracts and unexpired leases (a) designated by the Purchaser as an Assigned Contract, and (b) assumed by the Debtors and assigned to the Purchaser, on or before the Closing Date, pursuant to the Asset Purchase Agreement.

(17)      **Available Cash** means (a) all Cash and Cash Equivalents of the Debtors, determined in accordance with generally accepted accounting principles in the United States, as of the Effective Date (including the amount of any retainer or deposit held by a party which is required to be returned to the Debtors under the Plan or otherwise), and (b) all other Cash and Cash Equivalents in which the Post-Effective Date Debtors may hold an interest.

(18)      **Avoidance Actions** means any and all actual or potential Claims or Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a).

(19)      **Avoidance Actions Proceeds** means the proceeds of the resolution of Avoidance Actions.

(20)      **Ballot** means the document for accepting or rejecting this Plan, in the form approved by the Bankruptcy Court.

(21)      **Bankruptcy Code** means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as in effect on the Petition Date as heretofore or hereafter amended.

(22)   **Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Texas, Houston Division  or any other bankruptcy court having jurisdiction  over the Cases from time to time.

(23)   **Bankruptcy Rules** means, collectively,  the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, the Federal Rules of Civil Procedure, as amended, as applicable  to the Cases or proceedings therein, and the Local Rules of the Bankruptcy Court, as applicable  to the Cases or proceedings therein, as the case may be.

(24)   **Bankruptcy Schedules** means the schedules of assets and liabilities,  lists of executory contracts and unexpired  leases, and related information  Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(b), as such schedules may be amended or supplemented from time to time as permitted hereunder in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

(25)   **Bankruptcy SOFAs** means the statements of financial affairs and related financial information Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(b), as such statements may be amended or supplemented from time to time as permitted hereunder in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

(26)   **Bar Date** means the Administrative  Claims Bar Date, the General Bar Date, or the Governmental  Unit Bar Date, as applicable.

(27)   **Budgeted Claims Reserve** means the Distribution Reserve Account established for the payment of Budgeted Expenses (other than Plan Administrator  Expenses and Indenture Trustee Distribution,  both of which shall be paid from the Gift Reserve, and Allowed Professional Fee Claims, which shall be paid from the Professional Fee Claim Reserve), but only to the extent any such Budgeted Expense is not greater than the budgeted line item for such Budgeted Expense in the Wind-Down Budget and such Budgeted Expense exceeds the amount of any retainer or deposit held by the party to whom the Budgeted Expense is owed.

(28)   **Budgeted Expenses** means any accrued and unpaid Claim as of the Effective Date that is authorized to be paid under the DIP Budget and/or the Wind-Down Budget (other than the Gift Reserve), including,  but not limited to, (a) budgeted (i) Allowed Administrative  Claims, (ii) Allowed Professional Fee Claims, (iii) Allowed Priority Tax Claims, (iv) Allowed Priority Non-Tax Claims, (v) Allowed Miscellaneous  Secured Claims, (vi) Allowed KEIP obligations, and (vii) Allowed Severance Plan obligations,  and (b) other costs of the Wind-Down that are authorized to be paid under the Wind-Down Budget.

(29)   **Business Day** means any day, excluding Saturdays, Sundays, or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in Houston, Texas.

(30)   **Cases** means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all the Debtors, the procedurally  consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

(31)     **Cash** means legal currency of the United States of America or equivalents thereof, including bank deposits and checks.

(32)     **Cash Equivalents** means any item or asset of the Debtors readily converted to Cash, such as bank accounts, marketable securities, treasury bills, certificate of deposit, commercial paper maturing less than one year from date of issue, or other liquid investments.

(33)     **Causes of Action** means all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims whatsoever, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring through the Effective Date.

(34)     **Charging Lien** means the Indenture Trustee's lien and priority of payment rights under the Indenture or applicable law.

(35)     **Claim** means a claim, whether or not asserted or Allowed, as defined in section 101(5) of the Bankruptcy Code.

(36)     **Claim Objection Deadline** means the first Business Day, which is at least 120 days after the Effective Date, or such later date as may be established by the Bankruptcy Court in accordance with this Plan.

(37)     **Class** means a category of Claims or Interests as set forth in Section 3.03 pursuant to section 1122 of the Bankruptcy Code.

(38)     **Class 4 GUC Claims** means all General Unsecured Claims (including, for the avoidance of doubt, the Senior Notes Claims) other than Intercompany Claims and Prepetition Secured Claims.

(39)     **Closing** means the closing of the sale of the Acquired Property to the Purchaser in accordance with the Asset Purchase Agreement and the Sale Order.

(40)     **Closing Date** means the date of the Closing.

(41)     **Common Stock** means the common stock of Approach Resources Inc.

(42)     **Confirmation** means entry by the Bankruptcy Court of the Confirmation Order on the docket of the Cases.

(43)     **Confirmation Date** means the date on which the Confirmation Order is entered on the docket in the Cases within the meaning of Bankruptcy Rules 5003 and 9021.

(44)     **Confirmation Hearing** means the hearing or hearings held by the Bankruptcy Court to consider Confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code,

which may be combined with the Final Disclosure Statement Hearing, as such hearing may be continued from time to time.

(45)     **Confirmation Order** means the order entered by the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

(46)     **Consummation** means the occurrence of the Effective Date.

(47)     **Creditor** means any Person who holds a Claim against any Debtor.

(48)     **Cure Costs** means all costs required of a Debtor to cure any and all monetary defaults including pecuniary losses, pursuant to section 365 of the Bankruptcy Code, of such Debtor arising under any executory contract or unexpired lease.

(49)     **Debtors** means individually or collectively the following debtors and debtors-in-possession: Approach Resources Inc.; Approach Midstream Holdings LLC; Approach Oil & Gas Inc.; Approach Operating, LLC; Approach Delaware, LLC; Approach Services, LLC; and Approach Resources I, LP.

(50)     **Debtors' Related Persons** means each Debtor's officers, directors, advisory board members, employees, managers, financial advisors, attorneys, accountants, investment bankers, consultants, and professionals, each acting in such capacity.

(51)     **DIP Agent** has the meaning as defined in the Final DIP Order.

(52)     **DIP Budgets** means the budget or budgets approved in accordance with and as part of the DIP Orders entered in these Cases.

(53)     **DIP Facility Claims** means a Claim held by the DIP Lenders for all debts, indebtedness, obligations, covenants, and duties of payment and performance arising under or relating to the DIP Facility Loan Documents or the DIP Orders, including any and all accrued but unpaid interest and any unpaid fees or charges arising under the DIP Facility Loan Documents and any and all other interest, costs, fees, or charges arising under the DIP Orders.

(54)     **DIP Facility Loan Agreement** means the $41,250,000 Senior Secured Super-Priority Debtor-in-Possession Credit Agreement, dated as of December 18, 2019, by and among the DIP Lenders and the Debtors, as approved by the Bankruptcy Court pursuant to the Final DIP Order, together with any amendments, modifications, or supplements thereto.

(55)     **DIP Facility Loan Documents** means the DIP Facility Loan Agreement and the other Loan Documents (as defined in the DIP Facility Loan Agreement).

(56)     **DIP Lenders** means, in each case only in its capacity as such, the secured parties to the DIP Facility Loan Agreement.

(57)     **DIP Liens** has the meaning set forth in the DIP Orders.

(58)    **DIP Orders** means the Interim Financing Order and the Final DIP Order, together with any amendments, modifications, or supplements thereto.

(59)    **Disallowed** means any Claim or portion thereof which has been disallowed by a Final Order and includes any Claim which is not an Allowed Claim for any other reason.

(60)    **Disclosure Statement** means the *Disclosure Statement in Support of Amended Joint Plan of Liquidation of Approach Resources Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 662], as the same may be amended, modified, or supplemented from time to time, including all exhibits and schedules thereto, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

(61)    **Disputed** means, in reference to a Claim or Interest, any Claim or Interest not otherwise Allowed or Disallowed pursuant to this Plan or an order of the Bankruptcy Court (a) which has been Scheduled, or hereafter is listed on the Bankruptcy Schedules as unliquidated, contingent, or disputed, and which has not been resolved by written agreement of the parties (or, in the case of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Miscellaneous Secured Claims which have not been resolved by written agreement of the parties and the Agent or an order of the Bankruptcy Court with respect to which the Agent has had notice and an opportunity to object); (b) proof of which was required to be Filed but as to which a Proof of Claim or Interest was not timely or properly Filed; (c) proof of which was timely and properly Filed and which has been or hereafter is listed on the Bankruptcy Schedules as unliquidated, disputed, or contingent; (d) that is disputed in accordance with the provisions of this Plan; or (e) as to which a Debtor, as applicable, or the Agent or the Plan Administrator have interposed a timely objection in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any orders of the Bankruptcy Court, or is otherwise disputed by a Debtor or the Agent or the Plan Administrator in accordance with applicable law, which objection or dispute has not been withdrawn or determined by a Final Order; *provided, however*, that for purposes of determining whether a particular Claim is a Disputed Claim before the expiration of any period of limitation fixed for the interposition by a Debtor or the Agent or the Plan Administrator of objections to the allowance of Claims, any Claim that is not an Allowed Claim shall be deemed Disputed.

(62)    **Distribution** means the payment of Cash or other property, as the case may be, in accordance with the Plan, the Confirmation Order, and, if applicable, the Plan Administrator Agreement.

(63)    **Distribution Date** means the dates, occurring as soon as practicable after the Effective Date or as otherwise set forth in this Plan, upon which distributions are made pursuant to the terms of this Plan to Holders of Allowed Administrative Claims, and other Allowed Claims; *provided, however*, that should such Allowed Claims be paid in the ordinary course of business, the Distribution Date shall be the date such Allowed Claim becomes payable under the terms of any contract or agreement or applicable non-bankruptcy law.

(64)    **Distribution Record Date** means the close of business on the fifth (5th) Business Day following the Effective Date.

(65)     **Distribution Reserve Accounts** means one or more of the following accounts established by the Debtors or the Plan Administrator pursuant to this Plan: the Budgeted Claims Reserve, the Professional Fee Claims Reserve, the Gift Reserve, or the Undeliverable Distribution Reserve, each of which (other than the Gift Reserve and the Professional Fee Claims Reserve) shall be subject to the Liens of the Prepetition Agent as provided in Section 4.02(b).

(66)     **Effective Date** means the first Business Day on which all conditions precedent set forth in Section 12.01 of this Plan have been satisfied or waived as permitted hereunder.

(67)     **Employee Benefit Plans** means any employment, compensation, pension, welfare, healthcare, bonus, incentive compensation, sick leave and other leave, vacation pay, expense, reimbursement, dependent care, retirement, savings, deferred compensation, supplemental pension, retention, workers compensation, life insurance, disability, dependent care, dependent healthcare, education, severance or other compensation or benefit plan, agreement or arrangement for the benefit of the current or former directors, officers or employees (whether salaried or hourly, active or retired) of a Debtor.

(68)     **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

(69)     **Estates** means individually or collectively the estate created for such Debtor in its Case pursuant to section 541 of the Bankruptcy Code.

(70)     **Exculpated Parties** means, in each case only in its capacity as such, (a) the Debtors and each of their respective Related Persons, and (b) the Indenture Trustee solely in its capacity as disbursing agent with respect to the Senior Notes Claims.

(71)     **Executory Contract** means a contract to which one or more of the Debtors is a party and that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

(72)     **Exhibit** means an exhibit annexed either to this Plan, the Plan Documents, or the Disclosure Statement or Filed as part of the Plan Supplement.

(73)     **File, Filed, or Filing** means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Cases.

(74)     **Final DIP Order** means the *Final Order (i) Authorizing the Debtors to (a) Obtain Postpetition Financing Secured by Senior Priming Liens and (b) Use Cash Collateral, (ii) Granting Liens and Providing Superpriority Administrative Expense Status, (iii) Granting Adequate Protection, (iv) Modifying the Automatic Stay, (v) Scheduling a Final Hearing, and (vi) Granting Related Relief* that was entered on December 13, 2019 [Dkt. No. 110], as the same may be amended, modified or supplemented from time to time, including all exhibits and schedules thereto.

(75)     **Final Disclosure Statement Hearing** means the hearing or hearings held by the Bankruptcy Court to consider final approval of the Disclosure Statement, which may be combined with the Confirmation Hearing, as such hearing may be continued from time to time.

(76)    **Final Order** means (a) an order or judgment of the Bankruptcy Court, as entered on the docket in any of the Cases (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction; or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Cases (or in any related adversary proceeding or contested matter), in each case of (a) and (b) that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided, however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Rules, may be Filed relating to such order shall not prevent such order from being a Final Order.

(77)    **Free and Clear** means free and clear of all Liens, Claims, Causes of Action, encumbrances, interests, pledges, security interests, rights of setoff, restrictions or limitation on use, successor liabilities, conditions, rights of first refusal, options to purchase, obligations to allow participation, agreements or rights, rights asserted in litigation matters, rights asserted in adversary proceedings in these Cases, competing rights of possession, obligations to lend, matters filed of record that relate to, evidence or secure an obligation of the Debtors or the Estates, (and all created expenses and charges) of any type under, among other things, any document, instrument, agreement, affidavit, matter filed of record, cause, or state or federal law, whether known or unknown, legal or equitable, and all liens, rights of offset, replacement liens, adequate protection liens, charges, obligations, or claims granted, allowed or directed in any Order.

(78)    **General Bar Date** means April 8, 2020, which is the applicable date designated by the Bankruptcy Court as the last date for Persons or Entities (other than Governmental Units) to File Proofs of Claims or Interests in the Cases.

(79)    **General Unsecured Claim** means any Claim against any Debtor that is not Secured or entitled to priority under the Bankruptcy Code or any Final Order, excluding, for the avoidance of doubt, DIP Facility Claims, Administrative Claims, Professional Fee Claims, Prepetition Secured Claims, Miscellaneous Secured Claims, Priority Tax Claims, Priority Non-Tax Claims, Intercompany Claims, or any Claim that was assumed by the Purchaser.

(80)    **Gift Reserve** means the Distribution Reserve Account established for the Gifted Amount.

(81)    **Gifted Amount** means $1,800,000 to be funded from Available Cash.

(82)    **Governance Documents** means any certificate of incorporation, certificate of formation, bylaws, limited liability company agreements (or any other formation and organizational documents) of the Debtors in effect as of the Petition Date.

(83)    **Governmental Authority** means the government of the United States of America, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

(84)    **Governmental Unit Bar Date** means May 16, 2020, which is the applicable date designated by the Bankruptcy Court as the last date for Governmental Units to File Proofs of Claims or Interests in the Cases.

(85)    **Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

(86)    **Holder** means the beneficial holder of any Claim or Interest.

(87)    **Impaired** means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

(88)    **Indenture** means that certain senior indenture dated as of June 11, 2013, by and among Approach Resources Inc., its Subsidiary guarantors, and Wilmington Trust, National Association, as successor trustee, as supplemented by a first supplemental indenture of even date therewith and by the Second Supplemental Indenture, together with all supplements, amendments, and modifications thereto.

(89)    **Indenture Trustee** means Wilmington Trust, National Association, as successor trustee under the Indenture.

(90)    **Indenture Trustee Distribution** means an amount equal to the Indenture Trustee Fees not to exceed One Hundred Twenty Thousand dollars ($120,000.00), which shall be payable from the Gift Reserve as a settlement pursuant to the terms of the Plan.

(91)    **Indenture Trustee Fees** means all outstanding reasonable and documented actual compensation, fees, and expenses, whether incurred prior to or after the Effective Date, of (a) the Indenture Trustee, (b) Reed Smith, LLP as counsel to the Indenture Trustee, and (c) any other advisors to the Indenture Trustee, to the extent provided under the Indenture.

(92)    **Intercompany Claim** means any Claim by a Debtor against another Debtor.

(93)    **Interests** means the interest of any holder of equity securities in any of the Debtors represented by any issued and outstanding common stock or interests, preferred stock or interests, or other instrument evidencing a present ownership interest in any of the Debtors before the Effective Date (including before the Petition Date), whether or not transferable, any restricted stock units, calls, rights, puts, awards, commitments, repurchase rights, unvested or unexercised options, warrants, unvested common interests, unvested preferred interests or any other agreements of any character related to the common stock or preferred stock interests of any of the Debtors, obligating any of the Debtors to issue, transfer, purchase, redeem, or sell any equity interests or other equity securities, any rights under any equity incentive plans, voting agreements and registration rights agreements regarding equity securities of any of the Debtors, any claims

arising from the rescission of a purchase, sale, or other acquisition of any outstanding common stock interests or preferred stock interests or other equity securities (or any right, claim, or interest in and to any common stock interests, preferred stock interests or other equity securities) of any of the Debtors, any claims for the payment of any distributions with respect to any common stock or preferred stock interests of any of the Debtors, and any claims for damages or any other relief arising from the purchase, sale, or other acquisition of any of the Debtors' outstanding common stock interests, preferred stock interests or other equity securities, however evidenced, including the Common Stock.

(94)   **Interim Financing Order** means the *Interim Order (i) Authorizing The Debtors To Use Cash Collateral, (ii) Granting Adequate Protection, (iii) Modifying The Automatic Stay, (iv) Scheduling A Final Hearing, And (v) Granting Related Relief* [Dkt. No. 32] that was entered on November 20, 2019, as the same may be amended, modified or supplemented from time to time, including all exhibits and schedules thereto.

(95)   **Internal Revenue Code** means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute or statutes.

(96)   **KEIP** means the key employee incentive program approved by the Bankruptcy Court pursuant to the *Order Granting Emergency Motion of the Debtors for an Order (I) Authorizing and Approving the Key Employee Incentive Program Pursuant to 11 U.S.C. 105, 363, and 503; and (II) Granting Related Relief* [Dkt. No. 269], as such order may be amended, modified or supplemented from time to time.

(97)   **Lender Parties** means, in each case only in its capacity as such, the DIP Lenders, the DIP Agent, the Prepetition Agent, and the Prepetition Secured Lenders, and each of their respective Related Persons.

(98)   **Lien** means a charge against or interest in property to secure payment of a debt or performance of an obligation.

(99)   **Miscellaneous Secured Claim** means any Secured Claim against a Debtor other than the Prepetition Secured Claims and the DIP Facility Claims, but excluding, for the avoidance of doubt, any Claim that was assumed by the Purchaser.

(100)   **Net Sale Proceeds** means the remaining Sale Proceeds, if any, after deduction for (a) any ancillary fees payable in connection with the transactions contemplated by the Asset Purchase Agreement and approved by the Sale Order (other than Professional Fee Claims and any other fees separately treated and addressed under this Plan); and (b) any price adjustments pursuant to the Asset Purchase Agreement or Sale Order, including but not limited to post-closing adjustments, deposits, or all other amounts which reduce the amount of proceeds payable to the Debtors pursuant to and in accordance with the Asset Purchase Agreement.

(101)   **Order** means any award, decision, writ, injunction, judgment, order, or decree entered, issued, made, or rendered by any Governmental Authority (including the Bankruptcy Court), or by any arbitrator.

(102)  **Person** means an individual, corporation, general or limited partnership, limited liability company, trust, liquidating trust, incorporated or unincorporated association, joint venture, joint stock company, government (or an agency or political subdivision thereof) or other entity of any kind.

(103)  **Petition Date** means November 18, 2019, the date that each Debtor filed its respective chapter 11 Case.

(104)  **Plan** means this *Joint Plan of Liquidation,* including any Exhibits and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified, or supplemented from time to time as permitted herein and in accordance with the provisions of the Bankruptcy Code and the terms hereof.

(105)  **Plan Administrator** means the Person identified as such in the Plan Supplement, subject to the consent of the Agent, who will serve as the initial administrator of the Post-Effective Date Debtors and effectuate the Wind-Down pursuant to this Plan (or such other Person that may subsequently be appointed as Plan Administrator pursuant to this Plan with the consent of the Agent).

(106)  **Plan Administrator Agreement** means an agreement in form and substance acceptable to the Agent setting forth the economic arrangement and terms pursuant to which the Plan Administrator will perform its duties pursuant to this Plan.

(107)  **Plan Administrator Expenses** means any amounts owed under the Plan Administrator Agreement and any reasonable fees (including professional fees), costs, and expenses of the Plan Administrator, which, pursuant to the Wind-Down Budget, shall be capped at $100,000 and paid from the Gift Reserve.

(108)  **Plan Default Notice** shall have the meaning set forth in Section 16.08(a) of this Plan.

(109)  **Plan Documents** means all documents, forms, lists and agreements contemplated under this Plan (including, but not limited to the Plan Supplement), each in form and substance acceptable to the Agent, to effectuate the terms and conditions hereof.

(110)  **Plan Supplement** means any supplement to this Plan, and the compilation of Plan Documents and forms of documents and Exhibits to this Plan, including the Plan Administrator Agreement, the resume of and notice information for the initial Plan Administrator, the list of Retained Causes of Action, and the list of assumed Executory Contracts and Unexpired Leases and proposed Cure Costs, as amended, modified, or supplemented from time to time, and in each case in form and substance acceptable to the Agent, to be Filed by the Debtors as permitted herein on or before the Plan Supplement Filing Date.

(111)  **Plan Supplement Filing Date** means December 4, 2020, which date may be modified by (a) the Debtors, with the consent of the Agent, or (b) order of the Bankruptcy Court.

(112)  **Post-Effective Date Debtor** means a Debtor after the Effective Date.

(113)  **Post-Effective Date Agent Professional Retainers** means each of (a) a retainer in the amount of $100,000 for the payment of fees and expenses of the Agent's counsel incurred after the Effective Date and (b) a retainer in the amount of $50,000 for the payment of fees and expenses of the Agent's financial advisor incurred after the Effective Date, in each case to be funded by the Debtors on the Effective Date using Available Cash.

(114)  **Prepetition Agent** means JPMorgan Chase Bank, N.A., not individually, but as Administrative Agent pursuant to the Prepetition Credit Agreement.

(115)  **Prepetition Collateral** shall have the meaning ascribed to it in the DIP Orders.

(116)  **Prepetition Lien** shall have the meaning ascribed to it in the DIP Orders.

(117)  **Prepetition Secured Lenders** means the secured parties that are party to the Prepetition Secured Financing Documents.

(118)  **Prepetition Secured Claims** means all Claims arising from or relating to the Prepetition Secured Financing Documents and the corresponding obligations and as set forth in the DIP Orders.

(119)  **Prepetition Secured Financing Documents** means that certain Amended and Restated Credit Agreement, dated as of May 7, 2014 (as amended, the "Prepetition Credit Agreement"), by and among Approach Resources Inc. as borrower, the Prepetition Agent, and the Prepetition Secured Lenders, together with all supplements, amendments, and modifications thereto, and all other Loan Documents (as defined in the Prepetition Credit Agreement).

(120)  **Priority Non-Tax Claims** means any Claim other than an Administrative Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code; *provided, however,* that, for the avoidance of doubt, any Claim assumed by the Purchaser shall not be a Priority Non-Tax Claim.

(121)  **Priority Tax Claim** means a Claim that is entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code; *provided, however,* that, for the avoidance of doubt, a Claim that was assumed by the Purchaser shall not be a Priority Tax Claim.

(122)  **Pro Rata** means that proportion that a Claim or Interest in a particular Class bears to the aggregate amount of all Claims or Interests in such Class, except in cases where Pro Rata is used in reference to multiple Classes, in which case Pro Rata means the proportion that a Claim or Interest in a particular Class bears to the aggregate amount of all Claims in such multiple Classes.

(123)  **Professional** means any professional (a) employed in the Cases pursuant to sections 156, 327, 328 or 1103 of the Bankruptcy Code and (b) to be compensated for services rendered either (i) pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (ii) seeking compensation and reimbursement as an administrative expense of the Debtors' Estates.

(124)  **Professional Fee Claim** means a Claim of a Professional for compensation or reimbursement of expenses relating to services after the Petition Date through the Effective Date.

(125)  **Professional Fee Claim Reserve** means the Distribution Reserve Account established for the payment of Allowed Professional Fee Claims, but only to the extent any such Allowed Professional Fee Claim is not greater than the budgeted line item for such Budgeted Expense in the Wind-Down Budget and such Allowed Professional Fee Claim exceeds the amount of any retainer or deposit held by the party to whom the Allowed Professional Fee Claim is owed.

(126)  **Proof of Claim (or Interest)** means the proof of claim (or interest) that must be Filed by a Holder of a Claim (or Interest) by the General Bar Date or the Governmental Unit Bar Date, as applicable.

(127)  **Purchaser** means Zarvona III-A, L.P., the entity that purchased the Acquired Property pursuant to the Asset Purchase Agreement and the Sale Order.

(128)  **Related Persons** means, collectively, with respect to any Person, such Person's predecessors, successors and assigns (whether by operation of law or otherwise) and their respective present and former Affiliates and subsidiaries and each of their respective current and former members, management companies, fund advisors or managers, managed accounts or funds, partners, limited partners, general partners, principals, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, participants, officers, directors, advisory board members, employees, managers, shareholders, representatives, heirs, executors, financial advisors, attorneys, accountants, investment bankers, consultants, agents and professionals, each acting in such capacity, and any Person claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members, and professionals).

(129)  **Released Parties** means, collectively and individually, and in each case only in its capacity as such: (a) each of the Debtors and the Debtors' Related Persons who do not opt out of the releases contained in the Plan, (b) the Lender Parties and each of their respective Related Persons, and (c) the Indenture Trustee.

(130)  **Releasing Parties** means, collectively, and in each case only in its capacity as such (but in each case excluding the Lender Parties, and each such Lender Party's current and former Affiliates, and each such Lender Party's and its current and former Affiliates' and subsidiaries' Related Persons, each in their capacity as such): (a) each of the Debtors' current and former directors or officers; (b) all Holders of Claims or Interests who vote to accept the Plan; (c) the Indenture Trustee; (d) all Holders of Claims or Interests who (i) are presumed to accept the Plan; (ii) are deemed to reject the Plan; or (iii) are entitled to vote on the Plan but abstain from voting, are not entitled to vote, or vote to reject the Plan, and in each case of (i) through (iii) do not opt out of the Third Party Release on a timely submitted Ballot or opt-out form, as applicable; and (e) with respect to each of the foregoing (a) through (d), such Person and its current and former Affiliates and subsidiaries, and such Persons' and their current and former Affiliates' and subsidiaries' Related Persons, each in their capacity as such.

(131)  **Retained Causes of Action** means all Causes of Action listed on **Exhibit E** of the Disclosure Statement (as may be amended, modified, or supplemented from time to time) that the Debtors or the Estates may hold as of the Effective Date that are not released under this Plan. For

the avoidance of doubt, Retained Causes of Action shall not include any Claims or Causes of Action against any Released Parties.

(132)    **Retained Causes of Action Proceeds** means the proceeds of the resolution of Retained Causes of Action.

(133)    **Sale** means the sale of the Acquired Property to the Purchaser pursuant to the Asset Purchase Agreement.

(134)    **Sale Order** means the *Order Approving (A) The Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (B) The Assumption and Assignment of Certain Contracts and Unexpired Leases* [Docket No. 605].

(135)    **Sale Proceeds** means all of the Cash received from the sale, disposition, collection or other monetization of the Acquired Property as contemplated under the Asset Purchase Agreement, including, without limitation, funds held in deposit or in escrow under or in connection with the Asset Purchase Agreement, if any.

(136)    **Scheduled** means, with respect to any Claim or Interest, the status and amount, if any, of such Claim or Interest as set forth in the Bankruptcy Schedules.

(137)    **Second Supplemental Indenture** means that certain second supplemental indenture effective on January 27, 2019 by and among Approach Resources Inc., its Subsidiary guarantors, and Wilmington Trust, National Association, as successor trustee.

(138)    **Secured** means, when referring to a Claim: (a) secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to this Plan or the DIP Orders as a Secured Claim.

(139)    **Securities Act** means the Securities Act of 1933, 15 U.S.C. sections 77a-77aa, as now in effect or hereafter amended.

(140)    **Senior Notes** means those certain unsecured 7% Senior Notes due 2021 issued by Approach Resources Inc. pursuant to the Indenture, of which Eighty Five Million Two Hundred Forty Thousand dollars ($85,240,000.00) in principal is outstanding.

(141)    **Senior Notes Claims** means all Claims arising from or relating to the Senior Notes and the corresponding obligations.

(142)    **Severance Plan** means the severance plan approved by the Bankruptcy Court pursuant to the *Order Authorizing Debtors to Implement Non-Insider Severance Plan Pursuant to Section 363 and 503(c) of the Bankruptcy Code* [Docket No. 312].

(143) **Subsidiaries** means a Debtor other than Approach Resources Inc.; specifically Approach Midstream Holdings LLC; Approach Oil & Gas Inc.; Approach Operating, LLC; Approach Delaware, LLC; Approach Services, LLC; and Approach Resources I, LP.

(144) **Third Party Release** means the release provided by the Releasing Parties in favor of the Released Parties as set forth in Section 15.03(c) of the Plan.

(145) **Unclaimed Property** has the meaning set forth in Section 8.03 of this Plan.

(146) **Unexpired Lease** means a lease to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

(147) **Unimpaired** means a Claim or Interest that is not Impaired.

(148) **Voting Deadline** means the deadline by which a Creditor must deliver a Ballot to accept or reject this Plan as set forth in the order of the Bankruptcy Court approving the instructions and procedures relating to the solicitation of votes with respect to this Plan, which shall be December 11, 2020 at 4:00 p.m. (prevailing Central Time).

(149) **Voting Record Date** means the record date for voting on this Plan, which shall be November 5, 2020.

(150) **Wind-Down** means the process following the Effective Date for making Distributions pursuant to the Plan; liquidating or abandoning the Assets; pursuing, settling, or abandoning Retained Causes of Action or objections to Claims; and winding down, dissolving, and liquidating the Estates and the Post-Effective Date Debtors.

(151) **Wind-Down Budget** means the budget in form and substance acceptable to the Agent attached to the Plan Supplement and incorporated herein by reference, which shall include line items acceptable to the Agent to fund from Available Cash (a) the Budgeted Claims Reserve, (b) the Professional Fee Claims Reserve, and (c) the Gift Reserve (which shall provide for the payment of Plan Administrator Expenses and the Indenture Trustee Distribution from the Gift Reserve in accordance with the terms of the Plan), pursuant to which the Plan Administrator shall effectuate the orderly Wind-Down of the Estates in accordance with this Plan, which budget may be amended from time to time following the Effective Date with the consent of the Agent to include subsequent periods or otherwise in accordance with the Plan.

## Section 1.03     Computation of Time

In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## Section 1.04     Reference to Monetary Figures

All references in this Plan to monetary figures shall refer to legal currency of the United States of America, unless otherwise expressly provided.

**Section 1.05      Exhibits and Plan Supplement**

All Exhibits, all Plan Documents, as well as the Plan Supplement, are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits and Plan Supplement shall be timely Filed with the Clerk of the Bankruptcy Court on or before the Plan Supplement Filing Date. Holders of Claims and Interests may obtain a copy of the Filed Exhibits and the Plan Supplement upon written request to the Debtors' counsel. Upon their Filing, the Exhibits and the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or at the Balloting Agent's website for these Cases at https://dm.epiq11.com/case/approachresources. The documents contained in the Exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Subject to the consent of the Agent or by announcement on the record at the Confirmation Hearing, the Debtors may modify or make additions to or subtractions from any Exhibit to this Plan or the Plan Supplement and to amend, modify or supplement any Exhibit to this Plan before the Confirmation Date.

## ARTICLE II

### TREATMENT OF UNCLASSIFIED CLAIMS AGAINST THE DEBTORS THAT ARE NOT ENTITLED TO VOTE ON THE PLAN

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Priority Tax Claims, Professional Fee Claims and DIP Facility Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III and Article IV hereof. These unclassified Claims are treated as follows:

**Section 2.01      Administrative Claims**

Subject to the Administrative Claims Bar Date and other provisions herein and except to the extent the holder of an Allowed Administrative Claim agrees to different and less favorable treatment, the Plan Administrator shall pay, in full satisfaction and release of such Claim, to each holder of an Allowed Administrative Claim, Cash, in an amount equal to such Allowed Administrative Claim, on the later of (a) the Effective Date, and (b) the first Business Day after the date that is thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, *provided, however*, that Allowed Administrative Claims representing obligations incurred in the ordinary course of business of the Debtors, if any, shall be paid in full in accordance with the terms and conditions of the particular transactions and any applicable agreements. Cash payments of Allowed Administrative Claims constituting Budgeted Expenses (other than Allowed Professional Fee Claims) shall be paid from the Budgeted Claims Reserve; *provided, however*, that all Allowed Administrative Claims (other than Allowed Professional Fee Claims) not constituting a Budgeted Expense, shall instead be paid from the Gift Reserve; *provided, further, however*, that Allowed Professional Fee Claims shall be paid first from any retainer or deposit held by the Holder of such Claim, and subsequently from the Professional Fee Claims Reserve.

**Section 2.02      Administrative Claims Bar Date**

Except for Professional Fee Claims and DIP Facility Claims, all requests for allowance and payment or any other means of preserving and obtaining payment of Administrative Claims (including substantial contribution claims (but not including Professional Fee Claims or Priority Tax Claims)), that have not been paid in the ordinary course, assumed by the Purchaser, released or otherwise settled, must be filed with the Bankruptcy Court and served upon the Plan Administrator no later than thirty (30) days after the Effective Date (the "Administrative Claims Bar Date"). For the avoidance of doubt, the Indenture Trustee and counsel to the Indenture Trustee are not required to file a request for allowance and payment of the Indenture Trustee's Fees. Any request for allowance and payment of Administrative Claims that is not filed by the Administrative Claims Bar Date will be forever disallowed and barred, and holders of such Claims will not be able to assert such Claims in any manner against the Debtors, the Debtors' Estates, the Plan Administrator, the Post-Effective Date Debtors, or any of their respective Affiliates or representatives. Objections to such requests must be filed and served on the requesting party by not later than sixty (60) days after the filing of the applicable request for payment of such Administrative Claims (or such longer period as may be allowed by order of the Bankruptcy Court).

**Section 2.03      Priority Tax Claims**

Except to the extent the Holder of an Allowed Priority Tax Claim agrees to different and less favorable treatment, the Plan Administrator shall pay, in full satisfaction and release of such Claim, to each Holder of an Allowed Priority Tax Claim, Cash, in an amount equal to such Allowed Priority Tax Claim, on the later of (a) the Effective Date; and (b) the first Business Day after the date that is thirty (30) days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable. Cash payments of Allowed Priority Tax Claims that are Budgeted Expenses shall be paid from the Budgeted Claims Reserve; *provided, however*, that all Allowed Priority Tax Claims not constituting a Budgeted Expense shall instead be paid from the Gift Reserve.

**Section 2.04      Professional Fee Claims**

Professional Fee Claims shall be subject to approval by the Bankruptcy Court. Each Holder of a Professional Fee Claim seeking an award by the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred through and including the Effective Date (other than substantial contribution claims under section 503(b)(4) of the Bankruptcy Code) must file and serve its respective application for allowance of such Professional Fee Claim no later than the date that is forty-five (45) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court. Objections to applications of such Professionals for compensation and/or reimbursement of expenses must be filed and served on the Plan Administrator and the requesting Professional no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for compensation or reimbursement was served; *provided, however* that the Plan Administrator shall not have standing or the authority to object to Professional Fee Claims. Cash payments of Allowed Professional Fee Claims shall be paid (a) first, from any pre-Effective Date retainer or deposit held by the Holder of such Claim; and (b) second, to the extent any such pre-Effective Date retainer or

deposit is insufficient to satisfy such Holder's Allowed Professional Fee Claim in full, from the Professional Fee Claims Reserve. The balance of any pre-Effective Date retainer or deposit held by the Holder of a Professional Fee Claim shall be paid to the Plan Administrator within two (2) Business Days following satisfaction in full of such Holder's Professional Fee Claim and shall be distributed to the Prepetition Agent pursuant to Section 4.02(b).

**Section 2.05     DIP Facility Claims**

To the extent not indefeasibly paid in full in Cash prior to or as of the Effective Date, the DIP Facility Claims shall be deemed to be Allowed Secured Claims and Allowed superpriority Administrative Claims in the full amount, if any, due and owing under the DIP Facility Loan Documents and the Final DIP Order as of the Effective Date.

To the extent not indefeasibly paid in full in Cash prior to or as of the Effective Date, any unpaid DIP Facility Claims shall be paid in full, in Cash, from Available Cash on or before the Effective Date in full and final satisfaction, settlement and discharge of, and in exchange for, the DIP Facility Claims.

**Section 2.06     Statutory Fees**

On or before the Effective Date (or as soon as reasonably practicable after such fees become due), the Debtors shall have paid in full, in Cash (including by check or wire transfer), in U.S. dollars, all fees then due and payable pursuant to section 1930 of title 28 of the United States Code. After the Effective Date, the Plan Administrator shall pay any and all post-Effective Date fees pursuant to section 1930 of title 28 of the United States Code when due and payable from the Budgeted Claims Reserve until such time as the Bankruptcy Court enters a final decree closing the Cases.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

**Section 3.01     General Notes on Classification and Treatment of Classified Claims and Interests**

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests (other than Administrative Claims, Priority Tax Claims, Professional Fee Claims, and DIP Facility Claims, which are receiving the treatment set forth in Article II) are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. Notwithstanding anything to the contrary in this Plan, a Claim or Interest shall be deemed classified in a Class only to the extent that such Claim or Interest has not been paid, released, or otherwise settled before the Effective Date.

**Section 3.02      Voting; Presumptions**

(a)      The Plan is being proposed as a joint plan of liquidation for all of the Debtors.  As such, the Plan is also a motion requesting that the Bankruptcy Court consolidate the Debtors and their respective Estates solely for purposes of voting on the Plan, confirming the Plan, and making distributions pursuant to the Plan.  Voting on the Plan shall be counted on a consolidated basis.  Thus, the Plan must meet the requirements for section 1129 of the Bankruptcy Code with respect to the Debtors on a consolidated basis in order to be confirmed.

(b)      On the Effective Date, solely for purposes of voting on the Plan, objecting to the allowance of Claims provided for under the Plan, and making distributions under the Plan: (i) the Assets of the Debtors will be pooled and vest in the Post-Effective Date Debtors in accordance with the terms of this Plan for the purpose of paying Allowed Claims against the Debtors; (ii) any Claim filed or asserted against any of the Debtors shall be deemed a Claim against all of the Debtors; (iii) all Claims of each Debtor against any other Debtor shall be eliminated; and (iv) any obligation of any of the Debtors and all guarantees thereof executed by any of the Debtors shall be deemed to be an obligation of each of the Debtors.  Additionally, Holders of Allowed Claims or Allowed Interests who assert identical Claims against or Interests in multiple Debtors shall be entitled to only a single satisfaction of such Claims or Interests, and any such duplicate Claims shall be deemed disallowed, expunged, and void as against the Debtors without need for the filing of a Claim objection or further order of the Bankruptcy Court and such duplicate Claims or Interests shall receive no Distribution under the Plan.

(c)      **Acceptance by Impaired Classes.**  Each Impaired Class of Claims that will (or may) receive or retain property or any interest in property under this Plan shall be entitled to vote to accept or reject this Plan.  An Impaired Class of Claims shall have accepted this Plan if (i) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (ii) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.

(d)      **Voting Presumptions**.  Claims in Unimpaired Classes are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.  Claims and Interests in Classes that do not entitle the Holders thereof to receive or retain any property under this Plan are conclusively deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

**Section 3.03      Identification of Claims and Interests**

The following table designates the Classes of Claims against, and Interests in, the Debtors and specifies which of those Classes and Interest are (a) Impaired or Unimpaired by this Plan;

(b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or reject this Plan.

| Class | Impairment | Entitled to Vote |
|---|---|---|
| Class 1 - Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 – Prepetition Secured Claims | Impaired | Yes (Entitled to vote to accept or reject) |
| Class 3 – Miscellaneous Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 4 – Class 4 GUC Claims | Impaired | Yes (Entitled to vote to accept or reject) |
| Class 5 – Intercompany Claims | Impaired | No (Deemed to reject) |
| Class 6 – Interests | Impaired | No (Deemed to reject) |

## ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS

**Section 4.01     Priority Non-Tax Claims**

Classification:  Class 1 consists of the Allowed Priority Non-Tax Claims.

Treatment:  Except to the extent that a Holder of an Allowed Claim in Class 1 has agreed in writing with the Debtors or Plan Administrator (subject to the Agent's consent) to a different treatment (in which event such other writing will govern), each Holder of an Allowed Claim in Class 1 shall receive, on account of, and in full, final, and complete satisfaction, settlement, release, and discharge of and in exchange for, such Claim, at the election of the Plan Administrator (subject to the Agent's consent), (a) Cash equal to the amount of such Allowed Claims in Class 1, in accordance with section 1129(a)(9) of the Bankruptcy Code, on the later of (i) the Effective Date (or as soon as reasonably practicable thereafter); and (ii) 30 days after the date such Claim in Class 1 becomes an Allowed Claim in Class 1 (or as soon as reasonably practicable thereafter); and (b) such other treatment agreed to by the Plan Administrator, subject to the consent of the Agent, required to render such Allowed Claims in Class 1 Unimpaired pursuant to section 1124 of the Bankruptcy Code.  Cash payments of Allowed Claims in Class 1 shall be paid from the Budgeted Claims Reserve; *provided, however*, that all Allowed Claims in Class 1 that are not Budgeted Expenses shall instead be paid from the Gift Reserve.

Voting: Claims in Class 1 are Unimpaired.  The Holders of Claims in Class 1 shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, shall not be entitled to vote to accept or reject this Plan.

**Section 4.02      Prepetition Secured Claims**

Classification:  Class 2 consists of the Allowed Prepetition Secured Claims.

Allowance:  The Prepetition Secured Claims shall be (a) deemed Allowed in the amount of (i) $297,026,070.00 of unpaid principal, plus all interest, fees, costs, charges, and expenses due and owing pursuant to the terms of the Prepetition Secured Financing Documents and the DIP Orders *less* (ii) any amounts paid pursuant to the Sale Order, and (b) secured by a valid, binding, and perfected security interest in and to the properties and Assets of the Debtors pledged under the Prepetition Secured Financing Documents and as set forth in the DIP Orders.

Treatment:  The Prepetition Agent shall receive, on behalf of the Holders of the Prepetition Secured Claims:

(a)      on the Effective Date, from the Debtors, following payment of the DIP Facility Claims in full, all Available Cash, up to an amount necessary to satisfy the Prepetition Secured Claims in full, except for any portion of such Available Cash transferred by the Debtors to fund the Post-Effective Date Agent Professional Retainers and such Available Cash transferred by the Debtors or the Plan Administrator pursuant to the Wind-Down Budget to fund (i) the Budgeted Claims Reserve, (ii) the Professional Fee Claims Reserve, and (iii) the Gift Reserve; and

(b)      beginning on the first calendar quarter following the Effective Date, and continuing on at least a quarterly basis thereafter, the Plan Administrator shall pay all Available Cash in excess of the amounts in the Distribution Reserve Accounts then remaining to be paid in accordance with the Wind-Down Budget, up to an amount necessary to satisfy the Prepetition Secured Claims in full.

For the avoidance of doubt, unless and until the Allowed Prepetition Secured Claims are satisfied in full, except with respect to (i) amounts payable under the Wind-Down Budget and (ii) Available Cash transferred to the Gift Reserve, all Available Cash resulting from the liquidation of Assets shall be distributed to the Holders of Allowed Prepetition Secured Claims. All Assets vesting in the Post-Effective Date Debtors, other than Available Cash transferred to the Gift Reserve and the Professional Fee Claims Reserve, shall be subject to the Liens of the Prepetition Agent; *provided, however*, that such Liens shall be retained for defensive purposes only to entitle the Prepetition Agent to enforce the Distribution and other terms of this Plan; *provided, further, however*, that the Prepetition Agent shall not foreclose upon such retained Liens unless a Final Order is entered finding that (i) a Plan Default occurred (including if any collateral is sought to be used in a manner inconsistent with the Plan) and (ii) such default was not cured in accordance with this Plan.

Voting: Claims in Class 2 are Impaired.  The Holders of Claims in Class 2 shall be entitled to vote to accept or reject this Plan.

**Section 4.03      Miscellaneous Secured Claims**

Classification:  Class 3 consists of Miscellaneous Secured Claims.

Treatment:   On or as soon as reasonably practicable after the latest to occur of (a) the Effective Date; and (b) the date on which each such Miscellaneous Secured Claim becomes an Allowed Claim, each Holder of such an Allowed Miscellaneous Secured Claim, if any, shall receive, on account of, and in full, final and complete satisfaction, settlement, and release of, and in exchange for such Allowed Miscellaneous Secured Claim, at the election of the Plan Administrator with the Agent's consent, (i) such treatment in accordance with section 1124 of the Bankruptcy Code as may be determined by the Bankruptcy Court; (ii) payment in full, in Cash, of such Allowed Miscellaneous Secured Claim; (iii) satisfaction of any such Allowed Miscellaneous Secured Claim by delivering the collateral securing any such Claims and paying any interest fees, costs and/or expense required to be paid under section 506(b) of the Bankruptcy Code; or (iv) providing such Holder with such treatment in accordance with section 1129(b) of the Bankruptcy Code as may be determined by the Bankruptcy Court.  Cash payments of Allowed Miscellaneous Secured Claims that are Budget Expenses shall be paid from the Budgeted Claims Reserve; *provided, however,* that all Allowed Claims in Class 3 not constituting a Budgeted Expense shall instead be paid from the Gift Reserve.

Voting:   Claims in Class 3 are Unimpaired.   Each Holder of an Allowed Miscellaneous Secured Claim in Class 3 shall be conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, shall not be entitled to vote to accept or reject this Plan.

## Section 4.04      Class 4 GUC Claims

Classification:   Class 4 consists of all Class 4 GUC Claims.

Allowance:  The Senior Notes Claim is Allowed in the amount of Eighty Seven Million Seven Hundred Seventy-Five Thousand Eight Hundred Ninety dollars ($87,775,890.00).

Treatment:   Each Holder of an Allowed Class 4 GUC Claim shall receive, as soon as reasonably practicable after the Effective Date, in full and final satisfaction, settlement and release of and in exchange for such Allowed Class 4 GUC Claim, its Pro Rata share of (i) the Gift Reserve, following payment of all other Claims and other amounts entitled to receive payment from the Gift Reserve under this Plan, and (ii) following the indefeasible payment in full of all Prepetition Secured Claims, all remaining Available Cash.

Voting:  Claims in Class 4 are Impaired.   The Holders of Class 4 GUC Claims shall be entitled to vote to accept or reject this Plan.

## Section 4.05      Intercompany Claims

Classification:   Class 5 consists of all Intercompany Claims.

Treatment:   On the Effective Date, each Intercompany Claim shall be canceled, released, and extinguished, and will be of no further force or effect nor entitled to receive any Distribution on account of such Intercompany Claims.

Voting:  Claims in Class 5 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, accordingly are not entitled to vote to accept or reject this Plan.

**Section 4.06      Interests**

Classification:  Class 6 consists of all Interests in the Debtors.

Treatment:  All of the Class 6 Interests outstanding as of the Effective Date shall be eliminated, extinguished, and cancelled.  Pursuant to section 1129(b)(2)(C) of the Bankruptcy Code, Holders of Interests shall not be entitled to, nor shall they receive, any Distribution or retain any property or interest in property on account of such Interests.

Voting:  Interests in Class 6 are Impaired.  The Holders of Allowed Interests in Class 6 are deemed to have rejected this Plan and, accordingly, are not entitled to vote to accept or reject this Plan.

## ARTICLE V

## ACCEPTANCE OR REJECTION OF THIS PLAN

**Section 5.01      Designation of Unimpaired Classes**

Classes 1 and 3 are Unimpaired.

**Section 5.02      Designation of Impaired Classes**

(a)      **Impaired Classes of Claims**

Classes 2, 4, and 5 are Impaired.

(b)      **Impaired Classes of Interests**

Class 6 is Impaired.

**Section 5.03      Classes Entitled to Vote**

Classes 2 and 4 are entitled to cast Ballots with respect to this Plan.

**Section 5.04      Classes Not Entitled to Vote**

Classes 1 and 3 are Unimpaired under this Plan and therefore, Holders of Class 1 Claims and Class 3 Claims are not entitled to cast Ballots with respect to this Plan as they are deemed to accept this Plan in accordance with section 1126(f) of the Bankruptcy Code.

Classes 5 and 6 are not entitled to receive or retain property under this Plan and are deemed to reject this Plan in accordance with section 1126(f) of the Bankruptcy Code.

**Section 5.05      Sources of Cash for Distributions**

Except as otherwise specifically provided herein or in the Confirmation Order, all Cash required for the payments to be made pursuant to this Plan shall be obtained from the Available Cash.

**Section 5.06     Cram Down – Nonconsensual Confirmation**

If each Impaired Class of Claims entitled to vote shall not accept this Plan by the requisite statutory majority provided in sections 1126(c) or 1126(d) of the Bankruptcy Code, the Debtors request Confirmation of this Plan under section 1129(b) of the Bankruptcy Code. In that event, subject to the consent of the Agent or by announcement on the record at the Confirmation Hearing, the Debtors may modify this Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification or any other reason in their discretion.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THIS PLAN
## AND POST EFFECTIVE DATE GOVERNANCE

**Section 6.01     Plan Funding**

This Plan will be funded by the Available Cash.

**Section 6.02     Application of Available Cash**

(a)     **Payment of DIP Facility Claims and Prepetition Secured Claims/Funding of Post-Effective Date Agent Professional Retainers.**  On the Effective Date, (a) the Debtors shall fund the Post-Effective Date Agent Professional Retainers by (i) transferring to the Agent's counsel an amount of Available Cash equal to $100,000 and (ii) transferring to the Agent's financial advisor an amount of Available Cash equal to $50,000, and (b) the Debtors or the Plan Administrator, as applicable, shall (i) pay to the Agent an amount of Available Cash necessary to pay any remaining DIP Facility Claims in full (to the extent that such claims have not already been indefeasibly paid in full), and (ii) pay to the Agent for application to the Prepetition Secured Claim all remaining Available Cash, less the amount required to fund the Distribution Reserve Accounts pursuant to the Wind-Down Budget and the Plan.

(b)     **Professional Fee Claims Reserve and Budgeted Claims Reserve Funding.**  On the Effective Date, following the funding of the Post-Effective Date Agent Professional Retainers, payment of the DIP Facility Claims in full, and the transfer of Available Cash to the Agent as set forth above and in this Plan, the Debtors or the Plan Administrator, as applicable, shall, pursuant to the Wind-Down Budget, establish Distribution Reserve Accounts funded by an amount of Available Cash sufficient to fund (i) the Budgeted Claims Reserve and (ii) the Professional Fee Claims Reserve.

(c)     **Gift Reserve Funding.**  On the Effective Date, following the payment of the DIP Facility Claims in full, the transfer of Available Cash to the Agent as set forth above and in this Plan, and the funding of the Budgeted Claims Reserve and the Professional Fee Claims Reserve, the Debtors or the Plan Administrator, as applicable, shall establish a Distribution Reserve Account funded by an amount of Available Cash equal to the Gifted Amount to fund the Gift Reserve. The Plan Administrator Expenses and the Indenture Trustee Distribution shall be payable only from the Gift Reserve and shall be subject to the Wind-Down Budget.

**Section 6.03      Retained Causes of Action**

All Retained Causes of Action shall vest in the Post-Effective Date Debtors for the benefit of the Holders of Prepetition Secured Claims until the Prepetition Secured Claims are paid in full, and then for the benefit of Holders of Allowed Class 4 GUC Claims.

**Section 6.04      Vesting of Assets in the Post-Effective Date Debtors**

On the Effective Date, and except as otherwise set forth herein, the Assets, including, without limitation: (a) Available Cash; (b) the Distribution Reserve Accounts; and (c) all Retained Causes of Action, including the attorney-client privilege related to all Retained Causes of Action, shall vest in each respective Post-Effective Date Debtor pursuant to section 1141(b) of the Bankruptcy Code Free and Clear except for the Liens of the Prepetition Agent as provided in Section 4.02(b).

**Section 6.05      Corporate Form**

On the Effective Date, each of the Debtors shall maintain its current corporate form, which may be modified or changed at any time after the Effective Date by the Plan Administrator with the Agent's consent in accordance with the terms of this Plan and applicable law.

**Section 6.06      Officers and Directors**

On the Effective Date, (a) the positions of the current directors, officers, and managers, or in the case of a governing body created by a partnership agreement, limited liability company agreement or similar agreement, the members of such governing body (such persons and the corporate directors collectively, the "Governors") of each Debtor shall be eliminated, and each Governor shall be terminated (without the necessity of further action); and (b) to the fullest extent permitted by applicable law, the rights, powers, and duties of the Governors of each Debtor that has a Governor shall vest in the Plan Administrator, who shall serve as the sole officer and director of each Post-Effective Date Debtor after the Effective Date. The Plan Administrator, subject to the consent of the Agent, may also elect such additional director(s) and officer(s) of each Post-Effective Date Debtor as the Plan Administrator deems necessary to implement this Plan and the actions contemplated herein. The Plan Administrator, subject to the consent of the Agent, shall also have the power to act by written consent to remove any officer or director of any Post-Effective Date Debtor at any time with or without cause.

**Section 6.07      Corporate Existence**

After the Effective Date, the Plan Administrator shall, subject to the Agent's consent and consistent with applicable non-bankruptcy law and consistent with the implementation of this Plan, merge, dissolve, liquidate, or take such other similar action with respect to each Post-Effective Date Debtor (including the cancellation of all Interests in a Post-Effective Date Debtor) and complete the winding up of such Post-Effective Date Debtor as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Post-Effective Date Debtor or its directors or officers or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate Governmental Unit. The Plan Administrator may, subject to the Agent's consent and to the extent required by

applicable non-bankruptcy law, maintain a Post-Effective Date Debtor as a corporate entity in good standing until such time as such Post-Effective Date Debtor is dissolved or merged out of existence.

**Section 6.08      Cancellation of Notes, Instruments, Certificates, and Other Documents**

On the later of the Effective Date and the date on which Distributions are made pursuant to the Plan (if not made on the Effective Date), except for the purpose of evidencing a right to and allowing Holders of Claims and Interests to receive a distribution under the Plan or to the extent otherwise specifically provided for in the Plan, the Confirmation Order, or any agreement, instrument, or other document entered into in connection with or pursuant to the Plan, (a) the Indenture and the Senior Notes shall be deemed cancelled, without any need for further action by any Person, Holder, or the Bankruptcy Court, and the Indenture Trustee shall not have any continuing duties or obligations thereunder and shall be discharged; and (b) the obligations of the Debtors pursuant, relating, or pertaining to the Indenture and the Senior Notes shall be released and discharged; except that the Indenture shall continue in effect solely for the purpose of: (i) allowing the Indenture Trustee to receive distributions from the Debtors and to make further distributions to the Holders of Senior Notes Claims (subject to the Indenture Trustee's Charging Lien and allowing such Holders to accept distributions, on account of such Claims; (ii) preserving the Indenture Trustee's rights to payment of fees and expenses, and allowing the maintenance, exercise, and enforcement of the Indenture Trustee's Charging Lien under the Indenture or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (iii) seeking compensation and reimbursement for any reasonable and documented fees and expenses incurred by or on behalf of the Indenture Trustee in connection with the implementation of the Plan; (iv) preserving the right of the Indenture Trustee to exculpation and indemnification from the Debtors pursuant and subject to the terms of the Indenture; (v) maintaining, enforcing, and exercising any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other Claim or entitlement that the Indenture Trustee may have under the Indenture; and (vi) preserving the Indenture Trustee's right to appear and be heard in the Cases or in any other proceeding in the Bankruptcy Court, including but not limited to enforcing any obligations owed to it under the Plan or Confirmation Order; *provided that* nothing in this Plan shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan. On the Effective Date, each Holder of a certificate or instrument evidencing a Claim that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument (including the Senior Notes) in accordance with the Indenture or agreement that governs the rights of such Holder of such Claim. Such surrendered certificate or instrument shall be deemed cancelled as set forth in, and subject to the exceptions set forth in, this Section 6.08.

On and after the Effective Date, the duties and responsibilities of the Indenture Trustee under the Indenture shall be discharged and released, except (i) to the extent required to effectuate the Plan including, but not limited to, making distributions under the Plan to the Holders of Senior Notes Claims under the Indenture and (ii) with respect to any rights of the Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims or Interests under the Indenture, including any rights to the Indenture Trustee's Charging Lien. After the performance by the Indenture Trustee and the Indenture Trustee's respective representatives and professionals of any obligations and duties

required under or related to the Plan or the Confirmation Order, the Indenture Trustee shall be deemed to be relieved of and released from any obligations and duties arising thereunder.

On and after the final distribution on account of the Allowed Senior Notes Claims, the Senior Notes shall be deemed to be worthless, and Depository Trust Company shall take down the relevant positions at the request of the Indenture Trustee without any requirement of indemnification or security on the part of the Debtors or the Indenture Trustee.

On the Effective Date, all Interests in the Debtors shall be terminated and extinguished and any certificates or other documents that previously evidenced ownership of those Interests shall be deemed cancelled (all without further action by any Person or the Bankruptcy Court) and shall be null and void and such certificates and documents shall evidence no rights or interests in any of the Debtors. Upon cancellation of the Interests in Approach Resources Inc., neither Approach Resources Inc. nor the Plan Administrator shall file periodic or other reports with the Securities and Exchange Commission; *provided, however*, that Approach Resources Inc. shall continue to be subject to the requirements of the Securities Act until such time as the Plan Administrator terminates the registration of its common stock under the Securities Act and the rules and regulations promulgated thereunder.

### Section 6.09     Authorization for Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Plan Administrator may, subject to the consent of the Agent, take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, or reorganization containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of this Plan; (c) the filing of appropriate certificates of incorporation, merger, or consolidation with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Plan Administrator determines are necessary or appropriate, including the making of filings or recordings in connection with the Plan, which actions may be set forth in a Plan Supplement Exhibit.

### Section 6.10     Preservation of Rights of Action; Settlement

Except to the extent such rights, Claims, Causes of Action, defenses, and counterclaims are otherwise disposed of in this Plan, the Asset Purchase Agreement, or are expressly and specifically released in connection with this Plan and/or Confirmation Order, or in any settlement agreement approved by the Bankruptcy Court during the Cases, or in any contract, instrument, release, indenture, or other agreement entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code: any and all rights, Claims, Retained Causes of Action (including Retained Avoidance Actions), defenses, and counterclaims of or accruing to the Debtors or their Estates shall vest in the Post-Effective Date Debtors, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, Claims, Causes of Action, defenses, and counterclaims have been Scheduled, listed or referred to in this Plan, the

Bankruptcy Schedules, or any other document Filed with the Bankruptcy Court; and (b) the Post-Effective Date Debtors do not waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, Claim, Cause of Action, defense, or counterclaim that constitutes property of the Estates: (i) whether or not such right, Claim, Cause of Action, defense, or counterclaim has been listed or referred to in this Plan, the Bankruptcy Schedules, the Bankruptcy SOFAs, or any other document Filed with the Bankruptcy Court; (ii) whether or not such right, Claim, Cause of Action, defense, or counterclaim is currently known to any of the Debtors; and (iii) whether or not a defendant in any litigation relating to such right, Claim, Cause of Action, defense, or counterclaim Filed a Proof of Claim in the Cases, Filed a notice of appearance or any other pleading or notice in the Cases, voted for or against this Plan, or received or retained any consideration under this Plan. Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principle of law or equity, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, Cause of Action, defense, or counterclaim, or potential right, Claim, Cause of Action, defense, or counterclaim, in this Plan, the Bankruptcy Schedules, or any other document Filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Plan Administrator's right (subject to the consent of the Agent) to commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, or counterclaims that any of the Debtors have, or may have, as of the Effective Date. Subject to the limitations in section 11.02 of this Plan and the Plan Administrator Agreement, and subject to the consent of the Agent, the Plan Administrator may, on behalf of the Post-Effective Date Debtors, commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, and counterclaims that vest in the Post-Effective Date Debtors in its sole discretion, in accordance with what is in the best interests, and for the benefit, of the Creditors.

## Section 6.11      Employee Benefit Plans

Before the Effective Date, all Employee Benefit Plans other than the KEIP and Severance Plan shall be terminated in accordance with the applicable provisions of state and federal law. Subject to the Wind-Down Budget, to the extent that any KEIP or Severance Plan obligations constituting Budgeted Expenses remain outstanding as of the Effective Date, the KEIP and Severance Plan shall vest in the Post-Effective Date Debtors in accordance with the terms of such plans such that any KEIP or Severance Plan obligations constituting Budgeted Expenses shall be enforceable by and against the Post-Effective Date Debtors and payable from the Budgeted Claims Reserve.

## Section 6.12      Exclusivity Period

Subject to the consent of the Agent or by announcement on the record at the Confirmation Hearing, the Debtors may amend or modify this Plan, and solicit acceptances of any amendments to or modifications of this Plan, through and until the earlier of (a) the Effective Date; and (b) the expiration of the Debtors' exclusive period to solicit acceptances of this Plan (as may be extended by the Bankruptcy Court) under section 1121(d) of the Bankruptcy Code.

## Section 6.13     Effectuating Documents

The Plan Administrator shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan. The Plan Administrator shall be authorized to certify or attest to any of the foregoing actions. The Debtors are authorized to perform their obligations under this Plan.

## Section 6.14     Exemption from Certain Transfer Taxes

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any issuance, transfer, or exchange of an Interest or transfer of property, in each case, pursuant to, in contemplation of, or in connection with the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate or personal property transfer tax, sale or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, fee or charge, and upon entry of the Confirmation Order, the appropriate taxing authority, governmental officials or agents shall forgo the collection of any such tax or governmental assessment, fee or charge and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, or governmental assessment, fee or charge.

## Section 6.15     Plan Administrator Closing of the Chapter 11 Cases

When (a) the Bankruptcy Court has adjudicated all applications by Professionals for final allowances of compensation for services and reimbursement of expenses and the issuance of a Final Order for each application and the payment of all amounts payable thereunder; (b) all Disputed Claims filed against the Debtors have become Allowed Claims or have been Disallowed by Final Order or otherwise pursuant to this Plan, and (c) all appropriate Distributions have been made pursuant to this Plan, the Plan Administrator shall, subject to the consent of the Agent, seek authority from the Bankruptcy Court to close the Debtors' Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules. Notwithstanding the foregoing, the Plan Administrator may seek authority from the Bankruptcy Court to close all of the Cases other than the Case of Approach Resources, Inc. at any time after the Effective Date.

## ARTICLE VII

## PLAN ADMINISTRATOR

## Section 7.01     The Plan Administrator Agreement

The Plan Administrator Agreement shall be included in the Plan Supplement, and must be acceptable to the Agent in form and in substance. To the extent this Section is inconsistent with the Plan Administrator Agreement, the Plan Administrator Agreement shall control for all purposes.

**Section 7.02     The Plan Administrator**

Subject to the Bankruptcy Court's approval and appointment of the selection of the Plan Administrator at the Confirmation Hearing, a Person to be designated by the Agent and disclosed in the Plan Supplement shall initially serve as the Plan Administrator, and such initial Plan Administrator shall only be removable for cause. Such initial Plan Administrator's appointment, as well as a copy of the proposed initial Plan Administrator's resume, will be disclosed in the Plan Supplement.   Any subsequent Plan Administrator shall be appointed by the Agent. Matters relating to the appointment, removal, and resignation of the Plan Administrator and the appointment of any successor Plan Administrator shall be set forth in the Plan Administrator Agreement.   The Plan Administrator shall retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under this Plan and Plan Administrator Agreement, and as otherwise provided in the Confirmation Order. The Plan Administrator shall be required to perform his or her duties as set forth in this Plan and the Plan Administrator Agreement.

**Section 7.03     Retention of Professionals**

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the reasonable discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The payment of reasonable Plan Administrator Expenses shall be subject to and paid in accordance with the Wind-Down Budget from the Gift Reserve. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court except as otherwise provided in this Plan. Professionals of, among others, the Debtors, shall be eligible for retention by the Plan Administrator on a special counsel basis, and former employees of the Debtors shall, in the discretion of the Plan Administrator, be eligible for retention by the Plan Administrator.

The reasonable fees and expenses incurred in connection with services performed by the Plan Administrator and his or her professionals relating to the administration, liquidation, and/or distribution of Assets shall be subject to the Wind-Down Budget and paid from the Gift Reserve. Before each payment of any Plan Administrator Expenses, including the reasonable fees and expenses of the Plan Administrator's retained professionals, and other reasonable costs, expenses, and liabilities of the Plan Administrator, the Plan Administrator and the Plan Administrator's retained professionals shall provide written notice thereof to the Agent in such detail and with such support as the Agent may reasonably request. If the Agent does not object to the payment of such amounts within fifteen (15) Business Days after receipt of such notice, the Plan Administrator may make such payments provided that such payments are within the Wind-Down Budget. If the Agent objects and such objecting party and the Plan Administrator cannot agree on the appropriate amount of such payment, then the Plan Administrator may not make such payment unless he or she obtains an order from the Bankruptcy Court approving such payment.

**Section 7.04     Compensation of the Plan Administrator**

The Plan Administrator's compensation, on a post-Effective Date basis, shall be disclosed in the Plan Supplement. The payment of the reasonable fees of the Plan Administrator and any professionals retained by the Plan Administrator shall be subject to, and paid in accordance with,

the Wind-Down Budget from the Gift Reserve and made in accordance with the provisions of this Plan and the Plan Administrator Agreement.

**Section 7.05    Liability; Indemnification**

The Plan Administrator shall not be liable for any act or omission taken or omitted to be taken in his or her capacity as the Plan Administrator, other than acts or omissions resulting from such Person's willful misconduct, gross negligence, or fraud. The Plan Administrator may, in connection with the performance of his or her functions, and in his or her sole absolute discretion, consult with attorneys, accountants and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Professionals. Notwithstanding such authority, the Plan Administrator shall be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so should not result in imposition of liability on the Plan Administrator unless such determination is based on willful misconduct, gross negligence, or fraud. The Post-Effective Date Debtors shall indemnify and hold harmless the Plan Administrator and his or her agents, representatives, Professionals, and employees from and against and in respect to any and all liabilities, losses, damages, Claims, costs, and expenses, including, but not limited to reasonable attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the implementation or administration of this Plan; *provided, however,* that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

**Section 7.06    Powers and Duties of the Plan Administrator**

Upon the Effective Date, the Plan Administrator shall have the authority and right on behalf of each Post-Effective Date Debtor, without the need for Bankruptcy Court approval (unless otherwise set forth herein), to carry out and implement all provisions of this Plan, including to:

(a)      subject to Article 11, effectuate the Claims reconciliation process in accordance with and subject to the terms of this Plan, including to object to, seek to subordinate, compromise, or settle any and all Claims against or Interests in the Debtors (other than the Prepetition Secured Claims); *provided, however,* that, for the avoidance of doubt, nothing in this subsection (a) shall modify any rights of the Agent to object to any Claims on its own behalf in accordance with the Bankruptcy Code and Bankruptcy Rules;

(b)      make Distributions to holders of Allowed Claims in accordance with this Plan; *provided, however,* that all Distributions on account of the Senior Notes Claims shall be made to the Indenture Trustee (and shall be subject to the Charging Lien);

(c)      subject to the Wind-Down Budget, exercise its reasonable business judgment to direct and control the Wind Down under this Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(d)      prepare, File, and prosecute any necessary filings or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administrator as described herein;

(e)      in each case with the written consent of the Agent and, when necessary, subject to

Bankruptcy Court approval, prosecute all Causes of Action on behalf of the Post-Effective Date Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Post-Effective Date Debtors and Creditors;

(f)    subject to the Wind-Down Budget, retain and compensate professionals to assist in performing its duties under this Plan;

(g)    subject to the Wind-Down Budget, make payments on account of Professional Fee Claims and any other payments to Professionals (consistent with the terms of any Bankruptcy Court order approving such retention and subject to any applicable Bankruptcy Court approval requirements), as well as the reasonable fees and expenses of other professionals who may be engaged after the Effective Date;

(h)    maintain the books and records and accounts of the Post-Effective Date Debtors (in good faith consultation with the Agent);

(i)    subject to the consent of the Agent, invest Available Cash, including any Cash proceeds realized from the liquidation of any Assets, including any Causes of Action, and any income earned thereon;

(j)    subject to the Wind-Down Budget, incur and pay reasonable and necessary expenses in connection with the performance of his or her duties under this Plan;

(k)    administer each Debtor's and Post-Effective Date Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including any action, suit, proceeding, or audit;

(l)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or by applicable law;

(m)    consult with and update the Agent when reasonably requested, including with respect to Claims and the Claims-reconciliation process, Causes of Action, the Wind-Down, and other actions relating to implementation of the Plan and provide an accounting to the Agent of all post-Effective Date receipts and disbursements on a monthly basis or such other frequency as agreed to between the Plan Administrator and Administrative Agent;

(n)    pay statutory fees in accordance with this Plan;

(o)    close the Chapter 11 Cases in accordance with the Plan; and

(p)    perform any other duties and functions that are consistent with the implementation

of this Plan.

## Section 7.07      Access and Preservation of Records

The Plan Administrator shall be granted access to, among other things, the offices, books, and records relating to the Debtors or any of their businesses or operations that are in possession of the Purchaser and the Purchaser shall preserve records, all to the extent and on the terms of the Asset Purchase Agreement.

## Section 7.08      Distribution Procedures

Any payments or distributions to be made by the Plan Administrator to Holders of Claims as required by this Plan shall be made only to the Holders of Allowed Claims. No payments or other distributions of property shall be made on account of any Claim or portion thereof unless and until such Claim or portion thereof is Allowed. No Distribution will be made on account of a Claim or Interest to the extent that such Claim or Interest has been Disallowed, released, withdrawn, waived, settled, or otherwise satisfied or paid, including, without limitation, payments by third-party guarantors, sureties, or insurers, whether governmental or nongovernmental. Subject to approval of the Agent, the Plan Administrator may establish reserves for Disputed Claims, and (except with respect to the payment of Claims in Class 2) defer or delay distributions to ensure an equitable and ratable distribution to Holders of Allowed Claims, in accordance with the terms of this Plan; *provided that* the Plan Administrator will make Distributions of net income plus all net proceeds from any sale of the Assets to Holders of Allowed Claims in accordance with the Plan at least annually, except that the Plan Administrator may retain an amount of net income or net proceeds as is reasonably necessary to maintain the value of the Assets or to meet Claims and contingent liabilities (including Disputed Claims). The Plan Administrator will make no Distributions upon a Claim held by a party against whom the Plan Administrator asserts any Avoidance Action until resolution of the Avoidance Action by settlement or judgment or as otherwise provided by Final Order. Notwithstanding anything to the contrary in this Plan, all Distributions on account of Senior Notes Claims shall be delivered to the Indenture Trustee in a form that is eligible to be distributed through the facilities of the Depository Trust Company.

Except as otherwise provided herein, the Distributions on account of Allowed Senior Notes Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Senior Notes Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Senior Notes Claims, to any portion of such Allowed Senior Notes Claims for accrued but unpaid interest, if any.

## Section 7.09      Closing of the Chapter 11 Cases

Subject to approval of the Agent, the Plan Administrator shall have sole authority to seek to close the Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

### Section 7.10      Termination

The duties, responsibilities, and powers of the Plan Administrator shall terminate after all Assets have been fully resolved, abandoned, or liquidated, the Assets have been distributed in accordance with this Plan and the Plan Administrator Agreement, and the Cases have been closed.

### Section 7.11      Maintenance of Books and Records

The Plan Administrator shall retain and store such books, records, and files provided by the Debtors until such time as the Plan Administrator, subject to the consent of the Agent, determines that retention of same is no longer necessary or required under applicable law. The right of the Post-Effective Date Debtors or the Plan Administrator to seek authorization from the Bankruptcy Court for the destruction of books and records prior to the expiration of any statutory period requiring that such records be maintained is preserved.

## ARTICLE VIII

## PROVISIONS GOVERNING DISTRIBUTIONS GENERALLY

### Section 8.01      Timing and Delivery of Distributions

The terms of this Plan shall govern Distributions from the Post-Effective Date Debtors.

### Section 8.02      Method of Cash Distributions

Any Cash payment to be made pursuant to this Plan may be made by Cash, draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law at the option of the Plan Administrator; *provided, however,* that all Distributions on account of Allowed Senior Notes Claims shall be made by wire transfer to the Indenture Trustee (and shall be subject to the Charging Lien).

### Section 8.03      Failure to Negotiate Checks

Checks issued in respect of distributions under this Plan shall be null and void if not negotiated within sixty (60) days after the date of issuance. The Plan Administrator shall hold any amounts returned in respect of such non-negotiated checks. The Holder of an Allowed Claim with respect to which such check originally was issued shall make requests for reissuance for any such check directly to the Plan Administrator. All amounts represented by any voided check shall be deposited in the Undeliverable Distribution Reserve in accordance with Section 9.02 of this Plan and will be held until the later of six (6) months after (a) the Effective Date; and (b) the date that a particular Claim is Allowed by Final Order, and all requests for reissuance by the Holder of the Allowed Claim in respect of a voided check are required to be made before such date. Thereafter, all such amounts shall be deemed to be forfeited "Unclaimed Property," notwithstanding any federal or state escheat laws to the contrary and all Claims in respect of void checks and the underlying distributions shall be forever barred, estopped and enjoined from assertion in any manner against the Plan Administrator or the Post-Effective Date Debtors.

**Section 8.04     Fractional Dollars**

Notwithstanding any other provision of this Plan, Cash distributions of fractions of dollars will not be made; rather, whenever any payment of a fraction of a dollar would be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as Unclaimed Property pursuant to this Plan.

**Section 8.05     Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Authority, and all Distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions, or establishing any other mechanism they believe is reasonable and appropriate. The Debtors, the Post-Effective Date Debtors, and the Plan Administrator, as applicable, reserve the right to allocate all Distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The Plan Administrator may require a Holder of an Allowed Claim to complete and return an Internal Revenue Service Form W-8 or W-9, as applicable to each such Holder, and any other applicable tax forms.

With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law has not been received by the Plan Administrator within thirty (30) days from the date of such request (the "Initial Request"), the Plan Administrator may, at its option, withhold the amount reasonably determined by the Plan Administrator to be withheld from a distribution to such Person and decline to make such distribution until the information is received. Failure of any Person to provide the information requested within six (6) months of the Initial Request shall result in the forfeiture of the affected distribution and the treatment of said distribution as Unclaimed Property.

**Section 8.06     De Minimis Distributions**

No Cash payment of less than twenty ($20.00) dollars shall be made to the Holder of any Claim on account of its Allowed Claim.

**Section 8.07     Setoffs**

Except for any Claim that is Allowed in an amount set forth in this Plan, the Debtors, the Post-Effective Date Debtors, or the Plan Administrator, as applicable, may, subject to the consent

of the Agent, but shall not be required to, set off against any Claims and the payments or distributions to be made pursuant to this Plan in respect of such Claims, any and all debts, liabilities and Claims of every type and nature whatsoever that the Estates or the Debtors may have against the Holder of any Claim, but neither the failure to do so nor the Allowance of any such Claims, whether pursuant to this Plan or otherwise, shall constitute a waiver or release by the Debtors of any such Claims the Debtors may have against such Holder of any Claim, and all such Claims shall be preserved for and retained by the Post-Effective Date Debtors.

**Section 8.08     Distribution Record Date**

As of the Distribution Record Date, other than with respect to any publicly held securities (including the Senior Notes), all transfer ledgers, transfer books, registers and any other records maintained by the designated transfer agents with respect to ownership of any Claims will be closed and, for purposes of this Plan, there shall be no further changes in the record holders of such Claims. The Plan Administrator shall have no obligation to recognize the transfer of any Claims occurring after the Distribution Record Date, and will be entitled for all purposes to recognize and deal only with the Holder of any Claim as of the close of business on the Distribution Record Date, as reflected on such ledgers, books, registers or records.

**Section 8.09     Date of Distributions on Account of Allowed Claims**

Except as otherwise specifically provided herein, any Distributions and delivery to be made under this Plan shall be made on the Effective Date or as soon as practicable thereafter. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Any payment, delivery or Distribution by the Plan Administrator pursuant to this Plan, to the extent delivered by the United States mail, shall be deemed made when deposited by the Plan Administrator (or his or her agent or designee) (i) with the Indenture Trustee, with respect to the Allowed Senior Notes Claims or (ii) into the United States mail with respect to other Allowed Claims. Distributions or deliveries required to be made by this Plan on a particular date shall be deemed to have been made on such date if actually made on such date or as soon thereafter as practicable taking into account the need to establish the Distribution Reserve Accounts and account for Disputed Claims. Notwithstanding anything to the contrary in this Plan, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Distribution in excess of the Allowed amount of such Claim (plus any interest—and, in the case of Senior Notes Claims, fees—accruing on such Claim that is payable in accordance with this Plan and the Bankruptcy Code).

**Section 8.10     No Distributions Pending Allowance**

Notwithstanding any other provision of this Plan, no payments or distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been resolved, settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

**Section 8.11     Distributions After Allowance**

The Plan Administrator shall make payments and Distributions from the appropriate Distribution Reserve Account to each Holder of a Disputed Claim that has become an Allowed Claim in accordance with the provisions of this Plan governing the class of Claims to which such Holder belongs. As soon as reasonably practicable after the date that the Order or judgment of the Bankruptcy Court allowing all or part of any Disputed Claim becomes a Final Order, the Plan Administrator shall distribute to the Holder of such Claim the distribution (if any) that would have been made to such Holder on the Distribution Date had such Allowed Claim been allowed on the Distribution Date. After a Disputed Claim is Allowed or otherwise resolved, the excess Cash or other property that was reserved on account of such Disputed Claim, if any, shall become an Asset for the benefit of other Allowed Claims of the Class or Classes for which the Distribution Reserve Account was created.

## ARTICLE IX

## RESERVES AND POST-EFFECTIVE DATE AGENT PROFESSIONAL RETAINERS

**Section 9.01     Establishment of Distribution Reserve Accounts**

The Debtors or the Plan Administrator, as applicable, shall establish each of the Distribution Reserve Accounts (which, notwithstanding anything to the contrary contained in this Plan, may be effected by either establishing a segregated account or establishing book entry accounts, as determined by the Plan Administrator with the consent of the Agent). The Distribution Reserve Accounts shall be subject to the Liens of the Prepetition Agent as provided in section 4.02(b).

**Section 9.02     Undeliverable Distribution Reserve**

(a)     **Deposits**. If a Distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such Distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Section 8.03, Section 8.05 or Section 9.02(b) of this Plan.

(b)     **Forfeiture**. Any Holder of an Allowed Claim (other than the Indenture Trustee) that does not assert a Claim pursuant to this Plan for an undeliverable or unclaimed distribution within six (6) months after the first distribution is made to such Holder shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such Claim for the undeliverable or unclaimed distribution against the Debtors, the Estates, the Post-Effective Date Debtors, the Plan Administrator, or their respective properties or assets. In such cases, any Cash or other property held by the Post-Effective Date Debtors in the Undeliverable Distribution Reserve for distribution on account of such Claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become Unclaimed Property, notwithstanding any federal or state escheat laws to the contrary and

shall be available for immediate distribution by the Plan Administrator to the Holders of the Prepetition Secured Claims in accordance with Section 4.02 of this Plan. Such Holder shall be forever barred and enjoined from asserting any such Claim for the undeliverable or unclaimed distribution against the Agent and the Holders of the Prepetition Secured Claims.

(c)     **Disclaimer**. The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Claim Holder (other than the Indenture Trustee), or (ii) obtain an executed Internal Revenue Service Form W-9 or other form required by law from any Claim Holder.

(d)     **Beneficiaries**. The Unclaimed Property shall be held or deposited in the Undeliverable Distribution Reserve for the benefit of Holders of Prepetition Secured Claims.

**Section 9.03     Budgeted Claims Reserve Distribution**

On or as soon as reasonably practicable after the Effective Date, the Debtors or the Plan Administrator, as applicable, shall transfer the amount set forth in the Wind-Down Budget to fund the Budgeted Claims Reserve as described in Section 6.02(b) of this Plan for the benefit of the Holders of Claims entitled to receive payment from the Budgeted Claims Reserve under this Plan. After the payment of all such Claims, any remaining funds in the Budgeted Claims Reserve shall be paid to the Agent for the benefit of Holders of Allowed Prepetition Secured Claims.

**Section 9.04     Gift Reserve Distribution**

On or as soon as reasonably practicable after the Effective Date, the Debtors or the Plan Administrator, as applicable, shall fund the Gift Reserve using an amount of Available Cash equal to the Gifted Amount to be used for the purposes set forth under this Plan.

**Section 9.05     Post-Effective Date Agent Professional Retainers**

The Debtors or the Plan Administrator, as applicable, shall fund the Post-Effective Date Agent Professional Retainers on the Effective Date using Available Cash. The Post-Effective Date Agent Professional Retainers may be used to pay the fees and expenses incurred by the Agent's professionals from and after the Effective Date in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court. Any remaining funds in the Post-Effective Date Agent Professional Retainers shall be paid to the Agent for the benefit of Holders of Allowed Prepetition Secured Claims upon the completion of the Wind-Down. On the Effective Date, the Debtors shall pay in full all accrued and unpaid fees and expenses of the Agent's professionals as of the Effective Date and such fees and expenses shall not be subject to the approval of the Bankruptcy Court.

**Section 9.06     Professional Fee Claims Reserve Distribution**

On or as soon as reasonably practicable after the Effective Date, the Debtors or the Plan Administrator, as applicable, shall transfer the amount set forth in the Wind-Down Budget to fund the Professional Fee Claims Reserve for the benefit of the Holders of Professional Fee Claims entitled to receive payment from the Professional Fee Claims Reserve under this Plan. After the payment of all such Claims, any remaining funds in the Professional Fee Claims Reserve shall be

paid to the Agent for the benefit of Holders of Allowed Prepetition Secured Claims.

# ARTICLE X

# EXECUTORY CONTRACTS, UNEXPIRED LEASES, AND OTHER AGREEMENTS

## Section 10.01    Assumption/Rejection

**Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases**   On the Effective Date, except as otherwise provided in this Plan, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for any Executory Contract or Unexpired Lease (a) identified by the Debtors with the consent of the Agent in any Plan Supplement or by announcement on the record at the Confirmation Hearing as an Executory Contract or Unexpired Lease designated for assumption by the Debtors, (b) that is the subject of a separate motion or notice to assume or reject Filed by the Debtors with the consent of the Agent or by announcement on the record at the Confirmation Hearing and pending as of the Confirmation Hearing or (c) that previously expired or terminated pursuant to its own terms.  Except as otherwise agreed to by the Debtors and the counterparty to an Executory Contract or Unexpired Lease, unless otherwise assumed by the Debtors, any Executory Contract or Unexpired Lease that remains, as of the Effective Date, the subject of a pending notice of proposed or potential assumption and assignment issued in connection with the Sale shall be deemed rejected as of such date to the extent not assumed and assigned to the applicable Purchaser in connection with the Sale.

Except as otherwise previously approved by an Order of the Bankruptcy Court, entry of the Confirmation Order by the Bankruptcy Court shall constitute an order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, approving the assumptions, assumptions and assignments, and rejections of such Executory Contracts and Unexpired Leases as set forth in the preceding paragraph.  Unless otherwise indicated herein, assumptions, assumptions and assignments, and rejections of Executory Contracts and Unexpired Leases pursuant to this Plan shall be effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order and not assigned to a third party on or before the Effective Date shall vest in and be fully enforceable by the Post-Effective Date Debtors in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing its assumption pursuant to section 365 of the Bankruptcy Code; provided that if an assignment is pending as of the Effective Date, the Plan Administrator shall be authorized to take any and all actions necessary to implement such assignment.

To the maximum extent permitted by law, to the extent any provision (including, without limitation, any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the assumption and assignment contemplated by this Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired

Lease or to exercise any other default-related rights with respect thereto, except for asserting and pursuing a Claim for a Cure Amount. Notwithstanding anything to the contrary in this Plan, the Debtors, subject to the consent of the Agent or by announcement on the record at the Confirmation Hearing, reserve the right to alter, amend, modify or supplement the Plan Supplement in their discretion prior to the Effective Date on no less than seven (7) days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

## Section 10.02    Cure Amounts

With respect to any Executory Contract or Unexpired Lease assumed by the Debtors, any Claim for a Cure Cost shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Allowed amount of such Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to any particular Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (a) the Allowed amount of any Claim for Cure Costs; (b) the ability of the Post-Effective Date Debtors or another assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, no payments on account of the Claim for Cure Costs shall be made until such dispute is resolved by a Final Order. At least seven days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Costs to the applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or the related amount of any Claim for Cure Costs must be Filed, served and actually received by the Debtors on the later of (a) two days before the date of the Confirmation Hearing; and (b) five days after receiving notice of any amendment, modification or supplement to the Plan Supplement or notices of assumption and assignment. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption and assignment or the Cure Costs related thereto will be deemed to have assented to such assumption and assignment and/or Cure Cost. Payment of the Cure Costs associated with any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under such Executory Contract or Unexpired Lease occurring at any time prior to the effective date of the assumption and assignment. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned and with respect to which the Allowed Cure Cost has been paid shall be deemed disallowed and expunged without further notice, action, Order, or approval of the Bankruptcy Court.

## Section 10.03    Insurance Policies

All insurance policies to which the Debtors have any rights as of the date of the Confirmation Order shall be deemed and treated as Executory Contracts and assumed by the Debtors unless other treatment of such policies is proposed in the Plan Supplement.

## Section 10.04    Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court Order, any Proofs of Claim asserting

Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases pursuant to this Plan or otherwise must be Filed no later than thirty (30) days after the later of the Effective Date or the date a Final Order is entered granting the rejection. Any Proofs of Claim arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, or the Post-Effective Date Debtors without the need for any objection by any Person or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Bankruptcy Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts and Unexpired Leases shall be classified as Class 4 GUC Claims and shall be treated in accordance with the particular provisions of this Plan applicable to such Claims; *provided however*, if the Holder of an Allowed Claim for rejection damages has an unavoidable security interest in any collateral to secure obligations under such rejected Executory Contract or Unexpired Lease, the Allowed Claim for rejection damages shall be treated as an Other Secured Claim to the extent of the value of such Holder's interest in the collateral, with the deficiency, if any, treated as a Class 4 GUC Claim.

**Section 10.05    Reservation of Rights**

Nothing contained in this Plan shall constitute an admission by the Debtors that any contract, joint operating agreement, oil and gas lease, or other contractual obligation or arrangements is in fact an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter and to provide appropriate treatment of such contract or lease.

**Section 10.06    Nonoccurrence of Effective Date**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request by the Debtors to extend the deadline for assuming or rejecting executory contracts and unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE XI

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS

**Section 11.01    Expunging of Certain Claims**

Except as otherwise provided by a Bankruptcy Court order, all Claims marked or otherwise Scheduled as contingent, unliquidated, or disputed on the Bankruptcy Schedules and for which no Proof of Claim has been timely filed, shall be deemed Disallowed Claims and such Claims shall be expunged as of the applicable Bar Date without the necessity of filing a Claim objection and without further notice to, or action, order or approval of the Bankruptcy Court. Neither the Agent

nor any of the Prepetition Lenders shall be required to file Proofs of Claim in any of the Cases in order for the Prepetition Secured Claim to be Allowed. Any Order entered by the Bankruptcy Court in relation to the establishment of a Bar Date for any claim in any of the Cases, including the Confirmation Order, shall not apply to the Agent or the Prepetition Lenders with respect to the allowance of the Prepetition Secured Claims.

**Section 11.02    Objections to Claims**

(a)    **Authority**. Subject to the consent of the Agent, the Plan Administrator shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims. Except as set forth herein, from and after the Effective Date, the Plan Administrator may, subject to the consent of the Agent, settle or compromise any Disputed Claim without approval of the Bankruptcy Court and shall have the right to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law; *provided, however,* that (i) if the Plan Administrator and the Holder of a Disputed Claim agree to compromise, settle and/or resolve a Disputed Claim by granting such Holder an Allowed Claim in the amount of $25,000 or less, the Plan Administrator may compromise, settle, and/or resolve such Disputed Claim in his or her sole discretion; and (ii) if the Plan Administrator and the Holder of a Disputed Claim agree to compromise, settle, and/or resolve a Disputed Claim by granting such Holder an Allowed Claim in an amount greater than $25,000, the Plan Administrator may do so only with the consent of the Agent.

(b)    **Claim Objection Deadline**. As soon as practicable, but no later than the Claim Objection Deadline, the Plan Administrator may, subject to the consent of the Agent, File with the Bankruptcy Court objections to Claims and serve such objections on the Creditors holding the Claims to which such objections are made. Nothing contained herein, however, shall limit the right of the Plan Administrator to object to Claims, if any, Filed or amended after the Claim Objection Deadline. The Claim Objection Deadline may be extended by the Bankruptcy Court upon motion by the Plan Administrator.

**Section 11.03    Estimation of Claims**

Subject to the consent of the Agent, the Plan Administrator may at any time request that the Bankruptcy Court estimate any such Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator or the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the maximum limitation on such Claim, as determined by the Bankruptcy Court and the Plan Administrator may, subject to the consent of the Agent, elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

**Section 11.04    Reduction of Claims**

Notwithstanding the contents of the Bankruptcy Schedules or the Bankruptcy SOFAs, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtors before the Effective Date, including pursuant to any Order of the Bankruptcy Court. To the extent such payments are not reflected in the Bankruptcy Schedules or the Bankruptcy SOFAs, such Bankruptcy Schedules and Bankruptcy SOFAs will be deemed amended and reduced to reflect that such payments were made. Nothing in this Plan shall preclude the Plan Administrator from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court before the Effective Date.

## ARTICLE XII

### CONDITIONS PRECEDENT TO EFFECTIVENESS OF THIS PLAN

**Section 12.01    Occurrence of the Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied (or waived by the Agent) in accordance with the terms below:

(a)    The Confirmation Order shall have been entered in form and substance reasonably acceptable to the Debtors and acceptable to the Agent, and such Order shall have become a Final Order.

(b)    The Plan and the Plan Supplement shall be in form and substance acceptable to the Agent.

(c)    All documents and agreements necessary to implement the Plan, which documents shall be in form and substance acceptable to the Agent shall have (a) been tendered for delivery and (b) been effected or executed by all Persons party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements;

(d)    All DIP Facility Claims shall have been paid in full in Cash.

(e)    The Plan Administrator Agreement shall have been fully executed in form and substance reasonably acceptable to the Debtors and acceptable to the Agent.

(f)    The Debtors shall have paid in full all accrued and unpaid fees and expenses of the Agent's professionals as of the Effective Date.

(g)    The Post-Effective Date Agent Professional Retainers shall have been fully funded.

(h)    There shall not be in effect any (i) order entered by any court of any competent jurisdiction; (ii) any order, opinion, ruling or other decision entered by any administrative or governmental entity or (iii) applicable law, prohibiting or making illegal the consummation of any material Transactions contemplated by this Plan.

**Section 12.02    Substantial Consummation**

On the Effective Date, this Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

**Section 12.03    Waiver of Conditions**

Each of the conditions set forth above may be waived in whole or in part by the Debtors with the consent of the Agent. The failure to satisfy or waive any condition to Confirmation or the Effective Date may be asserted by the Agent regardless of the circumstances giving rise to the failure of such condition to be satisfied.

**Section 12.04    Revocation, Withdrawal, or Non-Consummation**

Subject to the consent of the Agent, the Debtors may revoke or withdraw this Plan at any time before the Confirmation Date and to File subsequent plans. For each revoked or withdrawn plan, or if Confirmation or Consummation of any plan does not occur, then, with respect to any such revoked or withdrawn Plan, (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing, allowance or limiting to an amount certain of any Claim or Interests or Class of Claims or Interests), unless otherwise agreed to by the Debtors and any counterparty to such settlement or compromise, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan, and no acts taken in preparation for Consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person; (ii) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors; or (iii) constitute an admission of any sort by the Debtors or any other Person.

**ARTICLE XIII**

**AMENDMENTS AND MODIFICATIONS**

Subject to the consent of the Agent or by announcement on the record at the Confirmation Hearing, the Debtors may alter, amend, or modify this Plan, the Plan Documents, or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time before the Confirmation Date. Further, if any amendment, modification, or supplement to this Plan (including the Plan Supplement or a modification described herein) or any Exhibit hereto or thereto is made without the consent of the Agent or by announcement on the record at the Confirmation Hearing, then notwithstanding any other agreement to the contrary, the Agent shall have no obligation to support, or take any actions in support of, this Plan. After the Confirmation Date and before "substantial consummation" of this Plan, as defined in section 1101(2) of the Bankruptcy Code, subject to the consent of the Agent, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of this Plan, so long as such proceedings do not (a) materially adversely affect the treatment of Holders of Claims or Interests under this Plan; or (b) materially modify any provision of the Asset Purchase Agreement or any of the

Purchaser's rights thereunder; *provided, however*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

# ARTICLE XIV

# RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Cases and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or Secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the Secured or unsecured status, priority, amount or allowance of Claims or Interests;

(b)     Hear and determine all applications for compensation and reimbursement of expenses of Professionals and Professional Fee Claims under sections 327, 328, 330, 331, 503(b), 1103 or 1129(a)(4) of the Bankruptcy Code; *provided, however*, that with respect to reasonable fees and expenses of professionals retained by the Post-Effective Date Debtors and/or the Plan Administrator that are incurred from and after the Effective Date, the payment of such reasonable fees and expenses shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court except as otherwise set forth in this Plan;

(c)     Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which any of the Debtors is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required cure or the liquidating of any Claims arising therefrom;

(d)     Hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Cases;

(e)     Enter and enforce such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, the Sale Order and/or the Confirmation Order;

(f)     Hear and determine disputes arising in connection with the interpretation, implementation, Consummation, or enforcement of this Plan, including disputes arising under agreements, documents or instruments executed in connection with this Plan;

(g)     Consider any modifications of this Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(h)     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with implementation,

Consummation, or enforcement of this Plan, the Sale Order and/or the Confirmation Order;

(i)     Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(j)     Hear and determine any matters arising in connection with or relating to this Plan, the Disclosure Statement, the Sale Order and/or the Confirmation Order, the Asset Purchase Agreement, the Plan Administrator Agreement or any other contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, the Sale Order and/or the Confirmation Order;

(k)     Hear and determine any disputes regarding the interpretation or implementation of the Asset Purchase Agreement;

(l)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Cases or pursuant to this Plan;

(m)     Recover all assets of the Debtors and property of the Estates, wherever located;

(n)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     Hear and determine all disputes involving the existence, nature, or scope of any releases or injunctions granted in this Plan;

(p)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

(q)     Enter an Order or final decree concluding or closing the Cases; and

(r)     Enforce all Orders previously entered by the Bankruptcy Court.

## ARTICLE XV

## EFFECT OF THIS PLAN ON CLAIMS AND INTERESTS

### Section 15.01    Compromise and Settlements

Except for those Retained Causes of Action that vest in the Post-Effective Date Debtors, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution and other benefits provided under this Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to this Plan, including, without limitation, all Claims arising before the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in this Plan, and the Bankruptcy Court's findings shall constitute its determination

that such compromises and settlements are in the best interests of the Debtors, the Estates, Creditors and other parties in interest, and are fair, equitable and within the range of reasonableness. The Indenture Trustee Distribution is being made with the express consent and agreement of the Holders of Allowed Prepetition Secured Claims in Class 2 as a good faith compromise and settlement of Claims and controversies between the Debtors, the Holders of Allowed Prepetition Secured Claims, and the Indenture Trustee.

## Section 15.02    Satisfaction of Claims

The rights afforded in this Plan and the treatment of all Claims and Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever against the Debtors or their Estates, assets, properties, or interests in property. The treatment set forth in this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Person holding a Claim or an Interest may have in or against the Debtors or the Estates. This treatment supersedes and replaces any agreements or rights that any Person may have in or against the Debtors, the Estates, or their respective property. Except as otherwise provided in this Plan and/or the Confirmation Order, on the Effective Date, all Claims against and Interests in the Debtors shall be satisfied and released in full. Neither the Debtors nor their Affiliates, their successors or assigns, shall be responsible for any pre-Effective Date obligations of the Debtors, except those expressly assumed by the Debtors and not assigned to the Purchaser. Except as otherwise provided in this Plan and/or the Confirmation Order, all Persons and Entities shall be precluded and forever barred from asserting against the Debtors and their Affiliates, their successors or assigns, or their Estates, assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence before the Effective Date, whether or not the facts of or legal bases therefore were known or existed before the Effective Date.

## Section 15.03    Releases

(a)    **Releases by the Debtors and Estates. Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided in this Plan and/or the Confirmation Order, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious formulation and implementation of the Plan and the consummation of the transactions contemplated by the Plan, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, the Debtors, on their own behalf and as representatives of their Estates, and each of their respective Related Persons, shall, and shall be deemed to, completely and forever release, waive, void, and extinguish unconditionally, each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that may or could have been asserted by or on behalf of the Debtors or the Debtors' Estates, directly or indirectly, derivatively or otherwise, that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or before the Effective**

Date (including before the Petition Date) in connection with or related to any of the Debtors (including any of the Debtors' capital structure, management, ownership, or operation thereof), or the Debtors' respective assets, operations, finances, contracts, potential contracts, business relationships, intercompany transactions between or among the Debtors, securities, property and Estates, the Cases, the Alpine Sale, the Debtors' in- or out-of-court restructuring efforts, or the negotiation, formulation, preparation, or solicitation of votes of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents, the Alpine APA, the Alpine Settlement Agreement, the Asset Purchase Agreement, the DIP Facility, the Disclosure Statement (including any contract, instrument, release, or other agreement or document—including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion—created or entered into in connection with the Plan or Plan Supplement), or any pleadings filed during the Cases, and any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

(b)     <u>**Releases by Lender Parties**</u>.  **Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided in this Plan and/or the Confirmation Order, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Lender Party shall, and shall be deemed to, completely and forever release, waive, void, and extinguish unconditionally, in each case only in its capacity as such and not otherwise, each and all of the Debtors and the Debtors' Related Persons who do not submit an opt-out form and therefore provide a mutual release to the Lender Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors (including the capital structure, management, ownership, or operation thereof), or the Debtors' respective assets, operations, finances, contracts, potential contracts, business relationships, intercompany transactions between or among the Debtors, securities, property and Estates, the Cases, the Alpine Sale, the Debtors' in- or out-of-court restructuring efforts, or the negotiation, formulation, preparation, or solicitation of votes of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents, the Alpine APA, the Alpine Settlement Agreement, the Asset Purchase Agreement, the DIP Facility, the Disclosure Statement (including any contract, instrument, release, or other agreement or document—including the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion—created or entered into in connection with the Plan or Plan Supplement), or any pleadings filed during the Cases, and any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.**

(c)      **Releases by Releasing Parties.**  Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided in this Plan and/or the Confirmation Order, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious formulation and implementation of the Plan and the consummation of the transactions contemplated by the Plan, on the Effective Date, for good and valuable consideration, to the fullest extent permissible under applicable law, each Releasing Party shall, and shall be deemed to completely and forever release, waive, void, and extinguish unconditionally each and all of the Released Parties of and from any and all Claims, any and all other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action and liabilities of any nature whatsoever (including, without limitation, those arising under the Bankruptcy Code), and any and all Interests or other rights of a Holder of an equity security or other ownership interest, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event or other circumstance taking place or existing on or before the Effective Date (including before the Petition Date) in connection with or related to the Debtors (including the capital structure, management, ownership, or operation thereof), or the Debtors' respective assets, operations, finances, contracts, potential contracts, business relationships, intercompany transactions between or among the Debtors, securities, property and Estates, the Cases, the Alpine Sale, the Debtors' in- or out-of-court restructuring efforts, or the negotiation, formulation, preparation, or solicitation of votes of the Plan, the Disclosure Statement, any Plan Supplement or related agreements, instruments or other documents, the Alpine APA, the Alpine Settlement Agreement, the Asset Purchase Agreement, the DIP Facility, the Disclosure Statement (including any contract, instrument, release, or other agreement or document—including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion—created or entered into in connection with the Plan or Plan Supplement), or any pleadings filed during the Cases, and any related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing third-party release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the foregoing third-party release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for a substantial contribution and for the good and valuable consideration provided by the Released Parties that is important to the success of the Plan; (d) a good faith settlement and compromise of the Claims released by the foregoing third-party release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the foregoing third-party release.

(d)      **Injunction Related to Releases.**  Except as provided in this Plan and/or the Confirmation Order, as of the Effective Date, (i) all Entities who hold or may hold Claims or

**Interests and all Entities acting on behalf of such Holders; (ii) the Releasing Parties; (iii) all other parties in interest; and (iv) each of the Related Persons of each of the foregoing entities, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such released or enjoined Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and of all Interests or other rights of a Holder of an equity security or other ownership interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Plan and/or the Confirmation Order.**

(e)    __Deemed Consent__. Each Releasing Party shall, and shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 15.03(c).

(f)    __Plan Obligations__. Notwithstanding the foregoing, nothing in this Section shall release any Debtor, Released Party, or other Person from its respective rights and obligations under this Plan, the Confirmation Order, the Plan Administrator Agreement, or any other Plan Document.

## Section 15.04    Exculpation

**The Exculpated Parties shall not be liable for any Cause of Action arising in connection with or out of the administration of the Cases, the planning of the Cases, the formulation, negotiation or implementation of this Plan, the good faith solicitation of acceptances of this Plan in accordance with section 1125(e) of the Bankruptcy Code, pursuit of Confirmation of this Plan, the Consummation of this Plan, or the administration of this Plan or the Acquired Property sold pursuant to the Asset Purchase Agreement or to be distributed under this Plan, except for (a) intentional fraud, criminal conduct, gross negligence, or willful misconduct as determined by a Final Order of the Bankruptcy Court or other court of competent jurisdiction, and (b) obligations under the Plan, the Plan Supplement, and the Confirmation Order. All Holders of Claims and Interests are enjoined from asserting or prosecuting any Claim or Cause of Action against any protected Person as to which such Released Party has been exculpated from liability pursuant to the preceding sentence.**

## Section 15.05    Permanent Injunction

As of the Effective Date, in each case whether or not: (a) a Proof of Claim or Interest based upon such debt, right, Claim, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has

accepted this Plan, and in order to, *inter alia*, preserve and promote the settlements contemplated by and provided for in this Plan, except as otherwise expressly provided in this Plan and/or the Confirmation Order, all Persons and any Person claiming by or through them, which have held or asserted, which currently hold or assert or which may hold or assert any Claims or any other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities of any nature whatsoever, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Interest in the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty or any other theory of law, equity or admiralty shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties, and/or their successors and assigns, for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest, arising before the Effective Date (including before the Petition Date), including, but not limited to:

    (i)    **commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests, or other rights of a Holder of an equity security or other ownership interest, against any of the Released Parties or the assets or property of any Released Party;**

    (ii)    **enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;**

    (iii)    **creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest;**

    (iv)    **except as otherwise expressly provided in this Plan and/or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest; and**

    (v)  **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of this Plan, the Plan Supplement and/ or the Confirmation Order relating to such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, Causes of Action or liabilities, and all Interests or other rights of a Holder of an equity security or other ownership interest.**

   (d)  <u>**No Waiver.**</u> Notwithstanding anything to the contrary contained in this Plan, the releases and injunctions set forth in this Plan shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Plan Administrator, on behalf of the Post-Effective Date Debtors (but subject to the consent of the Agent), to enforce, sue on, settle or compromise the rights, Claims and other matters that vest in the Post-Effective Date Debtors pursuant to this Plan and/or the Confirmation Order.

   (b)  <u>**Bankruptcy Rule 3016 Compliance.**</u> The Debtors' compliance with the formal requirements of Bankruptcy Rule 3016(c) shall not constitute an admission that this Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

   (c)  <u>**Integral to Plan.**</u> Each of the releases and injunctions provided herein is an integral part of this Plan and is essential to its implementation. Each of the Released Parties and any other Persons protected by the injunctions set forth herein shall have the right to independently seek the enforcement of such injunctions.

## Section 15.06  Setoffs

   Except as otherwise expressly provided for in this Plan and/or the Confirmation Order pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, and subject to the consent of the Agent, the Debtors, the Post-Effective Date Debtors or the Plan Administrator, as applicable, may set off against any Allowed Claim or Interest and the distributions to be made pursuant to this Plan on account of such Allowed Claim or Interest (before such distribution is made), any Claims, rights, and Causes of Action of any nature that such Debtors or Post-Effective Date Debtors, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or before the Effective Date (whether pursuant to this Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to this Plan shall constitute a waiver or release by the Debtors, the Post-Effective Date Debtors, or the Plan Administrator of any such Claims, rights, and Causes of Action that the Debtors or the Post-Effective Date Debtors may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to setoff or offset any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Post-Effective Date Debtors or their successors or assigns unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff within thirty (30) days of the Effective Date and provided notice thereof in writing to the Plan Administrator and the Post-Effective Date Debtors, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or offset pursuant to section 553 of the Bankruptcy Code or otherwise. **Failure by a Holder of Claims or Interests to assert the right**

**to setoff or recoupment within this thirty (30) period shall result in a permanent waiver of the right to setoff by the Holder and the Claim will no longer be enforceable against the Debtors or the Post-Effective Date Debtors or their successors or assigns.**

**Section 15.07    Recoupment**

Except as provided in this Plan and/or the Confirmation Order, any Holder of a Claim or Interest shall not be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Plan Administrator and the Post-Effective Date Debtors within thirty (30) days of the Effective Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment. **Failure by a Holder of Claims or Interests to assert the right to recoupment within this thirty (30) period shall result in a permanent waiver of the right to setoff or recoupment by the Holder and the Claim will no longer be enforceable against the Debtors or their successors or assigns.**

**Section 15.08    Release of Liens**

Except as otherwise provided in this Plan or in any contract, instrument, release, or other agreement or document created pursuant to this Plan and expressly excluding the Liens of the Prepetition Agent as provided in Section 4.02(b), on the Effective Date and concurrently with the applicable distributions made pursuant to this Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns.

**Section 15.09    Good Faith**

As of the Confirmation Date, the Debtors shall be deemed to have solicited acceptance or rejections of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

## ARTICLE XVI

## MISCELLANEOUS PROVISIONS

**Section 16.01    Severability of Plan Provisions**

If, before the Effective Date, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the consent of the Agent), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan shall remain in

full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## Section 16.02   Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in this Plan, including any Holder of a Claim, shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

## Section 16.03   Binding Effect

In accordance with section 1141 of the Bankruptcy Code, this Plan shall be binding upon and inure to the benefit of the Debtors, the Post-Effective Date Debtors, all present and former Holders of Claims against and Interests in the Debtors (whether or not the Claim or Interest of such Holder is impaired under the Plan and whether or not such Holder has filed a Proof of Claim or accepted this Plan), any Person acquiring property under this Plan, their respective successors and assigns, including, but not limited to, the Debtors, and all other parties-in-interest in the Cases.

## Section 16.04   Notices

Any notice, request, or demand required or permitted to be made or provided under this Plan to or upon the Debtors, the Post-Effective Date Debtors, the Agent, or the Plan Administrator shall be (a) in writing; (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission; and (c) deemed to have been duly given or made when actually delivered or, in the case of facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtors:

Approach Resources Inc.
Attn: Josh Dazey
One Ridgmar Centre,
6500 West Freeway, Suite 800,
Fort Worth, Texas 76116

With a copy to (which shall not constitute notice):

David M. Bennett
Thompson & Knight LLP
1722 Routh St., Suite 1500
Dallas, TX 75201

Email: david.bennett@tklaw.com

-and-

Demetra L. Liggins
Thompson & Knight LLP
811 Main Street, Suite 2500
Houston, TX 77002
Email: Demetra.Liggins@tklaw.com

If to the Prepetition Agent or the Prepetition Secured Lenders:

J.P. Morgan Chase Bank, N.A., as Prepetition Agent
Attn: David Morris
2200 Ross Avenue, Floor 3,
Dallas, Texas 75201-2787

With a copy to (which shall not constitute notice):

William L. Wallander, Esq. and Bradley R. Foxman, Esq.
Vinson & Elkins LLP,
2001 Ross Ave., Suite 3900,
Dallas, TX 75201

If to Post-Effective Date Debtors or Plan Administrator

See Plan Supplement

## Section 16.05    Term of Injunctions or Stay

Unless otherwise provided in this Plan and/or Confirmation Order, all injunctions or stays provided for in the Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in this Plan or Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan and/or Confirmation Order shall remain in full force and effect in accordance with their terms.

## Section 16.06    No Admissions

Notwithstanding anything herein to the contrary, nothing in this Plan shall be deemed as an admission by the Debtors with respect to any matter set forth herein, including liability on any Claim.

## Section 16.07    Notice of the Effective Date

The Debtors shall file on the docket of the Bankruptcy Court a *Notice of Effective Date* stating that (a) all conditions to the occurrence of the Effective Date have been satisfied or waived;

(b) the Effective Date has occurred and specifying the date thereof for all purposes under this Plan; and (c) setting forth the name, address and telephone number for the Plan Administrator.

## Section 16.08    Default Under Plan

(a)    **Plan Default Notice.**  Except or otherwise provided for in this Plan, after the Effective Date, in the event of an alleged default by the Plan Administrator under this Plan, any party alleging such default shall provide written notice of default (the "Plan Default Notice") to the Plan Administrator at the address set forth in the Notice of Effective Date (as may be updated from time to time) filed pursuant to this Plan with a copy thereof to the Post-Effective Date Debtors' counsel and the Agent's counsel at the addresses set forth in this Plan and shall contemporaneously file such Plan default notice with the Bankruptcy Court.  The Plan Administrator shall have five (5) Business Days from the receipt of a Plan Default Notice to cure any actual default that may have occurred.  Following receipt of a Plan Default Notice, the Plan Administrator shall not distribute, liquidate, or otherwise dispose of Assets of the Post-Effective Date Debtors without the consent of the Agent unless and until the earlier of (a) the cure of the breach that is the basis for the Plan Default Notice, and (b) the Bankruptcy Court determines whether a default under the Plan has occurred or such default has been cured by the Plan Administrator.

(b)    **Reservation of Right to Dispute Plan Default Notice.**  The Plan Administrator and any other party-in-interest shall have the right to dispute an alleged default that has occurred and to notify the party alleging such default that the Plan Administrator (or such other party-in-interest) contends no default has occurred. The Bankruptcy Court shall retain jurisdiction over any such dispute and any remedy with respect thereto.

## Section 16.09    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Texas, without giving effect to the principles of conflicts of law thereof, shall govern the construction and implementation of this Plan and any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control) as well as corporate governance matters with respect to the Debtors.

## Section 16.10    Plan Documents

The Plan Documents are incorporated herein and are a part of this Plan as set forth in full herein.

## Section 16.11    Entire Agreement

This Plan and the Plan Documents set forth the entire agreement and understanding among the parties-in-interests relating to the subject matter hereof and supersede all prior discussions and documents.

# ARTICLE XVII

## CONFIRMATION REQUEST

The Debtors request Confirmation of this Plan under section 1129 of the Bankruptcy Code. If any Impaired Class does not accept this Plan pursuant to section 1126 of the Bankruptcy Code, the Debtors request Confirmation pursuant to section 1129(b) of the Bankruptcy Code. In that event, the Debtors, subject to the consent of the Agent or by announcement on the record at the Confirmation Hearing, may modify this Plan to the extent (if any) that Confirmation of this Plan under section 1129(b) of the Bankruptcy Code requires modification.

Dated: November 11, 2020

APPROACH RESOURCES INC.

By:     */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer


Dated: November 11, 2020

APPROACH MIDSTREAM HOLDINGS LLC

By:     */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer


Dated: November 11, 2020

APPROACH OIL & GAS INC.

By:     */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer


Dated: November 11, 2020

APPROACH OPERATING, LLC

By:     */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer


Dated: November 11, 2020

APPROACH DELAWARE, LLC

By:     */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer

Dated: November 11, 2020

APPROACH SERVICES, LLC

By:   */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer

Dated: November 11, 2020

APPROACH RESOURCES I, LP

By:   */s/ Sergei Krylov*
Name:  Sergei Krylov
Title:   President and Chief Executive Officer

**Exhibit B**

**Liquidation Analysis**

<u>**EXHIBIT B**</u>

Liquidation Analysis

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN OR IN THE DISCLOSURE STATEMENT OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IF THE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY OR AMEND THE LIQUIDATION ANALYSIS SET FORTH HEREIN.

NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION, ADMISSION OR ALLOWANCE BY THE DEBTORS (OR ANY OTHER PARTY) OR OF ANY CLAIMS BY OR AGAINST THE DEBTORS. THE ESTIMATED AMOUNT OF ALLOWED CLAIMS SET FORTH HEREIN SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS OR ALLOWED EQUITY INTERESTS UNDER THE PLAN, OTHER THAN THE PRESENTATION OF A HYPOTHETICAL LIQUIDATION ANALYSIS. ACCORDINGLY, THE ASSET VALUES, AMOUNTS AND/OR PRIORITY OF ALLOWED CLAIMS IN THIS LIQUIDATION ANALYSIS COULD DIFFER MATERIALLY FROM THE AMOUNTS SET FORTH IN THE PLAN, THE DISCLOSURE STATEMENT OR ANY OF THE CHAPTER 11 CASES.

## 1) Introduction

Approach Resources Inc., and its debtor-affiliates (collectively, the "<u>Debtors</u>") with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (this "<u>Liquidation Analysis</u>") in connection with the Plan (as amended from time to time) and Disclosure Statement.[1] The analysis permits parties in interest to evaluate whether the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, also referred to as the "best interests of creditors" test. The test requires that each holder of an impaired allowed claim or interest must either:

i)  accept the Plan; or

ii) receive or retain value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To substantiate these findings, the Bankruptcy Court must:

i)  estimate the cash proceeds (the "<u>Liquidation Proceeds</u>") a chapter 7 trustee (the "<u>Trustee</u>") would generate if each Debtors' chapter 11 case was converted to a chapter 7 case on the Effective Date and the assets of such Debtors' estate were liquidated;

ii) determine the distribution (the "<u>Liquidation Distribution</u>") each holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and

---

[1] Capitalized terms not herein defined shall have the meanings ascribed to them in the Plan.

iii)    compare each holders Liquidation Distribution to the distribution under the Plan ("Plan Distribution") if it were confirmed and consummated.

Accordingly, asset values discussed herein may be different than amounts referred to in the Plan.

**2)  Process and Assumption Overview**

The Liquidation Analysis was prepared by the Debtors with the assistance of their advisors and assumes that the Debtors' assets would be liquidated in a jointly administered, consolidated case. The analysis has been prepared assuming that the Debtors' chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code on or about November 30, 2020 (the "Conversion Date"). The Debtors have assumed that the liquidation would occur over a three-month time period in order to administer and wind down the estates.

Except as otherwise noted herein, the Liquidation Analysis is based upon the Debtors' consolidated balance sheets as of September 30, 2020, which values are assumed to be representative of the Debtors' assets and liabilities. Any projected balance sheet amounts presented in this Liquidation Analysis are intended to be a proxy for actual balances on the Conversion Date (the "Liquidation Balances"). This analysis reflects the closing of the sale of substantially all of the Debtors' assets to the Purchaser on September 30, 2020. The proceeds from this sale are included in the Debtors' Liquidation Balances as Cash. In addition, this Liquidation Analysis incorporates certain adjustments to account for the effects of the chapter 7 liquidation process, including costs of winding down the Debtors' estates, trustee fees and professional fees.

It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee who would liquidate any remaining assets of the bankruptcy estate (the "Estate") and distribute the cash proceeds, net of liquidation related costs, to creditors in accordance with relevant bankruptcy law. It is assumed the appointed Trustee will retain lawyers and other necessary advisors to assist in the liquidation.

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a Plan absent a liquidation. Examples of these kinds of claims include various potential employee claims, executory contracts, litigation, and lease rejection damages in addition to other potential claims. Such claims can be material and can receive administrative or priority payment status. Priority claims would be paid in full from the Liquidation Proceeds before the balance would be made available to general unsecured claims.

No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preferences or fraudulent transfer actions due to, among other issues, the cost of such litigation, the uncertainty of the outcome and the anticipated disputes regarding these matters. Additionally, this analysis does not include estimates for tax consequences, both Federal and state, that may be triggered upon the liquidation and sale of assets; tax consequences could be material.

**3)  Distribution of Net Proceeds to Claimants**

Any available net proceeds would be allocated to Holders of Claims in strict priority in accordance with section 726 of the Bankruptcy Code:

- Liquidation Adjustments - includes wind-down costs, Trustee fees and expenses, and fees and expenses of advisors and brokers (including those retained by the Trustee);

- Superpriority and Structurally Senior Claims On September 30, 2020, $33.8 million of the DIP Facility was repaid pursuant to the $100 million adequate protection payment made in accordance with the Sale Order. This Liquidation Analysis assumes that there would be no outstanding principal balance on the DIP Facility as of the Conversion Date. To illustrate the total recovery we have included the $100 million adequate protection payment made in accordance with to the Sale Order in the Liquidation Analysis. The additional amount included within this claim class includes estimates for superpriority professional carve-out claims;

- Prepetition Secured Claims - includes estimated Claims arising under the Debtors' first lien Prepetition Secured Financing Documents;

- Administrative Claims - includes estimated Chapter 11 non-lien vendor claims, including Claims for post-petition accounts payable, post-petition accrued expenses, taxes, and employee obligations, Claims arising under section 503(b)(9) of the Bankruptcy Code, and certain Unsecured Claims entitled to priority under section 507 of the Bankruptcy Code. Because such Claims are being paid in the ordinary course of business, this analysis assumes that all administrative claims were satisfied prior to the Conversion Date such that there are no outstanding Administrative Claims;

- General Unsecured Claims - includes estimated deficiency claims arising from the Debtors' unsecured funded debt, Claims held by Holders of the Senior Notes, chapter 11 prepetition trade Claims, and numerous other types of prepetition Unsecured Claims;

- Interests - includes the Interests in the Debtors.

Under the absolute priority rule, no junior creditor would receive any distributions until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

When considering the generation of cash proceeds and the distribution thereof, the Debtors believe that the present value of distributions, to the extent available, may be further reduced because such distributions in a chapter 7 case may not occur until well after the three-month period assumed in the analysis. Moreover, in the event that litigation becomes necessary to resolve claims asserted in a chapter 7 case, distributions to creditors may be further delayed, which both decreases the present value of those distributions and increases administrative expenses that could diminish the liquidation proceeds available to creditors. The effects of this potential delay on the value of distributions under this Liquidation Analysis have not been considered in this analysis.

**4)  Conclusion**

The determination of hypothetical proceeds from this liquidation is a highly uncertain process involving the extensive use of estimates and assumptions, which, while considered reasonable by the Debtors and the Debtors' advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors.

The Debtors are continuing to evaluate claims filed against the Debtors' estates. Thus, the amount of the final Allowed Claims against the Debtors' estates may differ from the Claim amounts used in this Liquidation Analysis

Based on the analysis performed by the Debtors and their advisors, the Debtors have determined that, as summarized in the table below, upon the Effective Date, the Plan will provide all creditors and equity holders with a recovery (if any) that is not less than what they would otherwise

receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  Therefore, the Debtors thus believe the Plan satisfies the requirement of 1129(a)(7) of the Bankruptcy Code.

## Summary of Recoveries

*Amounts in $000's*

| Class | Claim / Equity Interest | Estimated Claims | Plan Recovery % | Estimated Mid Liquidation Recovery % | Pass/Fail |
|---|---|---|---|---|---|
| | Superpriority and Structurally Senior Claims | $        37,250 | 100.0% | 100.0% | Pass |
| 2 | Prepetition Secured Claims | 307,418 | 27.6% | 26.6% | Pass |
| 3 | Miscellaneous Secured Claims | - | N/A | 0.0% | Pass |
| 1 | Administrative / Priority Non-Tax Claims | - | N/A | N/A | Pass |
| | Priority Tax Claims | - | N/A | 0.0% | Pass |
| 4 | Senior Notes Claims | 87,823 | 1.8% | 0.0% | Pass |
| 4 | General Unsecured Claims | 4,648 | 1.8% | 0.0% | Pass |
| | General Unsecured Claims - Lender Deficiency Claims | 225,705 | 0.0% | 0.0% | Pass |
| 5 | Intercompany Claims | - | N/A | 0.0% | Pass |
| 6 | Equity Interests | - | 0.0% | 0.0% | Pass |

**The following table summarizes the Liquidation Analysis for consolidated Debtor entities. The Liquidation Analysis should be reviewed with the accompanying "Specific Notes to the Liquidation Analysis" set forth on the following pages.**

# Consolidated Debtor Liquidation Analysis

*Amounts in $000's*

| | Note | Pro-forma BS 11/30/2020 | Hypothetical Liquidation % Low | Hypothetical Liquidation % High | Hypothetical Liquidation Value ($) Low | Hypothetical Liquidation Value ($) High |
|---|---|---|---|---|---|---|
| Cash | 1 | $ 124,984 | 100.0% | 100.0% | $ 124,984 | $ 124,984 |
| **Gross Liquidated Assets** | | **124,984** | **100.0%** | **100.0%** | **124,984** | **124,984** |
| | | | | | | |
| Wind Down Costs | 2 | | | | (3,500) | (2,500) |
| Chapter 7 Trustee Fees | 3 | | | | (771) | (771) |
| Chapter 7 Professional Fees | 4 | | | | (2,500) | (2,000) |
| Avoidance Action Proceeds | 5 | | | | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | $ (6,771) | $ (5,271) |
| **Net Estimated Proceeds from Liquidation Available for Distribution** | | | | | $ 118,213 | $ 119,713 |

## Claims and Recoveries

| | Note | Claims Estimate | Hypothetical Liquidation % Low | Hypothetical Liquidation % High | Hypothetical Liquidation Value ($) Low | Hypothetical Liquidation Value ($) High |
|---|---|---|---|---|---|---|
| **Superpriority and Structurally Senior Claims** | | | | | | |
| DIP - New Money | 6 | $ 9,000 | 100.0% | 100.0% | $ 9,000 | $ 9,000 |
| DIP - Roll-up | 6 | 24,750 | 100.0% | 100.0% | 24,750 | 24,750 |
| Superpriority Professional Carve-out | 7 | 3,500 | 100.0% | 100.0% | 3,500 | 3,500 |
| **Total Superpriority and Structurally Senior Claims** | | **37,250** | **100.0%** | **100.0%** | **37,250** | **37,250** |
| | | | | | | |
| **Remaining Distributable Value after Superpriority Claims** | | | | | **80,963** | **82,463** |
| | | | | | | |
| **Secured Claims** | | | | | | |
| Secured Prepetition RCF | 8 | 307,418 | 26.3% | 26.8% | 80,963 | 82,463 |
| Misc. Secured Claims | 9 | - | 0.0% | 0.0% | - | - |
| **Total Secured** | | **307,418** | **26.3%** | **26.8%** | **80,963** | **82,463** |
| | | | | | | |
| **Remaining Distributable Value after Secured Claims** | | | | | **-** | **-** |
| | | | | | | |
| **Total Administrative / Priority Non-Tax Claims** | 10 | - | 0.0% | 0.0% | - | - |
| | | | | | | |
| **Remaining Distributable after Unsecured Administrative Claims** | | | | | **-** | **-** |
| | | | | | | |
| Priority Tax Claims | 11 | - | 0.0% | 0.0% | - | - |
| | | | | | | |
| **Proceeds Available after Priority Tax Claims** | | | | | **-** | **-** |
| | | | | | | |
| **General Unsecured Claims** | | | | | | |
| Unsecured Notes | 12 | 87,823 | 0.0% | 0.0% | - | - |
| Unpaid Prepetition AP | 13 | - | 0.0% | 0.0% | - | - |
| Contract Rejection Claims | 14 | 984 | 0.0% | 0.0% | - | - |
| Other | 15 | 3,664 | 0.0% | 0.0% | - | - |
| Prepetition RCF Deficiency Claim | 16 | 225,705 | 0.0% | 0.0% | - | - |
| **Total General Unsecured Claims** | | **318,177** | **0.0%** | **0.0%** | **-** | **-** |
| | | | | | | |
| **Remaining Distributable Value after Unsecured Claims** | | | | | **-** | **-** |
| | | | | | | |
| **Existing AREX Equity Interest** | 17 | $ - | 0.0% | 0.0% | $ - | $ - |

## SPECIFIC NOTES TO THE LIQUIDATION ANALSIS

### Liquidation Proceeds

*Gross Liquidation Proceeds*

1. <u>Cash & Cash Equivalents</u>: Entity cash is a pro-forma cash estimate as of November 30, 2020. All projected cash and equivalents on hand are considered to be 100% recoverable.

*Chapter 7 Liquidation Adjustments*

2. <u>Wind Down Costs</u>: The total Wind Down Costs are estimated to be approximately $2.5 million to $3.5 million, which includes personnel and overhead costs. For those employees that are retained during the liquidation process, the analysis includes estimated salary, retention, and severance expense.

3. <u>Chapter 7 Trustee Fees</u>: This would be limited to the fee guidelines in section 326(a) of the Bankruptcy Code. The Debtors assumed that Trustee fees would be approximately 3% of entity gross liquidation proceeds. Gross liquidation proceeds were calculated after taking into account the $100 million adequate protection payment made pursuant to the Sale Order.

4. <u>Chapter 7 Professional Fees</u>: This includes the estimated cost for advisors, attorneys and other professionals retained by the Trustee. In the Liquidation Analysis, chapter 7 professional fees are estimated to be $2.0 million to $2.5 million. These fees are applied on a pro-rata basis across Debtor-entities based on the estimated Liquidation Proceeds available to each estate. However, this amount can fluctuate based on length and complexity of wind-down process and could be substantially greater than the amounts assumed herein.

5. <u>Avoidance Actions Proceeds</u>: This Liquidation Analysis assumes no recoveries on potential avoidance actions.

### Claims and Recoveries

*Superpriority and Structurally Senior Claims*

6. <u>Superpriority DIP Facility Claims</u>: This Liquidation Analysis assumes that the outstanding principal balance on the DIP Facility Claims would be $33.8 million on the Conversion Date. On September 30, 2020, approximately $33.8 million of the DIP Facility Claims was repaid pursuant to the $100 million adequate protection payment made in accordance with the Sale Order. This amount has been included within this Liquidation Analysis to illustrate the total recovery for each class of Claims.

7. <u>Superpriority Professional Carve-Out Claims</u>: The DIP Orders grant superpriority status to chapter 11 Allowed Professional Fee Claims incurred prior to notice of conversion to a chapter 7 liquidation for each professional retained by the Bankruptcy Court pursuant to sections 327, 328, or 363 of the Bankruptcy Code. The Liquidation Analysis assumes $3.5 million in Superpriority Carve-Out Claims at the Liquidation Date and that the Liquidation Proceeds would be sufficient to satisfy 100% of the Superpriority Carveout Claims.

*Secured Claims*

8. <u>Prepetition Secured Claims (Class 2):</u> This Liquidation Analysis assumes that the outstanding principal balance under the Prepetition Secured Financing Documents is approximately $307.4 million, comprised of initial outstanding balance of $332.2 million less $24.8 million that was rolled up into DIP Facility Claims. On September 30, 2020, $66.3 million of the Prepetition Secured Claims was repaid pursuant to the $100 million adequate protection payment made in accordance with the Sale Order.  This amount has been included within this Liquidation Analysis to illustrate the total recovery for each class of Claims. Implied Liquidation Proceeds on account of Prepetition Secured Claims would range from $81.0 million to $82.5 million which represents 26.3% and 26.8% recovery of the total Prepetition Secured Claims.

9. <u>Miscellaneous Secured Claims (Class 3):</u> Other Secured Claims are estimated to be zero and receive no recovery.

*Administrative and Other Unsecured Chapter 11 Claims*

10. <u>Administrative Claims:</u> These Claims consist of post-petition unsecured trade vendor Claims that are unable to assert statutory liens against collateral, employee Claims, priority non-tax Claims, and miscellaneous other priority Claims. Due to the Debtors  paying Administrative Claims in the ordinary course of business, the Debtors estimate that there will be no unpaid Administrative Claims on the Effective Date.  This Liquidation Analysis projects that such Claims, if any, would receive no recovery if the Cases were converted to Cases under Chapter 7.

11. <u>Priority Tax Claims:</u> The Debtors do not believe there are any outstanding Priority Tax Claims and project that such Claims, if any, would receive no recovery if the Cases were converted to Cases under Chapter 7.

12. <u>Unsecured Notes (Class 4):</u> This class consists of principal and unpaid accrued interest on the Senior Notes. The Liquidation Analysis assumes an outstanding balance of $87.8 million and projects that there would be no recovery on account of such Claims if the Cases were converted to Cases under Chapter 7.

13. <u>Unpaid Prepetition AP (Class 4):</u> The Debtors do not believe there are any outstanding unpaid Prepetition AP Claims and project that such Claims, if any, would receive no recovery if the Cases were converted to Cases under Chapter 7.

14. <u>Contract Rejection Claims (Class 4):</u> This Liquidation Analysis assumes that there would be $1.0 million in contract rejection Claims and projects that there would be no recovery on account of such Claims if the Cases were converted to Cases under Chapter 7.

15. <u>Other General Unsecured Claims (Class 4):</u>  This Liquidation Analysis assumes there would be $3.7 million in other general unsecured Claims and projects that there would be no recovery on account of such Claims if the Cases were converted to Cases under Chapter 7.

16. <u>Prepetition Secured Claim Deficiency Claims:</u> Represents the deficiency balance on the Prepetition Secured Claims, which would be entitled to receive distributions along with other general unsecured claimants if the Cases were converted to Cases under Chapter 7. This Liquidation Analysis projects that there would be no recovery on account of such Claims if the Cases were converted to Cases under Chapter 7.

*Equity Interests*

17. <u>Existing Interests (Class 6):</u> Existing Interests are projected to receive no recovery on account of such Interests if the Cases were converted to Cases under Chapter 7.

**Exhibit C**

**Conditional Disclosure Statement Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
11/10/2020

|  |  |  |
|---|---|---|
| **In re:** | § | **Chapter 11** |
|  | § |  |
| **APPROACH RESOURCES INC.,** *et al.,* | § | **Case No. 19-36444 (MI)** |
|  | § |  |
|  | § | **(Jointly Administered)** |
| **Debtors.**[1] | § |  |
|  | § | **Re:** ECF No. 661 |

**ORDER (I) CONDITIONALLY APPROVING PROPOSED DISCLOSURE**
**STATEMENT; (II) ESTABLISHING SOLICITATION AND VOTING**
**PROCEDURES; (III) SCHEDULING COMBINED HEARING; AND**
**(IV) ESTABLISHING NOTICE AND OBJECTION PROCEDURES**

Having considered the *Emergency Motion of the Debtors for an Order (i) Conditionally*

*Approving Proposed Disclosure Statement; (ii) Establishing Solicitation and Voting Procedures;*

*(iii) Scheduling Combined Hearing; and (iv) Establishing Notice and Objection Procedures for*

*Confirmation of the Proposed Plan* (the "Motion")[2] of Approach Resources Inc. and its debtor

affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, the "Debtors"), pursuant to sections 1125, 1126, 1128, 1145, and 105 of title 11 of

the United States Code (the "Bankruptcy Code"), Rules 2002, 3001, 3003, 3016, 3017, 3018, 3020,

and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Bankruptcy

Local Rules 2002-1 and 3016-1, and the Complex Chapter 11 Procedures; the Court finds that:

(a) jurisdiction over the matters in the Motion is proper pursuant to 28 U.S.C. § 1334;

(b) consideration of the Motion and the requested relief being a core proceeding pursuant to 28

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Approach Resources Inc. (4817); Approach Midstream Holdings LLC (4122); Approach Oil & Gas Inc. (7957); Approach Operating, LLC (1981); Approach Delaware, LLC (7483); Approach Services, LLC (3806); and Approach Resources I, LP (5316). The Debtors' mailing address is One Ridgmar Centre, 6500 West Freeway, Suite 900, Fort Worth, Texas 76116.

[2] All capitalized terms not expressly defined herein shall have the same meaning as ascribed in the Motion.

U.S.C. § 157(b); (c) venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; (d) due and proper notice of the Motion having been provided, and such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and (e) good and sufficient cause exists for granting the relief requested in the Motion.  The Court having reviewed the Motion and having held a hearing on the Motion; and no objections to the Motion having been filed; and upon the record of the Hearing; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their respective estates, creditors, and all parties in interest; and it appearing that good business reasons and the facts and circumstances of these cases support the relief requested in the Motion; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS FOUND AND DETERMINED THAT:**[3]

**<u>Approval of Deadlines Related to Plan Confirmation</u>**

A.      Notice of the Motion and the Hearing on the Motion provided due, proper, and adequate notice, comports with due process, and complies with Bankruptcy Rules 2002 and 3017, and Bankruptcy Local Rule 2002-1.  No further notice is required.

B.      The following dates and deadlines are hereby established (subject to modifications as necessary) with respect to the *Disclosure Statement in Support of the Amended Joint Chapter 11 Plan of Approach Resources Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 662] (the "<u>Proposed Disclosure Statement</u>"), solicitation of the *Amended Joint*

---

[3]  Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact.

*Chapter 11 Plan of Approach Resources Inc. and its Debtor Affiliates Under Chapter 11 of the*

*Bankruptcy Code* [Dkt. No. 661] (the "Plan"), voting on the Plan, and confirmation of the Plan:

| Proposed Solicitation and Confirmation Timeline | |
|---|---|
| Voting Record Date | November 5, 2020 |
| Mailing Deadline for Notice of Combined Hearing and Release Opt-Out Form | November 16, 2020 |
| Solicitation Deadline | November 16, 2020 |
| Rule 3018(a) Motion Deadline for Temporary Allowance of Claims | December 7, 2020 at 4:00 p.m. (prevailing Central Time) |
| Plan Supplement Deadline | December 4, 2020 |
| Voting Deadline | December 11, 2020 at 4:00 p.m. (prevailing Central Time) |
| Objection Deadline | December 11, 2020 at 4:00 p.m. (prevailing Central Time) |
| Ballot Certification Deadline | December 14, 2020 |
| Deadline to File Confirmation Brief and Reply to Plan Objection(s) | December 15, 2020 at 4:00 p.m. (prevailing Central Time) |
| Combined Hearing | December 16, 2020 at 9:00 a.m. (prevailing Central Time) |

## THE DISCLOSURE STATEMENT

C.    The Proposed Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code and complies with Bankruptcy Rule 3016(c). No further information is necessary. The Proposed Disclosure Statement should be approved on a conditional basis. The Debtors are authorized to use the Proposed Disclosure Statement to solicit votes from the Voting Classes on acceptance or rejection of the Plan.

## BALLOTING AND VOTING PROCEDURES

D.      The procedures set forth in the Motion for the solicitation and tabulation of votes to accept or reject the Plan provide for a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

## BALLOTS

E.      The ballots substantially in the forms annexed hereto as **Exhibits 2-5** (collectively, the "Ballots"), including all voting instructions provided therein, are (a) consistent with Official Bankruptcy Form No. B 314, (b) address the particular needs and circumstances of these chapter 11 cases, and (c) provide adequate information and instructions for each party entitled to vote to accept or reject the Plan.  No further information, instructions, or notice are necessary.

## PARTIES ENTITLED TO VOTE

F.      Pursuant to the Plan, holders of Claims in Class 2 (Prepetition Secured Claims), and Class 4 (Class 4 GUC Claims) are impaired and are entitled to receive distributions under the Plan.  Accordingly, holders of Allowed Claims in such Classes are entitled to vote on account of such Claims (to the extent set forth herein).

## PARTIES NOT ENTITLED TO VOTE

G.      Pursuant to the Plan, Holders of Claims in Class 1 (Priority Non-Tax Claims) and Class 3 (Miscellaneous Secured Claims) are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to accept the Plan and are not entitled to vote on account of such Claims and Interests.

H.      Pursuant to the Plan, Holders of Interests in Class 5 (Intercompany Claims) and Class 6 (Interests) are Impaired and will receive no recovery on account of such Claims and Interests and, pursuant to section 1126(g) of the Bankruptcy Code, are conclusively deemed to reject the Plan and are not entitled to vote on account of such Claims and Interests.

## NOTICE OF NON-VOTING STATUS AND UNCLASSIFIED CLAIMS NOTICE

I.       The Notice of Non-Voting Status, substantially in the form attached hereto as **Exhibit 6**, complies with the Bankruptcy Code, applicable Bankruptcy Rules, applicable Bankruptcy Local Rules and Complex Chapter 11 Procedures and, together with the Combined Hearing Notice that includes an opt-out form to opt out of the plan release (the "Notice of Combined Hearing and Release Opt-Out Form"), provides adequate notice to Holders of Claims or Interests in Class 1 (Priority Non-Tax Claims), Class 3 (Miscellaneous Secured Claims), Class 5 (Intercompany Claims), and Class 6 (Interests) of their non-voting status. The Notice of Non-Voting Status, including all instructions provided therein, address the particular needs and circumstances of these chapter 11 cases. No further information, instructions, or notice are necessary.

J.       The Unclassified Claims Notice, substantially in the form attached hereto as **Exhibit 7**, complies with the Bankruptcy Code, applicable Bankruptcy Rules, and applicable Bankruptcy Local Rules and Complex Chapter 11 Procedures and, together with the Notice of Combined Hearing and Release Opt-Out Form, provides adequate notice to holders of Unclassified Claims of their non-voting status. The Unclassified Claims Notice, including all instructions provided therein, addresses the particular needs and circumstances of these chapter 11 cases. No further information, instructions, or notice are necessary.

## SOLICITATION

K.       The proposed distribution and contents of the Solicitation Packages comply with Bankruptcy Rules 2002 and 3017 and constitute sufficient notice to all interested parties of the Record Date, Voting Deadline, Plan Objection Deadline, Combined Hearing, Release Provisions, procedures and deadlines to opt out of the Release Provisions (the "Opt-Out Rights"), and other related matters.

L.      The period proposed by the Debtors in the Motion during which the Debtors will solicit votes to accept the Plan is a reasonable and sufficient period of time for holders of Claims and Interests in the Voting Classes to make an informed decision regarding whether to accept or reject the Plan and timely return Ballots evidencing such decision.

M.      The procedures set forth in the Motion for tabulating Ballots are fair and appropriate.

## NOTICE OF COMBINED HEARING AND OBJECTION DEADLINE

N.      The procedures set forth in the Motion regarding notice to all parties of the Combined Hearing and the Objection Deadline, including the form and content of the Notice of Combined Hearing and Release Opt-Out Form, attached as **Exhibit 1**, and the Publication Notice, attached as **Exhibit 8**, (a) provide due, proper, and adequate notice, (b) comport with due process, (c) comply with Bankruptcy Rules 2002, 3017, and 3020, and (d) conspicuously disclose the release, injunction, and exculpation provisions contained in Article XV of the Plan (the "Release Provisions") (including the instructions to opt out of the Release Provisions) and provide adequate notice of the Release Provisions and Opt-Out Rights.  No further information, instructions, or notice are required.

## NOTICE OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

O.      The Plan Assumption Notice, substantially in the form attached hereto as **Exhibit 9**, complies with the Bankruptcy Code, applicable Bankruptcy Rules, and applicable Bankruptcy Local Rules and Complex Chapter 11 Procedures and provides adequate notice to counterparties to Executory Contracts and Unexpired Leases of the potential assumption and assignment of such contract, including the proposed Cure Costs.  The Plan Assumption Notice and related Objection Deadline address the particular needs and circumstances of these chapter 11 cases, and are

necessary and appropriate under the circumstances. No further information, instructions, or notice are necessary.

### IT IS HEREBY ORDERED THAT:

1.      Omitted.

2.      The Proposed Disclosure Statement is **APPROVED** on a conditional basis.

3.      The Proposed Disclosure Statement (including all applicable exhibits thereto) provides sufficient notice of the Release Provisions in accordance with Bankruptcy Rule 3016(c).

## <u>SOLICITATION PROCEDURES</u>

**A.      Solicitation Packages**

4.      The Solicitation Packages are **APPROVED**.

5.      The Debtors shall mail the Solicitation Packages no later than **<u>November 16, 2020</u>** (the "<u>Solicitation Deadline</u>") to (a) the U.S. Trustee, and (b) holders of Claims in Voting Classes entitled to vote on the Plan as of the Voting Record Date, as required by Bankruptcy Rule 3017(d).

6.      Solicitation Packages shall contain copies of:

    a.      this Order (without attachments);

    b.      the Notice of Combined Hearing and Release Opt-Out Form;

    c.      the Proposed Disclosure Statement, which shall include the Plan as an attachment (except as provided below); and

    d.      if the recipient is entitled to vote on the Plan, a Ballot customized for such holder in the form described below, and a postage-prepaid return envelope.

7.      If a holder of a Claim or Interest is in a Non-Voting Class, and therefore not entitled to vote on the Plan, the Debtors are authorized to serve such holder only the Notice of Combined Hearing and Release Opt-Out Form and the Notice of Non-Voting Status.

8.      The Debtors are authorized to distribute the Plan, Proposed Disclosure Statement, and this Order to Holders of Claims entitled to vote on the Plan in electronic format (*i.e.* on a CD-

ROM, USB drive, or by a link to the Debtors' website at https://dm.epiq11.com/approachresources where the Proposed Disclosure Statement and Plan shall be available free of charge); *provided however*, that the Ballots, Notice of Combined Hearing and Release Opt-Out Form, Notice of Non-Voting Status and Unclassified Claims Notice, as applicable, shall be provided in paper form; *provided further* that any party receiving solicitation documents in electronic format may request to receive paper copies of any solicitation materials from the Solicitation Agent at no cost, and upon receipt of such a request, the Debtors or the Solicitation Agent shall mail such party a paper copy of the requested documents within twenty-four (24) hours.

9.      Holders of Unclassified Claims are not entitled to vote on the Plan, and the Debtors are authorized to serve such Holders only the Notice of Combined Hearing and Release Opt-Out Form and the Unclassified Claims Notice, as defined and described more fully in the Motion.

10.      Any creditor for which service in an electronic format poses a hardship may request an additional copy of the Disclosure Statement (and attachments) in paper format by contacting Epiq Corporate Restructuring LLC, by email at approachresources@epiqglobal.com, or by phone at (855) 930-0678 (for calls within the U.S.) or (503) 597-5538 (outside of the U.S.). Upon receipt of a telephonic or written request, the Debtors shall provide such creditor with a paper copy of the Disclosure Statement (and attachments) at no cost to the creditor within twenty-four (24) hours thereafter.

11.      The Debtors shall not be required to send Solicitation Packages to creditors that have Claims that have already been paid in full, and instead the Debtors are authorized to send such creditors only a Notice of Combined Hearing and Release Opt-Out Form; *provided however*, that if any such creditor would be entitled to receive a Solicitation Package for any other reason,

then the Debtors shall send such creditor a Solicitation Package in accordance with the procedures set forth herein.

12.     With respect to addresses from which mail has been returned as undeliverable by the United States Postal Service, the Debtors are excused from mailing Solicitation Packages or any other materials related to voting or confirmation of the Plan to those entities listed at such addresses unless the Debtors are provided with accurate addresses for such entities before the Voting Deadline, and failure to mail Solicitation Packages or any other materials related to voting or confirmation of the Plan to such entities shall not constitute, or be deemed to constitute, inadequate notice of the Combined Hearing or the Voting Deadline and shall not constitute, or be deemed to constitute, a violation of Bankruptcy Rule 3017.

**B.     Voting and Non-Voting Parties**

13.     Pursuant to the Plan, the following classes are Impaired but entitled to receive distributions under the Plan and, thus, may vote to accept or reject the Plan, subject to certain exceptions discussed below (collectively, the "Voting Classes"):

| Class | Description |
|-------|-------------|
| Class 2 | Prepetition Secured Claims |
| Class 4 | Class 4 GUC Claims |

14.     A creditor or interest holder that holds a Claim in a Voting Class is nonetheless not entitled to vote to the extent that:

    a.    as of the Voting Record Date (as defined below), the outstanding amount of such creditor's Claim is zero ($0.00);

    b.    as of the Voting Record Date, such creditor's Claim has been disallowed, expunged, disqualified or suspended;

    c.    the Debtors have not scheduled such creditor's Claim or scheduled such creditor's claim in an undetermined amount or as contingent, unliquidated,

or disputed, and such creditor has not timely filed a proof of claim in accordance with the applicable deadline to file such claim as of the Voting Record Date; or

d.      such creditor's Claim or interest holder's Interest is subject to an objection or request for estimation filed on or before **November 23, 2020**, subject to the procedures set forth herein, including the **December 7, 2020 at 4:00 p.m. (prevailing Central Time)** Rule 3018(a) Motion Deadline for Temporary Allowance of Claims.

15.      Pursuant to the Plan, Class 1 (Priority Non-Tax Claims) and Class 3 (Miscellaneous Secured Claims) are unimpaired and therefore are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote on the plan.

16.      Holders of Claims or Interests in Class 5 (Intercompany Claims) and Class 6 (Interests) are Impaired, not entitled to a recovery under the Plan on account of such Claims, and thus not entitled to vote on the Plan.

17.      Holders of Claims or Interests in the following classes constitute the Non-Voting Classes:

| Class | Impairment | Entitled to Vote | Class |
|---|---|---|---|
| Class 1 - Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) | Class 1 - Priority Non-Tax Claims |
| Class 3 – Miscellaneous Secured Claims | Unimpaired | No (Deemed to accept) | Class 3 – Miscellaneous Secured Claims |
| Class 5 – Intercompany Claims | Impaired | No (Deemed to reject) | Class 5 – Intercompany Claims |
| Class 6 – Interests | Impaired | No (Deemed to reject) | Class 6 –Interests |

## C.      Notice of Non-Voting Status and Unclassified Claims Notice

18.      The Notice of Non-Voting Status and Unclassified Claims Notice (each of which include a description of the Opt-Out Rights) are **APPROVED**.

19.     To the holders of Claims or Interests in Class 1 (Priority Non-Tax Claims), Class 3 (Miscellaneous Secured Claims), Class 5 (Intercompany Claims), and Class 6 (Interests), the Debtors shall mail a Notice of Combined Hearing and Release Opt-Out Form and a Notice of Non-Voting Status, substantially in the form attached hereto as **Exhibit 6** in lieu of a Solicitation Package.

20.     To the Holders of Unclassified Claims, the Debtors shall mail a Notice of Combined Hearing and Release Opt-Out Form and Unclassified Claims Notice, substantially in the form attached hereto as **Exhibit 7** in lieu of a Solicitation Package.

**D.      The Voting Record Date**

21.     The Voting Record Date shall be set as **November 5, 2020**.  Only holders of Claims in Class 2 (Prepetition Secured Claims) and Class 4 (Class 4 GUC Claims), as of the Voting Record Date, who are otherwise eligible to vote shall be entitled to vote to accept or reject the Plan.

22.     The record holders of Claims shall be determined, as of the Voting Record Date, based upon the records of the Debtors and the Solicitation Agent.  Accordingly, any notice of claim transfer received by the record holder of the Debtors' debt securities, the Debtors, the Solicitation Agent, or other similarly situated registrar after the Voting Record Date shall not be recognized for purposes of voting or receipt of the Plan confirmation materials.

23.     With respect to transfers of Claims filed pursuant to Bankruptcy Rule 3001(e), the transferee shall be entitled to receive a Solicitation Package and, if the holder of such Claim is otherwise entitled to vote with respect to the Plan, cast a Ballot on account of such Claim only if: (a) all actions necessary to transfer such Claim are completed by the Voting Record Date or (b) the transferee files by the Voting Record Date (i) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (ii) a sworn statement of the transferor supporting the validity of the transfer. In the event a Claim is transferred after the Voting Record Date, the transferee of

such Claim shall be bound by any vote or election on the Plan made by the holder of such Claim as of the Voting Record Date.

**E.      Solicitation Deadline and Mailing Deadline for Notice of Combined Hearing and Release Opt-Out Form**

24.      The Solicitation Deadline and the Mailing Deadline are set as **November 16, 2020**.

**F.      Voting Deadline**

25.      To be counted as a vote to accept or reject the Plan, each Ballot must be properly executed, completed, and delivered to the Solicitation Agent: (a) by first-class mail in the return envelope provided with each Ballot; (b) by overnight courier; or (c) by hand delivery so that (in each instance) it is **actually received** by the Solicitation Agent no later than **December 11, 2020 at 4:00 p.m. (prevailing Central Time)** (the "Voting Deadline").

## VOTING AND BALLOTING PROCEDURES

**A.      Claims Amount for Voting Purposes**

26.      <u>Prepetition Secured Claims</u>.  The amount of each Prepetition Secured Claim for voting purposes only will be established by reference to the list of participant lenders to the Prepetition Credit Agreement and those participant lenders' corresponding Prepetition Secured Claim amounts as of the Voting Record Date as reflected on the loan register maintained by the Agent, which shall be provided by the Agent to the Solicitation Agent no later than three (3) Business Days following the Voting Record Date.  The Claim amount listed in the Ballot of any Holder of a Prepetition Secured Claim shall be used for voting purposes only and shall not be binding on the Agent, any Holder of a Prepetition Secured Claim, or any other person and shall not be used for any other purposes (including for purposes of allowance).

27.      <u>Class 4 GUC Claims Arising Under the Indenture</u>.  The amount of each Class 4 GUC Claim that arises under or relates to the Indenture, for voting purposes only, will be

established by reference to the books and records of the applicable Nominee (defined below) as of the Voting Record as evidenced by the securities position report from the Depository Trust Company ("DTC"), which shall be provided to the Solicitation Agent no later than three (3) business days following the Voting Record Date.

28. <u>Other Class 4 GUC Claims.</u> The amount of each Class 4 GUC Claim other than those arising under or relating to the Indenture, for voting purposes only, shall be established pursuant to the following procedures:

a. if a Claim has been estimated or otherwise Allowed for voting purposes by order of this Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by this Court;

b. if (a) does not apply, but the Claim has been estimated or otherwise Allowed for voting purposes pursuant to a stipulation, settlement, or other agreement reached between the Debtors and the holder of the Claim (whether such stipulation, settlement, or agreement is filed or not), such Claim is temporarily Allowed in the amount set forth in the stipulation, settlement, or other agreement;

c. if neither (a) nor (b) applies, then such claim shall be temporarily Allowed in the liquidated, non-contingent, and undisputed amount set forth on a proof of claim timely filed in accordance with Bankruptcy Rule 3002 as of the Voting Record Date, provided that if a Claim is filed for unknown or undetermined amounts, or the amount set forth on a timely-submitted proof of claim is wholly unliquidated, contingent, and/or disputed, (as indicated on the face of the Claim or after a reasonable review of the supporting documentation by the Debtors or the Solicitation Agent) then the Claim shall be temporarily allowed for voting purposes in the amount of $1.00;

d. if neither (a), (b), nor (c) apply, then such claim shall be temporarily Allowed in the liquidated, non-contingent, and undisputed amount set forth on the Debtors' Schedules, and if the Claim appearing on the Debtors' Schedules is unliquidated, contingent, disputed, or in a $0.00 amount, then the Claim shall be disallowed for voting purposes;

e. for purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code separate Claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one Claim against the Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan;

f.    notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class shall be provided with only one Solicitation Package and one ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

g.    if a proof of claim has been amended by a later proof of claim that is filed on or prior to the Voting Record Date, the later filed amending claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier filed claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended claim.  Except as otherwise ordered by the Court, any amendments to proofs of claim after the Voting Record Date shall not be considered for purposes of these tabulation rules.

29.    If any creditor seeks to challenge the allowance of its Claim for voting purposes, such creditor shall file with this Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes in a different amount (a "Rule 3018(a) Motion").  Any Rule 3018(a) Motion must be filed with the Court and served on the Notice Parties so as to be actually received not later than 4:00 p.m. (prevailing Central Time) on **December 7, 2020 at 4:00 p.m. (prevailing Central Time)**.

30.    Upon the filing of any such motion, such creditor's Ballot shall be counted in accordance with the above-designated guidelines, unless temporarily Allowed in a different amount by an order of this Court entered prior to or concurrent with entry of an order confirming the Plan.

31.    If the Debtors have filed an objection to, or a request for estimation of, a Claim on or before **November 23, 2020**, such Claim is temporarily disallowed for voting purposes, except as ordered by the Court before the Voting Deadline; *provided*, *however*, that, if the Debtors' objection seeks only to reclassify or reduce the Allowed amount of such Claim, then such Claim is temporarily Allowed for voting purposes in the reduced amount and/or as reclassified (as

applicable), except as may be ordered by this Court prior to or concurrent with entry of an order confirming the Plan.

**B.     The Form of Ballots**

32.     The Ballots are **APPROVED**.

33.     Except as otherwise set forth herein, all Ballots must be properly executed, completed, and delivered to the Solicitation Agent (a) by first-class mail in the return envelope provided with each Ballot; (b) by overnight courier; or (c) by hand delivery, so that they are actually received by the Solicitation Agent no later than the Voting Deadline.

34.     Master Ballots may be returned by the Nominees to the Solicitation Agent by email at Tabulation@epiqglobal.com.

35.     The Debtors will distribute the following three forms of Ballots to holders of Claims entitled to vote on the Plan in Class 4 (Class 4 GUC Claims): (a) a form of Ballot for a beneficial owner of any Class 4 GUC Claim arising under the Indenture (the "Beneficial Holder" and the corresponding ballot, the "Beneficial Holder Ballot"); (b) a form of Ballot for the bank, broker, or other financial institution that holds the Class 4 GUC Claim arising under the Indenture "in street name" at DTC on behalf of the Beneficial Holder (the "Nominee") (or agent thereof) to transmit the votes of one or more beneficial owners (the "Master Ballot"); and (c) a form of Ballot for the Holders of any Class 4 GUC Claim other than those arising under the Indenture (the "General Class 4 Ballot").

36.     Such Nominees shall, upon receipt of the Solicitation Packages, promptly distribute such Solicitation Packages to Beneficial Holders (including Beneficial Holder Ballots) using one of the following two methods within five business days of receipt of the Solicitation Packages:

        a.     **Master Ballot Method**: The Nominee shall obtain the votes of Beneficial Holders by forwarding to the Beneficial Holders the unsigned Beneficial Holder Ballots, together with the Solicitation Package, a pre-addressed,

postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such Beneficial Holder must then indicate her, his, or its vote on the Beneficial Holder Ballot, complete the information requested on the Beneficial Holder Ballot, review the certifications contained on the Beneficial Holder Ballot, execute the Beneficial Holder Ballot, and return the Beneficial Holder Ballot to the Nominee. After collecting the Beneficial Holder Ballots, the Nominee should, in turn, complete the Master Ballot compiling the votes and other information from the Beneficial Holder Ballots, execute the Master Ballot, and deliver the Master Ballot to the Solicitation Agent so that it is RECEIVED by the Solicitation Agent on or before the Voting Deadline. Each Nominee should advise its Beneficial Holders to return their Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it sufficient time to prepare and return the Master Ballot to the Solicitation Agent so that it is RECEIVED by the Solicitation Agent on or before the Voting Deadline. For the avoidance of doubt, if it is the Nominee's customary practice to transmit the information contained in the Solicitation Package to its Beneficial Holder clients by e-mail or any other method, the Nominee is authorized to follow those customary practices. Moreover, if it is the Nominee's customary practice to collect votes from its Beneficial Holder clients by telephone, e-mail, "voter information form", or otherwise (in lieu of a Beneficial Holder Ballot), the Nominee is authorized the follow those customary practices.

b.  **Pre-Validated Method**: A Nominee may pre-validate a Beneficial Holder Ballot (each, a "Pre-Validated Ballot"), by: (i) signing the applicable Beneficial Holder Ballot, indicating the Nominee participant name and DTC participant number and; (ii) indicating on the Beneficial Holder Ballot the account number of the Beneficial Holder, and amount of the Class 4 GUC Claims held by the Nominee for such Beneficial Holder; and (iii) forwarding such Beneficial Holder Ballot, together with the Disclosure Statement, a preaddressed, postage-paid return envelope addressed to, and provided by, the Solicitation Agent. The Beneficial Holder may then complete the information requested in the Ballot, review the certifications contained in the Ballot, and return the Ballot directly to the Solicitation Agent in the pre-addressed, postage paid envelope included with the Solicitation Package so that it is received by the Solicitation Agent before the Voting Deadline.

## C.   Tabulation Procedures

37.   The following tabulation procedures are **APPROVED**.

38.   **For Votes Cast by (or on Behalf of) Holders of Class 4 GUC Claims Not Arising Under or Related to the Indenture**. The following procedures apply to tabulating Ballots that

are not cast by (or on behalf of) Holders of Holders of Class 4 GUC Claims arising under or related to the Indenture:

a.  whenever a holder of Claims casts more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline shall be deemed to reflect such creditor's or equity security holder's intent, and thus, to supersede any prior Ballot. Following the Voting Deadline, no Ballot may be changed or revoked.

b.  whenever a holder of Claims casts a Ballot that is properly completed, executed and timely returned to the Solicitation Agent, but does not indicate either an acceptance or rejection of the Plan, the Ballot will not be counted.

c.  whenever a holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Solicitation Agent, but indicates both an acceptance and a rejection of the Plan, the Ballot will not be counted.

d.  A holder of Claims shall be deemed to have voted the full amount of its Claim or Interest in each class and shall not be entitled to split its vote within a particular class or between more than one Debtor. Any creditor's Ballot that partially accepts and partially rejects the Plan will not be counted.

e.  whenever a holder of Claims casts multiple Ballots received by the Solicitation Agent on the same day, but which are voted inconsistently, such Ballots will not be counted.

f.  A holder of claims in more than one Class must use separate Ballots for each class of claims.

g.  the following Ballots shall not be counted:

i.   any Ballot received after the Voting Deadline, unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot;

ii.  any Ballot that is illegible or contains insufficient information to permit the identification of the voting party;

iii. any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

iv.  any Ballot cast by a person or entity that is not entitled to vote, even if such individual or entity holds a Claim in a Voting Class;

v.   any unsigned Ballot;

> vi.   any Ballot which the Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code; or

> vii.  any Ballot transmitted to the Solicitation Agent by e-mail or facsimile or other means not specifically approved herein.

39.   **For Votes Cast by (or on Behalf of) Holders of Class 4 GUC Claims Arising Under or Related to the Indenture.**  The following procedures apply to tabulating Ballots cast by (or on behalf of) Holders of the Class 4 GUC Claims arising under or related to the Indenture:

> a.   votes cast by Holders of Class 4 GUC Claims arising under the Indenture through Nominees will be applied to the applicable positions held by such Nominees of Class 4 GUC Claims arising under the Indenture, as applicable, as of the Voting Record Date, as evidenced by the applicable records. Votes submitted by a Nominee or by a Pre-Validated Ballot will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date;

> b.   if conflicting votes or "over-votes" are submitted, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominee;

> c.   if over-votes are not reconciled prior to the preparation of the voting report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and to reject the Plan submitted on the Master Ballot or Pre-Validated Ballot that contained the over-vote, but only to the extent of the Nominee's position, as of the Voting Record Date, of the Class 4 GUC Claims arising under the Indenture;

> d.   each Holder of a Class 4 GUC Claim arising under the Indenture shall have the amount voted adjusted by the Solicitation Agent through the application of a factor as provided by the Debtors' professionals to account for interest and fees that comprise their claim; and

> e.   a single Nominee may complete and deliver to the Solicitation Agent multiple Master Ballots. Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the last-dated valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior dated Master Ballot.

40.   Each holder of Claims that votes to accept or reject the Plan is deemed to have voted the full amount of its Claim therefore.

41. Neither the Debtors nor the Solicitation Agent, nor any other entity have a duty to provide notification of defects or irregularities with respect to delivered Ballots, nor will any party incur liability for failure to provide such notification.

42. The Debtors and/or their Solicitation Agent, as applicable, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots, which determination will be final and binding.

43. The Debtors are authorized to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.

44. The Debtors are further authorized to reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot, either before or after the Voting Deadline, and, provided that any such waivers must be documented in the voting report

45. The Debtors or their Solicitation Agent shall file the Ballot Certification on or before **December 14, 2020**.

## THE COMBINED HEARING, OBJECTION DEADLINE AND RELATED PROCEDURES

### A. The Combined Hearing Date

46. The Combined Hearing on final approval of the Proposed Disclosure Statement and confirmation of the Plan shall be held on **December 16, 2020 at 9:00 a.m. (prevailing Central Time)**, *provided*, *however*, that the Combined Hearing may be adjourned or continued from time to time by the Court or the Debtors without further notice other than adjournments announced in open Court or as indicated in any notice (including any notice of agenda of matters scheduled for hearing) filed by the Debtors with the Court.

47.     The applicable notice periods for final approval of the Proposed Disclosure Statement and confirmation of the Plan under section 2002 of the Bankruptcy Code shall run simultaneously pursuant to section 105(d)(2)(B)(vi) of the Bankruptcy Code, Bankruptcy Rule 9006(c)(1), and section L of the Complex Chapter 11 Procedures.

## B.     Objection Procedures

48.     The deadline to object or respond to final approval of the Proposed Disclosure Statement or confirmation of the Plan shall be **December 11, 2020 at 4:00 p.m. (prevailing Central Time)** (the "Objection Deadline").

49.     Objections and responses, if any, must: (a) be in writing; (b) conform to the applicable Bankruptcy Rules and the Local Rules; (c) set forth the name of the objecting party, the basis for the objection, and the specific grounds thereof; and (d) be filed with the Court, together with proof of service.

50.     Registered users of this Court's case filing system must electronically file their objections and responses on or before the Objection Deadline.  All other parties in interest must file their objections and responses in writing with the United States Bankruptcy Court Clerk's Office, 515 Rusk Avenue, Courtroom 404, 4th Floor, Houston, Texas 77002, on or before the Objection Deadline.

51.     Pursuant to Bankruptcy Rule 3020(b), if no objection is timely filed, this Court may, without receiving evidence on such issues, determine that the Proposed Disclosure Statement contains "adequate information" as required under Bankruptcy Code section 1125(b), and/or that Plan has been proposed in good faith and not by any means forbidden by law.

52.     Objections to confirmation of the Plan that are not timely filed, served, and actually received in the manner set forth above shall not be considered and shall be deemed waived, released, and overruled.

53.     The Debtors and any parties in interest are authorized to file and serve replies or an omnibus reply to any such objections along with a brief in support of confirmation of the Plan (the "Confirmation Brief") either separately or in a single, consolidated document on or before **December 15, 2020 at 4:00 p.m. (prevailing Central Time)**.

**C.     Plan Supplement Procedures**

54.     The Debtors are authorized to file the Plan Supplement with the Bankruptcy Court no later than **December 4, 2020** (the "Plan Supplement Filing Deadline"); *provided that* through the Effective Date, the Debtors shall have the right to amend the documents contained in, and the exhibits to, the Plan Supplement in accordance with the terms of the Plan.

**D.     Notice of Combined Hearing and Release Opt-Out Form**

55.     The Notice of Combined Hearing and Release Opt-Out Form substantially in the form attached hereto as **Exhibit 1** is **APPROVED**.

56.     The form and proposed manner of service of the Notice of Combined Hearing and Release Opt-Out Form comply with all applicable Bankruptcy Rules and Bankruptcy Local Rules, including paragraph 32 of the Complex Chapter 11 Procedures regarding consensual releases against non-debtor parties, and no further notice is necessary.

57.     The Debtors are authorized, but not directed, to give supplemental publication notice of the Combined Hearing no later than 28 days prior to the Combined Hearing, in the *Houston Chronicle* and/or the national edition of *Wall Street Journal*, in a form substantially the same as the notice attached as **Exhibit 8**.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

58.     The form and proposed manner of service of the Plan Assumption Notice comply with all applicable Bankruptcy Rules and Bankruptcy Local Rules, and no further notice is necessary.

59.     The Plan Assumption Notice, in a form substantially similar to that attached as **Exhibit 9**, is **APPROVED**.  The Debtors are authorized to include the Plan Assumption Notice in the Plan Supplement.  The Debtors are further authorized to serve the Plan Assumption Notice on the counterparties to affected Executory Contracts or Unexpired Leases electronically or by first-class mail on the Plan Supplement Filing Deadline.

60.     Objections, if any, to the assumption and/or assumption and assignment of any Executory Contract or Unexpired Lease, or to the Cure Cost associated therewith (a "Contract Objection"), in accordance with the Plan must (a) be filed by **December 14, 2020 at 4:00 p.m. (prevailing Central Time)**; (b) state with specificity the nature of such objection; and (c) comply with the Bankruptcy Rules.

61.     Any Contract Objections not timely filed and served in accordance with the provisions herein shall be deemed waived, released, and overruled, and any party that fails to timely file a Contract Objection shall be deemed to have assented to such assumption and/or assumption and assignment (including the associated Cure Cost relating thereto).

## GENERAL

62.      The Debtors are authorized to make non-substantive changes to the Disclosure Statement, the Plan, the Ballots, and related documents without further order of the Court including, without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages prior to mailing.

63.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

64.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Signed:  November 10, 2020

Marvin Isgur
United States Bankruptcy Judge

**Exhibit D**

**Wind Down Budget**

**Approach Resources Inc.**
Wind-Down Budget
*Amounts in $000's*

| | Proposal | Comments |
|---|---|---|
| Estate Professional Fees | | |
| Thompson Knight | $ 300 | Estimate based on 3-6 month wind-down |
| Alvarez & Marsal | 175 | Estimate based on 3-6 month wind-down |
| V&E | 100 | Estimate based on 3-6 month wind-down |
| Opporture | 50 | Estimate based on 3-6 month wind-down |
| Epiq | 75 | Claims analysis and noticing |
| UST | 65 | |
| KPMG | 65 | Related to outstanding sales tax audit |
| Tax Advisory | 125 | Includes filing of 2019 and 2020 returns |
| | 955 | |
| Other Costs | | |
| IT / Document Preservation Fees | 30 | |
| Sales Tax Audit Reserve | 300 | |
| | 330 | |
| *Indenture Trustee Fees* | *120* | *To be offset against Gifted Amount* |
| *Plan Administrator Fees* | *100* | *Up to $100k, to be offset against Gifted Amount* |
| **Total Estimated Wind-Down Costs** | **$ 1,505** | |

## <u>Exhibit E</u>

**List of Retained Causes of Action**

**Retained Causes of Action**

Pursuant to the *Amended Joint Plan of Liquidation of Approach Resources Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 661] (as amended, modified and/or supplemented, the "Plan"),[1] the Debtors disclosed their intention to preserve certain Causes of Action as Retained Causes of Action in Section 6.03, Section 6.04 and Section 6.10 of the Plan, as set forth below:

## Section 6.03    Retained Causes of Action

All Retained Causes of Action shall vest in the Post-Effective Date Debtors for the benefit of the Holders of Prepetition Secured Claims until the Prepetition Secured Claims are paid in full, and then for the benefit of Holders of Allowed Class 4 GUC Claims.

## Section 6.04    Vesting of Assets in the Post-Effective Date Debtors

On the Effective Date, and except as otherwise set forth herein, the Assets, including, without limitation: (a) Available Cash; (b) the Distribution Reserve Accounts; and (c) all Retained Causes of Action, including the attorney-client privilege related to all Retained Causes of Action, shall vest in each respective Post-Effective Date Debtor pursuant to section 1141(b) of the Bankruptcy Code Free and Clear except for the Liens of the Prepetition Agent as provided in Section 4.02(b).

## Section 6.10    Preservation of Rights of Action; Settlement

Except to the extent such rights, Claims, Causes of Action, defenses, and counterclaims are otherwise disposed of in this Plan, the Asset Purchase Agreement, or are expressly and specifically released in connection with this Plan and/or Confirmation Order, or in any settlement agreement approved by the Bankruptcy Court during the Cases, or in any contract, instrument, release, indenture, or other agreement entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code: any and all rights, Claims, Retained Causes of Action (including Retained Avoidance Actions), defenses, and counterclaims of or accruing to the Debtors or their Estates shall vest in the Post-Effective Date Debtors, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, Claims, Causes of Action, defenses, and counterclaims have been Scheduled, listed or referred to in this Plan, the Bankruptcy Schedules, or any other document Filed with the Bankruptcy Court; and (b) the Post-Effective Date Debtors do not waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, Claim, Cause of Action, defense, or counterclaim that constitutes property of the Estates: (i) whether or not such right, Claim, Cause of Action, defense, or counterclaim has been listed or referred to in this Plan, the Bankruptcy Schedules, the Bankruptcy SOFAs, or any other document Filed with the Bankruptcy Court; (ii) whether or not such right, Claim, Cause of Action, defense, or counterclaim is currently known to any of the Debtors; and (iii) whether or not a defendant in any litigation relating to such right, Claim, Cause of Action, defense, or counterclaim Filed a Proof of Claim in the Cases, Filed a notice of appearance or any other pleading or notice in the Cases, voted for or against this Plan, or received or retained any consideration under this Plan. Without in any manner limiting the generality of the foregoing, notwithstanding any otherwise applicable principle of law or equity, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, Cause of Action, defense, or counterclaim, or potential

---

[1] All capitalized terms used herein but not otherwise defined shall have the meaning ascribed in the Plan.

right, Claim, Cause of Action, defense, or counterclaim, in this Plan, the Bankruptcy Schedules, or any other document Filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Plan Administrator's right (subject to the consent of the Agent) to commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, or counterclaims that any of the Debtors have, or may have, as of the Effective Date.  Subject to the limitations in section 11.02 of this Plan and the Plan Administrator Agreement, and subject to the consent of the Agent, the Plan Administrator may, on behalf of the Post-Effective Date Debtors, commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, and counterclaims that vest in the Post-Effective Date Debtors in its sole discretion, in accordance with what is in the best interests, and for the benefit, of the Creditors.

*[End of Plan Provisions]*

Notwithstanding and without limiting the generality of <u>Section 6.10</u> of the Plan, the Debtors expressly preserve the Causes of Action contained in <u>Schedules 1-7</u> attached to this Exhibit E as Retained Causes of Action.

In addition, pursuant to the *Order Granting Emergency Motion of Debtors' for Entry of an Order (a) Authorizing Consolidated Creditors Lists, and (b) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information* [Dkt. No. 40] (the "<u>Notice Order</u>"), the Debtors prepared a consolidated Creditor Matrix.[2]  In addition to the Causes of Action expressly referenced herein, to the extent not released pursuant to the Plan, the Debtors expressly retain all Causes of Action against any entity listed in the Creditor Matrix, regardless of whether such entity is set forth herein, to the extent such entity or entities owe or may in the future owe money to the Debtors.

**The Debtors reserve the right to modify, supplement, or amend this Exhibit E from time to time in accordance with the Plan.**

*[Remainder of the Page Intentionally Left Blank]*

---

[2] As defined in the Notice Order.

## Schedule 1
## Claims Related to Insurance Policies

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies, occurrence contracts, or surety bonds to which the Debtors are a party or pursuant to which the Debtors have any rights whatsoever. The Causes of Action reserved include Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, occurrence carriers, surety bond issuers, and/or surety bond brokers relating to coverage, indemnity, contribution, reimbursement or any other matters, regardless of whether such Causes of Action is included on this Schedule 1.  Specifically, the Debtors retain all Causes of Action related to the following insurance policies:

| Type of Policy Coverage | Insurance Carrier(s) | Policy Number |
|---|---|---|
| Commercial Umbrella-First Level | Federal Ins. Co. (Chubb Group) | 7986-06-77 |
| Excess Liability-Second Level | Lloyds of London & Cert Unds | 19XS2H12169 |
| Excess Liability-Third Level | Evanston Insurance Co. | MKLV4EFX101209 |
| Excess Liability-Fourth Level | Underwriters at Lloyd's, London | WCIS-EL0000646-02 |
| Excess Liability-Fifth Level | Kinsale Insurance Co. | 1000470562 |
| Cost of Control & Extra Expense | Lloyds of London & Cert Unds. | T19110 |

| Type of Policy Coverage | Insurance Carrier(s) | Policy Number |
|---|---|---|
| TX Work Comp/Employer's Liability | Texas Mutual Ins. Co. | TSF0001192922 |
| D&O Policy | Chubb, Sompo, CNA, AIG, Axis, and Nationwide | Chubb: 8210-9587<br>Sompo: DOX3000844100<br>CNA: 287307489<br>AIG: 02-778-81-64 and 02-781-95-57<br>AXIS: MLN770380/01/2018<br>Nationwide: XMF1800601 |
| Employment Practices Liability | CNA | 596630437 |
| Fiduciary Liability | Sompo | MAP30000844300 |
| Network Security and Privacy (Cyber) Liability | Beazley | W20B68200301 |

**Schedule 2**
**Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation**

Schedule 2 includes entities that are party to or that the Debtors believe may become party to litigation, arbitration or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial. Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action against or related to all entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding, whether formal or informal, judicial or non-judicial, including, without limitation, dealers, creditors, customers, employees, utilities, suppliers, vendors, insurers, sureties, factors, lenders, bondholders, lessors or any other parties, regardless of whether such entity is included in Schedule 2.

1. That certain action titled *Creek Swabbing & Roustabout Services Inc. and David Creek v. Approach Resources Inc. and Bill Halfmann*, Cause No. 5868, 112th Judicial District, Sutton County (Sonora), Texas, filed in May of 2013.

2. That certain action titled *Cressman Tubular Products Corp. v. Approach Resources Inc. & Approach Operating LLC*, Cause No. 017-307519-19, 17th Judicial District Court, Tarrant County Texas, filed in April of 2019.

3. Any and all Claims or Causes of Action of the Debtors against any Person or Entity not specifically identified in this Schedule, that were not expressly released under the terms of the Plan. For the avoidance of doubt, the foregoing does not limit, modify, or otherwise affect in any way the scope of the releases provided by the Debtors under the Plan.

**Schedule 3**
**Claims Related to Accounts Receivable and Accounts Payable**

Unless otherwise released under the Plan, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities, including, but not limited to, Entities that are or were parties to contracts or leases with the Debtors or that owe or that may in the future owe money to the Debtors, regardless of whether such Entity is expressly identified in the Plan, the Plan Supplement, or any amendments thereto.  Furthermore, the Debtors expressly reserve all of their rights with respect to Causes of Action against or related to all Entities who assert or may assert that the Debtors, as applicable, owe money to them.

**Schedule 4**
**Causes of Action Related to Tax Refunds**

Schedule 4 includes Entities that have recently or that currently owe money to the Debtors for or related to taxes paid. Unless otherwise released under the Plan, the Debtors expressly reserve all Causes of Action against or related to all Persons that owe or that may in the future owe money related to tax refunds to the Debtors, the Estates, or the Post-Effective Date Debtors, regardless of whether such Entity is included on Schedule 4. Furthermore, the Debtors expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors, the Estates, or the Post-Effective Date Debtors, owe taxes to them, including all Claims and Causes of Action against the taxing authorities listed in the Debtors' Bankruptcy Schedules, and any amendments thereto, which are available for viewing at https://dm.epiq11.com/case/approachresources/info.

1. The Debtors are currently involved in a sales and use tax audit for the period from January of 2018 through June of 2019 for amounts which have been paid, or may be paid, to the Texas State Comptroller, which may result in the Debtors', their Estates, or the Post-Effective Date Debtors becoming entitled to a tax refund.  The Debtors expressly retain all rights with respect to this sales and use tax audit and any related tax refund.

2. The Debtors are currently involved in a severance tax audit for the period from September 1, 2013 through April 30, 2020 for amounts which have been paid, or may be paid, to the Texas State Comptroller, which may result in the Debtors', their Estates, or the Post-Effective Date Debtors becoming entitled to a tax refund.  The Debtors expressly retain all rights with respect to severance tax audit and any related tax refund.

**Schedule 5**
**Causes of Action Related to Setoff**

Unless otherwise released by the Plan, any and all Causes of Action related to rights of setoff are expressly reserved. After the Effective Date, such setoff may be exercised by the Plan Administrator or the Post-Effective Date Debtors.  The Plan Administrator or the Post-Effective Date Debtors may, but shall not be required to, setoff from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtors, their Estates, or the Post-Effective Date Debtors, may have against the holder of such claim but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, their Estates, or the Post-Effective Date Debtors of any right of setoff or recoupment that any of them have against the holder of any Claim.

### Schedule 6
### Causes of Action Related to Contracts and Leases

Unless otherwise released by the Plan, Causes of Action, based in whole or in part upon any and all contracts and leases to which the Debtors have any rights whatsoever, including, but not limited to, any Executory Contracts or Unexpired Leases not assumed and assigned or rejected under the Plan are expressly reserved.  The Causes of Action reserved include Causes of Action against counterparties to such contracts and leases: (a) for overpayments, back charges, duplicate payments, improper holdbacks, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) for wrongful or improper termination, suspension of services, or failure to meet other contractual or regulatory obligations; (c) for failure to fully perform or to condition performance on additional requirements under contracts with the Debtors before the assumption or rejection, if applicable of such contracts; (d) for payments, deposits, holdbacks, reserves or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor or other party; (e) arising out of environmental or containment exposure matters against landlords, lessors, environmental, consultants, environmental agencies, or suppliers of environmental services or goods; (f) counter-claims and defenses related to any contractual obligations; (g) any turnover actions arising under sections 542 or 543 of the Bankruptcy Code; (h) for breach of contract  or any business tort claims; and (i) any and all indemnification rights.

1. The Debtors previously paid a $250,000.00, refundable bond to the Railroad Commission of Texas.  The Debtors preserve all rights with respect to the return of this bond.